**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

MICHAEL LEWIS WARDLOW,      )
                                       )
               Plaintiff,      )
                                       )
               v.              )       1:22cv416
                                       )
OFFICER REYES, et al.,        )
                                       )
               Defendants.     )

**MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the Court on (i) the "Motion for Leave to File an Amended Complaint" (Docket Entry 43)[1] (the "Amendment Motion") filed by Michael Lewis Wardlow (the "Plaintiff") and (ii) "Defendant Officer Reyes' Motion for Summary Judgment" (Docket Entry 37) (the "Summary Judgment Motion"). For the reasons that follow, the Court (i) will grant in part and deny in part the Amendment Motion and (ii) should grant the Summary Judgment Motion.

**BACKGROUND**

Alleging injuries related to an incident around 11:00 p.m. on November 10, 2020, Plaintiff sued Winston-Salem Police Chief Catrina Thompson,[2] "Officer Reyes," "Officer(s) John Doe," and the

---

1 For legibility reasons, this Opinion omits the word "the" in front of "Plaintiff" and uses standardized spelling and capitalization in all quotations from the parties' materials.

2 Plaintiff originally spelled this defendant's name "Catherine Thompson" (Docket Entry 2 at 1), but, as the Court noted, "the Winston-Salem Police Chief's actual name is Catrina Thompson" (Docket Entry 4 at 1 n.1), a spelling Plaintiff subsequently adopted (see, e.g., Docket Entry 43-1 at 1). [Docket

"City of Winston-Salem" (Docket Entry 2 (the "Complaint") at 1) pursuant to 42 U.S.C. § 1983 and North Carolina law. (See generally Docket Entry 2.) According to the Complaint, Officer John Doe broke Plaintiff's knee during his arrest "after a short foot chase by Officer Reyes" (id. at 14), while "approximately 10-20 additional John Doe officers" (id. at 13) and Officer Reyes failed to intervene to stop the first officer's use of excessive force (see id. at 14). However, per the Complaint, "all names [we]re presently being withheld from Plaintiff" (id. at 13), so "Plaintiff would like to amend his complaint if discovery is allowed to show the other officers['] proper names as Defendants" (id. at 23).

"Because Plaintiff [wa]s a prisoner seeking redress from a governmental entity or officer or employee of a governmental entity, this Court ha[d] an obligation to review [his] Complaint" pursuant to 28 U.S.C. § 1915A. (Docket Entry 4 (the "Screening Order") at 1 (brackets and internal quotation marks omitted).) In conducting that review, the Court concluded that "some portions of the Complaint should be allowed to proceed while other portions fail to state a claim on which relief may be granted." (Id. at 3; see also Docket Entry 12 at 1 (adopting Screening Order and ordering that "[P]laintiff's individual capacity claims against Defendants Reyes and Doe are allowed to proceed but that the

_____

Entry page citations utilize the CM/ECF footer's pagination.]

2

remainder of the claims be and are DISMISSED pursuant to 28 U.S.C. § 1915A for failing to state a claim upon which relief may be granted," except that "[t]he dismissals [we]re without prejudice to [P]laintiff amending his pleadings if he can state proper claims for relief" (all-cap font in original)).) As the Screening Order explained:

> The Complaint names Officer Reyes and Officer John Doe as Defendants in both their individual and official capacities. It alleges that Defendant Reyes arrested Plaintiff after a short foot chase on November 10, 2020. It further claims that while Plaintiff lay face down in a yard with his hands behind his back and Defendant Reyes's knee in his back, Defendant Doe grabbed Plaintiff's ankles, crossed them, and began to bend Plaintiff's legs toward his back while Plaintiff begged and pleaded for him to stop. However, Defendant Doe allegedly continued to apply pressure until one of Plaintiff's knees dislocated. At that point, he released Plaintiff's legs and Plaintiff was handcuffed. Emergency Medical Services were called and later transported Plaintiff to a hospital where he received treatment for the dislocation. He also later had knee surgery. The Complaint raises claims of excessive force and assault and battery against Defendant John Doe and contends that Reyes had the opportunity to intervene before the dislocation of Plaintiff's knee, but did not do so. The[se] . . . allegations do state potential claims for relief against Defendants Reyes and Doe and th[us] the Complaint should go forward as to those Defendants in their individual capacities.
>
> One of the two remaining Defendants in the Complaint is the City of Winston-Salem. Plaintiff's claims against the City of Winston-Salem fail because,
>
> > "[a] municipality cannot be held liable *solely* because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658, 691 (1978) (emphasis in original). "Only in cases where the municipality causes the deprivation 'through an

official policy or custom' will liability attach." Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)). "Because section 1983 was not designed to impose municipal liability under the doctrine of respondeat superior, the 'official policy' requirement was 'intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby to make clear that municipal liability is limited to action for which the municipality is actually responsible.'" Riddick v. School Bd. of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)). "To state a cause of action against a municipality, a section 1983 plaintiff must plead (1) the existence of an official policy or custom; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right." Pettitford v. City of Greensboro, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008).

Roseboro v. Winston-Salem/[Forsyth Cnty. Sch. Bd. of Educ., No. 1:14cv455,] 2014 WL 5304981, at *4 (M.D.N.C. Oct. 15, 2014) (footnote omitted), recommendation adopted, No. 1:14CV455 (M.D.N.C. Dec. 9, 2014). Here, Plaintiff does not successfully plead the existence of any specific policy or practice fairly attributable to the City of Winston-Salem which proximately caused a deprivation of his constitutional rights. The Complaint alleges that it is the policy, practice, or custom of the City to ignore uses of excessive force by its police officers and even to condone such force. However, it does so in an entirely conclusory fashion without citing any specific instances of such behavior or any facts demonstrating that the City ignored or condoned it. It also states in conclusory fashion that Defendants Reyes and Doe acted in accordance with those policies or customs, but again sets out no supporting facts for that conclusion. Therefore, the Complaint states no claim for relief against the City of Winston-Salem. This failure also means that the Complaint states no official capacity claim based on the actions of actions of Defendants Reyes and Doe.

The remaining Defendant listed in the Complaint is Defendant Thompson. It names her in both her individual

4

and official capacities, but does not set out any facts showing personal involvement on her part. Therefore, it fails to state any individual capacity claim. As for the attempted official capacity claim, the Complaint relies on the same type of unsupported and conclusory allegations just discussed in relation to the City and adds similarly conclusory allegations that she failed to properly train or supervise Defendant Reyes and Doe. These allegations fail for the same reasons discussed above. Further, to the extent the Complaint seeks to rely merely on the fact that Defendant Thompson [supervised] those Defendants, theories of *respondeat superior* or liability predicated solely on a defendant's identity as a supervisor do not exist under § 1983. [Ashcroft v.] Iqbal, 556 U.S. [662,] 677 [(2009)]. All of the attempted claims against Defendant Thompson should be dismissed.

(Docket Entry 4 at 3-5 (emphasis and third set of brackets in original).)

The Court (per the undersigned) thereafter established January 19, 2023, as the deadline for moving for leave to amend the pleadings or add parties. (See Text Order dated Nov. 16, 2022 (the "Scheduling Order").) Meanwhile, Plaintiff repeatedly, and unsuccessfully, sought information regarding the identities of the officers involved in the incident on the night of November 10, 2020. (See, e.g., Docket Entry 2 at 8, 26-31; Docket Entry 23 at 2, 4; Docket Entry 28 at 2-5.) In June 2023, pro bono counsel made a limited appearance on Plaintiff's behalf to assist in these endeavors, including by obtaining body camera footage and identification information that Plaintiff had requested. (See Docket Entry 30 at 1; see also Docket Entries 27-28.) On September 7, 2023, pro bono counsel produced to Plaintiff "incident report

#2055751, the names and badge numbers of the officers requested, [and the] use of force policy," and also "reviewed the relevant portions of the body camera footage in person with [Plaintiff]." (Docket Entry 34 at 1-2.)  Having completed his task, pro bono counsel withdrew from representation a few days later.  (See id.; see also Text Order dated Sept. 12, 2023 (granting withdrawal request).)

On October 1, 2023, Plaintiff submitted another application to proceed in forma pauperis and a roughly forty-page pleading regarding this incident, which, inter alia, identified the "John Doe" defendants referenced in the Complaint.  See Wardlow v. Faw, No. 1:23cv850, Docket Entries 1-2 (M.D.N.C. Oct. 4, 2024).  On October 11, 2023, the undersigned recommended dismissal of the new action "without prejudice to Plaintiff moving to file an amended complaint in case 1:22CV416," id., Docket Entry 3 at 2 (M.D.N.C. Oct. 11, 2024), a recommendation that the Court (per Chief United States District Judge Catherine C. Eagles) subsequently adopted, see id., Docket Entry 5 at 1 (M.D.N.C. Nov. 14, 2023).  Meanwhile, on November 5, 2023 (see Docket Entry 43-1 at 12), Plaintiff moved for leave to amend his Complaint (see Docket Entries 43 to 43-2). Officer Reyes opposes the Amendment Motion, primarily on grounds of undue delay.  (See Docket Entry 44 at 1-4.)

In addition, Officer Reyes moved for summary judgment on "Plaintiff's claims asserted against him in this matter."  (Docket

6

Entry 37 at 1; see also Docket Entry 38 at 2 ("[Officer] Reyes in his individual capacity now moves for summary judgment as to all claims brought by Plaintiff against [Officer] Reyes.").) Of particular relevance, Officer Reyes maintains that "the facts show that [he] did not violate Plaintiff's constitutional rights." (Docket Entry 38 at 15.) Plaintiff opposes the Summary Judgment Motion, primarily on the grounds that the video establishes Officer Reyes saw and could have prevented Officer Faw's use of excessive force against Plaintiff. (See Docket Entry 45 at 1-2.)

As relevant to the pending motions, the record reflects the following:

Through his various verified filings (see, e.g., Docket Entry 49 at 4 (verifying proposed amended complaint); Docket Entry 46-1 at 3, 6 (verifying similar assertions)), Plaintiff avers that:

"On November 10, 2020[,] Plaintiff was arrested . . . after a short foot chase by Officer J.M. Reyes." (Docket Entry 43-1 at 3.) "During Plaintiff's arrest while laying face down in the front yard of a Winston-Salem residen[ce,] Officer C.J. Faw grabbed Plaintiff's right leg by the ankle and began striking the outside of Plaintiff's right knee very hard while Officers Reyes, Coppola[,] and Walker restrained Plaintiff." (Id. (citing "exhibit 2").)[3] "Plaintiff at this time was not trying to run and was not

_____

3 The Amended Complaint lacks an "exhibit 2" (see Docket Entries 43-1, 43-2), but from context, Plaintiff appears to reference the body camera footage (see Docket Entry 43-1 at 3-4

7

kicking, flailing or in any other way utilizing his legs and/or feet in a way that would be considered threatening or assaultive to any officer present." (Id.) "Also at this time Plaintiff's pants and underwear were down to the point where his buttocks and genitals were exposed which shows no weapon in the waist area." (Id.) "After Officer 'Faw' finished punching Plaintiff's knee, he then grabbed Plaintiff's right ankle, brace[d] his leg against the outside of Plaintiff's right knee and pulled until he dislocated Plaintiff's knee." (Id. at 3-4.) Additionally:

> At the time Faw is pulling Plaintiff's leg towards him[,] Plaintiff is yelling that he is not resisting and "You gonna break my leg." Plaintiff's hands were behind his back well before the injury yet officers did not cuff him. Prior to this[,] Plaintiff was in fear of being killed by these European officers and repeatedly stated [as] such.

> Officers Reyes, Coppola, Walker, Hollifield, [and] Vanburen[] listened and watched as Officer Faw intentionally applied the extreme and tremendous force that it took to dislocate Plaintiff's knee. They heard Plaintiff's pleas that "Faw was breaking his leg" but decided to drown out these pleas with loud shouts of "stop reaching[,]" "stop resisting[,]" etc. These officers did nothing to intervene to prevent the injury.

> Officer Reyes witnessed Faw apply pressure and dislocate Plaintiff's knee. Reyes wore his camera on a headband around his head[, so] where his head moves the camera moves. The video footage shows Faw breaking Plaintiff's knee therefore Reyes witnessed Faw commit the injury.

---

(citing "exhibit 2" for description of actions and statements during incident); Docket Entry 46-1 at 3 (citing "Exhibit 2 video footage" for similar allegations)). See also Wardlow, Docket Entry 2 at 31 (identifying "BodyCam" as "Exhibit 2").

> Officer Faw continued to bend Plaintiff's knee after
> he dislocated it causing more unbearable pain to
> Plaintiff. Faw could have simply restrained
> Plaintiff['s] legs to the ground by the ankles.

(Id. at 4 (certain internal quotation marks omitted); see also Docket Entry 43-2 at 6 ("Officer Faw sadistically and maliciously dislocated Plaintiff's knee . . . . Reyes, Coppola, Walker[,] and Hollifield restrained Plaintiff in [a] prone position while Faw dislocated Plaintiff's knee. Vanburen watched. No officers intervened." (internal quotation marks omitted)).)

"EMS was called and Officer Merritt reported his findings to EMS as to Plaintiff's injuries. Merritt falsely reported to EMS Personnel that Plaintiff was running from police[,] fell[,] and injured his knee." (Docket Entry 43-1 at 5 (citing "exhibit 6").) "Plaintiff was taken to Baptist Hospital where he was treated for the dislocation of his knee." (Id.) "Plaintiff later received surgery for other related extensive injuries on his knee besides the dislocation." (Id.) Plaintiff also "suffers severe emotional distress in the form of depression and paranoia." (Docket Entry 46-1 at 5.)

For his part, Officer Reyes avers:

On November 11, 2020, Officer Reyes "was a duly sworn police officer and on duty with the Winston-Salem Police Department." (Docket Entry 38-1, ¶ 1.) "Around 12:10 a.m., [Officer Reyes] was conducting routine patrol in" Winston-Salem (id., ¶ 3) and observed

9

a suspected drug transaction involving a gold Cadillac (see id., ¶¶ 3-5). More specifically:

> It was [Officer Reyes's] reasonable suspicion and belief that the operator of this Cadillac was possibly completing a "hand-to-hand" drug transaction when [Officer Reyes] passed by. [Officer Reyes] then drove to the parking lot across from Rubert Bell Park and turned [his] patrol vehicle lights off and waited for the Cadillac to leave. A few seconds later, [Officer Reyes] observed the gold Cadillac approaching the intersection of N. Jackson Avenue and Mount Zion Place. [Officer Reyes] observed the vehicle to have no front head lights on. Shortly after [Officer Reyes] made this observation, [he] drove [his] vehicle out of the parking lot. [Officer Reyes's] body cam video shows [him] pulling out of the parking lot at around the :28 mark in [his] body camera video. The gold Cadillac then made a left onto Mount Zion and [Officer Reyes] attempted to get behind it. As noted above, the time was just after midnight so it was dark outside. This meant that the operator of this car was required to operate the car with its headlights on, per the North Carolina General Statute § 20-129 (a)(1) and (2).

> Once [Officer Reyes] was on Mount Zion Place, the vehicle made a quick right onto N. Graham Avenue. [Officer Reyes] observed the vehicle to be picking up speed due to the distance between [his] vehicle and the suspect vehicle separating. The gold Cadillac then quickly made a left onto Graham Court, where [Officer Reyes] observed the vehicle to be parking left of center, on the north curb line of Graham Court. The Cadillac still had no headlights operational on the vehicle. Due to radio traffic, [Officer Reyes] did not call for a license check but asked communications to show [him] out on a security check in the 1700 block of Graham Court. (At :50 and :56 to 1:02 or so in the video). [Officer Reyes] then activated [his] blue lights to conduct a traffic stop for the observed violation and [he] pulled [his] vehicle behind the Cadillac. This can be seen at approximately the :58 mark of [his] body cam video.

> [Officer Reyes] then observed the driver's side door open, and after a few seconds, the driver exited the vehicle. (1:01 to 1:02). As he exited, [Officer Reyes] observed [the driver] hastily walk towards the building

10

(1715 Graham Court).  (1:01 to 1:02).  [Officer Reyes]
told the driver "Hey, stay in the car."  When he did not
comply, [Officer Reyes] said loudly, "Stay in the car!
Stay out here!"  (1:04 to 1:09).  [Officer Reyes] exited
[his] vehicle.  As [Officer Reyes] was telling the
suspect multiple times to stay in the car, the suspect
went to the door of the building, and seemed to knock on
the door while saying, "Hey bro.  Bro."  (1:05 to 1:10).
[Officer Reyes] believed that the suspect was trying to
get the attention of someone inside the building.

        As [Officer Reyes] walked away from [his] vehicle
and toward the driver, [Officer Reyes] looked to [his]
right to see if there were any more occupants in the
vehicle and saw none.  However, [Officer Reyes] did
observe a white Styrofoam cup containing a substance
[Officer Reyes] believed to be marijuana, placed under
the vehicle, right below the driver's side door where the
driver had just exited.  The cup was still intact and
positioned in a manner that it would have been run over
by the car as it parked.  Based on [his] observation,
[Officer Reyes] believed that the driver had just placed
the Styrofoam cup there when he exited the car.

        [Officer Reyes] was wearing [his] standard patrol
uniform, which features Winston-Salem Police Department
patches on both arms, as well as a Winston-Salem Police
Department badge (448) on the left side of the chest, and
a nameplate displaying "J.M. REYES" on the right side of
the chest.  [Officer Reyes] was driving patrol vehicle
number 1124 that night, which is a White Chevy Caprice
and is equipped with a light bar (blue/red lights) on top
and all applicable police markings on the sides that
distinguish [his] car as a police vehicle.  [Officer
Reyes] was clearly identifiable as a police officer.

        [Officer Reyes] then approached the driver and the
driver turned around and faced [Officer Reyes], and said
something.  (1:11).  [Officer Reyes] said to the suspect,
"Walk over here.  Turn around.  Face away from [Officer
Reyes].  Turn around."  (1:11 to 1:13).  The suspect then
walked away from the door of the building, looked at a
window of the building, and shouted in the direction of
the window, "Hey bruh.  Open the door."  (1:13 to 1:15).
[Officer Reyes] continued to slowly walk toward the
suspect.  [Officer Reyes] said, "Stay over here,"
intending to convey to him to stay outside the building.
The suspect started walking in the direction of the

11

Cadillac. (1:17). [Officer Reyes] told him, "Put your hands on the car." (1:19). The suspect did not comply. Instead, he walked away, with his back to [Officer Reyes], then moved back toward the door of the building. (1:20 to 1:22). [Officer Reyes] then called over [his] radio for "code one back up" due to the driver's resistive behavior and failure to comply with [his] commands. (1:22). "Code one back up" is a term used by Winston-Salem police officers to request immediate assistance from any officer who might be close by.

The suspect again shouted at the building, "Bro." (1:21 to 1:22). [Officer Reyes] then said, "Stay over here. Stay over here. Stay over here." (1:23). At this point, the suspect had his back to [Officer Reyes], walking away. He turned around and said, "For what?" (1:23 to 1:26). [Officer Reyes] said, "Let me see your hands. Let me see your hands." The suspect continued to walk away, and raised both his hands. (1:28). [Officer Reyes] then yelled, "Put your hands on the car. You're being detained." (1:31 to 1:32). The suspect then turned to his right, with his hands still in the air, as if he intended to walk to the Cadillac. (1:32). [Officer Reyes] said something like, "I'm just putting you in cuffs. You're being detained. You're just being detained." (1:33). Then [Officer Reyes] said, "Put your hands on the car." (1:34 to 1:35). The suspect, who at this point was near his car, turned around with his hands up, and said "Don't shoot me, bruh." (1:35). [Officer Reyes] responded, "You're not. Put your hands on the car. Put your hands on the car." (1:35 to 1:36). The suspect, still facing [Officer Reyes] with his hands up, started to yell at the building again, "Hey bruh! Hey bruh! Bruh! Hey bruh! Bruh!" (1:37 to 1:45). [Officer Reyes] believed that the suspect was trying to get the attention of someone in the building.

Based on the driver's behavior, failure to follow [Officer Reyes's] commands, and continued attempts to attract the attention of someone inside the apartment, [Officer Reyes] then attempted to grab [the driver's] right arm and the driver pulled back, clinching his fist and stating, "Don't touch me. Don't touch me, bro." (1:45). From training and experience, [Officer Reyes is] aware that when someone clinches their fists, blades their stance and backs up as the driver was doing, it indicates that the person is getting ready to fight.

12

The driver was physically taller and more muscular than [Officer Reyes], and [Officer Reyes] believed that engaging him physically or going "hands on" at that time was not appropriate. Several factors made [Officer Reyes] believe this, such as the driver clinching his fists, blading his stance and backing up, along with him yelling for someone to come out of the apartment. It seemed clear to [Officer Reyes] that he would fight [Officer Reyes] if [Officer Reyes] tried to engage him at that point. [Officer Reyes] believed that if [Officer Reyes] were to engage the driver and he did fight, and someone from the building came out, [Officer Reyes] would be outnumbered. The suspect starting [sic] walking away, with his hands still lowered. [Officer Reyes] then stated loudly, "Get on the ground. Get on the ground" (1:45 to 1:48), as the driver was walking away with his hands at his sides. (1:47). The suspect continued to yell at the apartment building, "Hey, bruh! Bruh!" (1:48-1:50). The suspect's left hand was out of [Officer Reyes's] sight line, near his left pocket. (1:50). At this time, the suspect was walking away from [Officer Reyes], by the side of the building. He said something that sounded like, "Hey, fuck that bullshit." (1:50). [Officer Reyes] said, "Get on the ground. You're not going." (1:51 to 1:52).

As the driver walked towards the back of the building, he half turned toward [Officer Reyes], and he bladed his stance again to shield the left side of his body from [Officer Reyes's] view as he began to reach his left hand into his front left pocket. (1:52). [Officer Reyes] know[s] through [his] training and experience that it is common for individuals who are involved in the sale of illegal narcotics to be armed with weapons at their disposal. The driver quickly turned around with his left hand still inside his pants pocket. (1:53). It was [Officer Reyes's] belief that the driver was potentially in possession of a weapon that could present a threat to [Officer Reyes]. [Officer Reyes] then drew [his] issued service weapon, which is a Smith and Wesson M&P 9mm handgun and pointed it at the driver stating, "Get your hands out of your pocket." Then [Officer Reyes] repeated, again, louder this time, "Get your hands out of your pocket." (1:54 to 1:55). The suspect said something that sounded like, "Bro. Bro." (1:54 to 1:55).

13

From training and experience [Officer Reyes is] aware that firearms could be concealed in pant pockets and that guns come in all sizes. [Officer Reyes] ha[s] made numerous arrests where suspects had concealed firearms in their pants pockets. This is another reason [Officer Reyes] reasonably believed the driver had a weapon.

The driver then began to jog towards the back of the building, where [Officer Reyes] lost sight of him for a few seconds due to [Officer Reyes] allowing space after [Officer Reyes] observ[ed] the driver's mannerisms up to this point. (1:57 to 2:00). After the suspect was out of [Officer Reyes's] field of vision for a few seconds, [Officer Reyes] could hear him saying, "I ain't running. I ain't running. I ain't running." (2:00 to 2:02). [Officer Reyes] then walked towards the back of the building and observed the driver running around the building. [Officer Reyes] then gave chase and began to give the suspect's description and direction of travel over [his] radio. (2:01 to 2:03).

[Officer Reyes] ran to the back of the building, and [Officer Reyes] saw the suspect ahead of [him]. (2:04 to 2:05). The suspect ran around the corner, heading to his left. [Officer Reyes] followed. (2:07). While [Officer Reyes] was still running after the driver, [Officer Reyes] saw him run towards the vehicle he had been operating. [Officer Reyes] then stated over the radio, "He's going to get in the car." (2:11). However, the driver then continued to run past the car, heading towards New Walkertown Road. (2:13 to 2:15). While [Officer Reyes] was still running after him, [Officer Reyes] stated over the radio that officers who would be shortly arriving at the scene should "block in the Cadillac" and that there was "VCSA under the car." (2:16). "VCSA" is another term Winston-Salem police officers use for illegal narcotics. As [Officer Reyes] continued pursuit, [Officer Reyes] said over the radio, "Black male. Gray shirt. Running toward New Walkertown.["] (2:22 to 2:24).

[Officer Reyes] continued to run after the suspect. The suspect ran across New Walkertown Road, and [Officer Reyes] said over the radio, "Crossing New Walkertown." (2:28). As [Officer Reyes] was running behind him, [Officer Reyes] shouted, "Get on the ground, get on the ground!" (2:34 to 2:35). The driver then ran north on

14

the sidewalk towards Big House Gaines Boulevard. The driver then attempted to cross New Walkertown Road, where he tripped and fell. (2:37-2:41). The driver then attempted to get up and [Officer Reyes] pushed him by the left shoulder to force him onto the grass area of the south curb line of New Walkertown Road. [Officer Reyes] told him, "Stay down! Stay down! Stay down!" and then, "Get on the fucking ground." (2:39 to 2:44).

At that point the suspect was lying on his back, facing [Officer Reyes]. [Officer Reyes] saw the suspect motion as if he was going to place his hands back in both of his pants pockets. (2:42 to 2:44). [Officer Reyes] again took out [his] issued service weapon (Smith and Wesson M&P handgun) and began to yell, "Get your hands out of your pockets!" (2:46). Officer Coppola then arrived and went "hands on" with the driver, grabbing his arms, and [Officer Reyes] holstered [his] service weapon and [Officer Reyes] also went "hands on" with him. (2:41 to 2:51). [Officer Reyes] was aware that other officers had arrived.

The driver continued to resist by failing to follow instructions and was actively trying to pull away as [Officer Reyes] tried to grab [the driver's] right arm. He continued this behavior and would not listen to orders as officers shouted for the suspect to put his hands behind his back. (2:47 to 2:56). The suspect said, "Are ya'll going to kill me?" and "What ya'll going to do, kill me?" (2:47 to 2:55). The suspect also said, "Ya'll don't kill me, bro." (2:58 to 3:00). Officer Coppola then grabbed on to both of the driver's arms, and [Officer Reyes] attempted to turn the driver on his stomach to attempt to get control of his arms and handcuff him. Around this time, [Officer Reyes] observed Officer Faw using hand strikes to the back of the driver's right leg to gain the driver's compliance but the driver still refused to fully roll on his stomach and bring his arms to the back. [Officer Reyes] observed Officer Faw attempting to control the driver's right leg as [Officer Reyes] was trying to finish rolling him over to his stomach for prone handcuffing.

[Officer Reyes] continued to try and roll the driver on his stomach. About the time that the driver was rolled over onto his stomach, [Officer Reyes] heard the driver yell, "Oh shit my knee, you broke my knee." (3:06 to 3:12). The driver was then on his stomach and

15

Officers were able to bring his hands to his back. Officers were then able to handcuff the driver. The driver was identified by an Officer on scene who knew the driver from prior interactions. The driver was identified as [Plaintiff].

Right before the suspect said that his knee was injured, [Officer Reyes] was focused on trying to turn him over on his stomach in order to bring him under control and handcuff him. [Officer Reyes] was not looking at the suspect's leg or knee at the moment of the injury, and [Officer Reyes] did not see the injury occur. [Officer Reyes] do[es] not know how the injury occurred. If, during the encounter with [Plaintiff], [Officer Reyes] had seen or had knowledge of any officer violating [Plaintiff's] constitutional rights, [Officer Reyes] would have attempted to stop the violation. However, [Officer Reyes] did not see, or have knowledge of, any officer violating [Plaintiff's] constitutional rights.

[Officer Reyes] then got up and attempted to broadcast over the radio to make sure someone was out with the gold Cadillac. [Plaintiff] kept yelling that his knee was hurt. [Officer Reyes] then touched the knee and felt his bone to be in an unnatural position. EMS was called to respond emergency traffic [sic]. Sergeant M. Merritt then cut [Plaintiff's] pants in efforts to see if he had a pulse in his foot. Sergeant M. Merritt has prior medical training. EMS responded and began assisting [Plaintiff].

At some point, Officer M. A. VanBuren then handed [Officer Reyes] an orange manila envelope with money which [Plaintiff] had on his person when he was placed under arrest.

After EMS arrived, [Officer Reyes] walked back to the suspect vehicle where Officers with the GCRU (Gun Crime Reduction Unit) were standing near the vehicle. (9:31 to 10:36). Officers with GCRU had conducted a search of the vehicle but requested [Officer Reyes] conduct a more thorough search. Officer C. Marshall located a plastic white cup under the vehicle, right below the driver's side door. The white cup was the same cup [Officer Reyes] observed with marijuana when [Officer Reyes] exited [his] vehicle and walked up to the driver earlier in the investigation. Inside the white plastic cup was a clear sandwich bag with a green flaky substance

16

consistent with marijuana.  It also had the strong smell of marijuana.  [Officer Reyes] know[s] this from training and experience.

(Id., ¶¶ 5-25 (internal paragraph numbering omitted).)  Officer Reyes then searched Plaintiff's car, seizing various items that "relate to the charge of sell and deliver of illegal narcotics" (id., ¶ 33).  (See id., ¶¶ 26-33.)  "[Officer Reyes] was advised that [Plaintiff] had been transported to Baptist Hospital. [Officer Reyes] then went to Beaty training center and verified the illegal narcotics and money."  (Id., ¶ 34.)

Finally, Officer Reyes' body camera footage reflects:

Late at night, Officer Reyes briefly follows Plaintiff's car through a dimly illuminated area, activating his patrol car lights and parking behind Plaintiff's car when it stops at the curb in front of an apparently residential building.  Plaintiff, wearing baggy, low-riding jeans, exits his car and approaches the building, disregarding Officer Reyes's instructions to, inter alia, stay in and return to his car.  With Officer Reyes's flashlight providing most of the illumination, Plaintiff and Officer Reyes interact outside the building for approximately a minute, with Plaintiff repeatedly calling out for his "Bro" and disregarding Officer Reyes's instructions.  After reaching inside the front pocket of his jeans, Plaintiff disappears behind the edge of the building, calling out, "I ain't running."  Officer Reyes follows Plaintiff, radioing a report of Plaintiff's description and flight.  Officer

Reyes chases Plaintiff around the building, through various yards, and across two streets, before catching up to Plaintiff. Although the video does not clearly capture how it happens, it shows that Plaintiff falls, rolls to his feet, and attempts to stand back up as Officer Reyes approaches, yelling at Plaintiff to "stay down." Plaintiff falls back down, rolling onto his back with his pants and underwear falling down his thighs. By the 2:42 mark on the video, Plaintiff lies on his back with his hands at his side while Officer Reyes points a handgun at him and tells him to get on the ground and get his hands out of his pockets. Within seconds, two other officers rush in from Plaintiff's right, grabbing his arms and legs. As Plaintiff repeatedly asks, "Are y'all going to kill me," one of the officers repeatedly orders, "Hands on your back" as they appear to try rolling Plaintiff onto his stomach, rolling him from right to left towards Officer Reyes, who, from the increased proximity of Plaintiff and the other officers in the video footage, has bent or knelt down closer to Plaintiff. By the 2:49 mark, Officer Reyes appears stationed at Plaintiff's left torso, where the video primarily captures Plaintiff's face and the upper body of the officer on the right side of Plaintiff's torso. At the 2:56 mark, the video briefly shows an officer to the left of Officer Reyes grasping Plaintiff's right leg, twisting it towards the officer as they continue rotating Plaintiff to his stomach.

18

A second later, the video again shows the officer at Plaintiff's torso before, at the 3:03 mark, showing the officer holding Plaintiff's leg again. Plaintiff continues to tell the officers not to kill him, while they continue to tell him to put his hands behind his back; between the 3:02 and 3:04 marks, Plaintiff tells the officers to get off him. At the 3:05 mark, roughly the left third of the video shows a portion of the officer to Officer Reyes's left as he kneels atop Plaintiff's leg, while the rest of the video reveals multiple officers around Plaintiff's upper body. One second later, Plaintiff exclaims, "Oh shit, my knee!" The next second, at 3:07, the video again shows the officer at Plaintiff's legs, this time kneeling back beside Plaintiff rather than on top of him, as Plaintiff cries, "you broke it, you broke it." Plaintiff then continues to exclaim, sounding pained and in distress, that the officer broke his knee. At the 3:08 mark, the video shows that officer bending Plaintiff's right knee at a 90 degree angle, before, at the 3:10 mark, bracing that officer's left foot against Plaintiff's lower back. One second later, at the 3:11 mark, the video shows the middle and upper portion of Plaintiff's body, with his pants and underwear still below his buttocks, as he lays on his stomach and officers attempt to restrain his arms, bringing them behind his back. Although difficult to hear properly given overlapping orders from officers for Plaintiff to put his hands behind his back, at around the 3:16

19

mark, Plaintiff says something that sounds like, "Quit bending my knee." By the 3:18 mark, officers have begun handcuffing Plaintiff; at the 3:28 mark, one of the officers shines a flashlight at Plaintiff's hands, as one of the other officers finishes handcuffing him.

Meanwhile, continuing to exclaim that officers broke his knee, Plaintiff implores, "Please bro, you broke my knee," and "Just let my knee go." As Plaintiff continues to request that officers let his knee go, Officer Reyes tells them to stay away from his lower back, to which another officer responds, "That's why I've got him in a leg lock." Throughout this encounter, the video, which remains dark with limited visibility, mainly illuminated by nearby patrol car flashing (red and blue) lights, frequently jolts, suggesting movement by Officer Reyes, and quickly switches vantage points from right to left, suggestive of quick glances around by Officer Reyes, with a primary focus on Plaintiff's upper body. Officer Reyes then stands up, asking about Plaintiff's car, to which one officer responds something to the effect of "GRU has it" and another officer says something like, "Go to the Cadillac." Around this time, Plaintiff again implores, "Let my knee go." Shortly thereafter, around the 3:42 mark, after one of the officers says they are calling EMS, Officer Reyes walks away from Plaintiff, who remains surrounded by other officers, imploring them to "let [his] knee go." After another officer at the 3:56 mark tells

20

Officer Reyes that "they're already there, they're already at the Cadillac," Officer Reyes walks back toward the area where Plaintiff lays, continuing to exclaim about his knee and asking officers to let it go.[4]

At approximately the 4:03 mark, an officer says to search Plaintiff "real quick for weapons," at which point the video shows Plaintiff, from the thighs upwards, lying on his right side with an officer holding his handcuffed arms behind his back. At the 4:08 mark, Plaintiff starts asking the officer holding his arms to pull up his underwear to cover his bottom, which the officer does shortly thereafter. Plaintiff then returns to commenting about his knee, saying that "it hurts so bad" and asking the officers not to grab his knee while they conduct the search. At about the 4:16 mark, the video briefly shows Plaintiff's entire body, with his right leg angulated behind him. An officer asked if someone called EMS, to which Officer Reyes responds "yeah," after which the first officer asks Plaintiff which knee was injured. After Plaintiff identifies his right knee, the officer holding his arms slightly rotates him towards his stomach, at which point Plaintiff yells in

---

4   Because of the lighting and number of officers surrounding Plaintiff, the video does not clearly show Plaintiff's leg between approximately the 3:10 mark and when he lies on his side with his leg outstretched approximately a minute later, as described below. However, at the 3:39 mark, the video shows the sole of Plaintiff's right foot, indicating that his knee remains in a bent position. The video does not clearly reveal when the officer releases Plaintiff's knee from the bent position.

21

pain. Officer Reyes then briefly touches Plaintiff's knee and says, "It is broken," after which the officer holding Plaintiff's hands says something that sounds like, "Did I break his leg?"[5] Another officer asks something about whether Plaintiff tripped or was tackled and Officer Reyes responds, "I don't know. He just ran." Meanwhile, officers tell Plaintiff that EMS was on its way. As other officers deal with Plaintiff, Officer Reyes discusses the preceding events with surrounding officers.

By the 5:44 mark, Officer Merritt has started cutting the right leg of Plaintiff's jeans, telling Plaintiff to lay still, as "your leg is angulated, I want to make sure that you've got a pulse in your leg." After cutting open Plaintiff's pant leg, removing his shoe, and cutting off his sock, Officer Merritt checks Plaintiff's foot for a pulse. At the 7:26 mark, Officer Merritt tells Plaintiff that he has a pulse in his foot and needs to keep his leg still. At approximately the 7:42 mark, an officer says "the ambulance is pulling up right now." By the 8:15 mark, after the ambulance parks, Officer Reyes walks away from the officers surrounding Plaintiff to answer an inquiry over his radio. When Officer Reyes returns to Plaintiff's vicinity around the 9:01 mark,

---

5    Officer Merritt's "Case Supplemental Report" suggests Officer Faw made this statement. (See Docket Entry 43-2 at 25 ("On my arrival, I located several officers standing around Officer C. Faw, who had a black male subject lying face down, slightly tilted to his right side and in handcuffs. The black male subject was screaming in pain and complaining that we (Officers) had broken his knee.").)

EMS had begun examining Plaintiff, telling him not to move until they could bring over their stretcher. As EMS removes their stretcher from the ambulance, Officer Reyes starts walking back to the area where he first encountered Plaintiff. The remainder of the video shows Officer Reyes searching Plaintiff's car and the area where Officer Reyes first encountered Plaintiff, who does not appear again on the video.

**DISCUSSION**

## I. Amendment Motion

After receiving the video footage and requested discovery in September 2023, Plaintiff moved to amend the Complaint, "pursuant to Rule[] 15(a)" of the Federal Rules of Civil Procedure (the "Rules"). (<u>See</u> Docket Entry 43 at 1.) In response, Officer Reyes contends that Plaintiff failed to satisfy Rules 16 and 15(a). (<u>See</u> Docket Entry 44 at 2-4.) Plaintiff disputes this assertion. (<u>See</u> Docket Entry 50 at 1-3.)

### A. Relevant Standards

As the United States Court of Appeals for the Fourth Circuit has explained, "tension" exists between Rule 15(a), which "provides that leave to amend shall be freely given when justice so requires," and Rule 16(b), which "provides that a schedule shall not be modified except upon a showing of good cause and by leave of the district judge." <u>Nourison Rug Corp. v. Parvizian</u>, 535 F.3d 295, 298 (4th Cir. 2008) (internal quotation marks omitted).

23

However, "[g]iven their heavy case loads, district courts require the effective case management tools provided by Rule 16. Therefore, after the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings." Id.; see also Cook v. Howard, 484 F. App'x 805, 814-15 (4th Cir. 2012) (explaining that, after scheduling order deadline, "a party must first demonstrate 'good cause' [under Rule 16(b)(4)] to modify the scheduling order deadlines, before also satisfying the Rule 15(a)(2) standard for amendment"). "'Good cause' requires 'the party seeking relief [to] show that the deadlines cannot reasonably be met despite the party's diligence,'" Cook, 484 F. App'x at 815 (brackets in original), a lesser showing than required under either the "'manifest injustice' or 'substantial hardship' test," Fed. R. Civ. P. 16, advisory comm. notes, 1983 amend., discussion, subdiv. (b).

If a party can establish "good cause" under Rule 16(b)(4), the Court must also consider the Rule 15(a) factors. The Fourth Circuit has "interpreted Rule 15(a) to provide that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). The Fourth Circuit has further explained that "absence of prejudice, though not alone determinative, will normally warrant

24

granting leave to amend." <u>Davis v. Piper Aircraft Corp.</u>, 615 F.2d 606, 613 (4th Cir. 1980). Moreover, "[d]elay alone is an insufficient reason to deny leave to amend." <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 242 (4th Cir. 1999).

Here, however, because of Plaintiff's status as a prisoner seeking relief against government officials (<u>see</u> Docket Entries 43-1, 43-2), the Court also must review the proposed amended complaint for futility, <u>see</u> 28 U.S.C. § 1915A. "Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards." <u>Katyle v. Penn Nat'l Gaming, Inc.</u>, 637 F.3d 462, 471 (4th Cir. 2011). Accordingly, a proposed amendment fails for futility if it could not survive a Rule 12(b)(6) motion to dismiss. <u>See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.</u>, 525 F.3d 370, 376 (4th Cir. 2008).

In reviewing a motion under Rule 12(b)(6), "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." <u>E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.</u>, 637 F.3d 435, 448 (4th Cir. 2011). The Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." <u>Coleman v. Maryland Ct. of App.</u>, 626 F.3d 187, 189 (4th Cir. 2010), <u>aff'd sub nom.</u>, <u>Coleman v. Court of App. of Md.</u>, 566 U.S. 30 (2012). The Court must also "draw all reasonable inferences in favor of the plaintiff." <u>E.I. du Pont</u>, 637 F.3d at 440 (internal

25

quotation marks omitted). Moreover, a pro se complaint must "be liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks omitted); but see Giarratano v. Johnson, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (explaining that the Fourth Circuit has "not read Erickson to undermine [the] requirement that a pleading contain more than labels and conclusions" (internal quotation marks omitted)).

Nevertheless, the Court "will not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc., 707 F.3d 451, 455 (4th Cir. 2013) (internal quotation marks omitted). "Nor must [the Court] accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks omitted). The Court can also "put aside any naked assertions devoid of further factual enhancement." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015), as amended on reh'g in part (Oct. 29, 2015) (internal quotation marks omitted).

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To qualify as

26

plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. Id. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Moreover, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint" cannot "survive a Rule 12(b)(6) motion." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009). "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 556 U.S. at 679).

**B. Analysis**

Officer Reyes opposes the Amendment Motion on the interrelated grounds that Plaintiff failed to establish "good cause" and unduly delayed in filing the Amendment Motion. (See generally Docket

27

Entry 44.) However, the record establishes Plaintiff's diligent attempts to secure the information needed to pursue his proposed amended claims, which efforts commenced before he filed this action, remained ongoing prior to issuance of the Scheduling Order, and continued throughout the discovery period. (See, e.g., Docket Entry 2 at 8, 26-31; Docket Entry 14 at 1; Docket Entry 23 at 2, 4; Docket Entry 28 at 2-5.) As detailed above, the record further establishes that Plaintiff promptly sought to pursue his amended claims, albeit originally under the mistaken impression that he needed to initiate a new lawsuit for those matters. (See, e.g., Docket Entry 50 at 1-3.) Thus, Plaintiff has established good cause for his requested amendment. In addition, although Officer Reyes does not contend otherwise (see Docket Entry 44), it bears noting that amending the Complaint under the circumstances of this case presents no prejudice to Officer Reyes, as the proposed Amended Complaint pursues the same claims against Officer Reyes as the Complaint (compare Docket Entry 2 at 5, 12-17, 20-21, with Docket Entry 43-1 at 1-6, 10-11, and Docket Entry 43-2 at 6, 8), rendering the Summary Judgment Motion equally applicable to the Amended Complaint.

Nonetheless, certain of Plaintiff's proposed amended claims fail for futility. As with the Complaint (see Docket Entry 2 at 16-21), the Amended Complaint asserts claims for excessive force, assault and battery, and intentional infliction of emotional

distress against various police officers in their individual and official capacities (see Docket Entry 43-1 at 6, 10-11; Docket Entry 43-2 at 2-4 (selecting "individual capacity" and "official capacity" as nature of suit against officers)) and an official-capacity fourteenth-amendment claim against Chief Thompson and the City of Winston-Salem (collectively, the "Government Defendants")[6] (see Docket Entry 43-1 at 7-9; Docket Entry 43-2 at 5 (selecting only "official capacity" as nature of suit against Government Defendants)). For the reasons discussed below, the Court will grant Plaintiff leave to amend his Complaint to pursue only his individual-capacity fourth-amendment excessive force, assault and battery, and intentional infliction of emotional distress claims

---

[6]    The Amended Complaint captions this claim as against "[Chief] Thompson and the City of Winston-Salem" (Docket Entry 43-1 at 7), but also identifies the Winston-Salem Police Department as a defendant (see id. at 1, 9; see also Docket Entry 43-2 at 5) and, as part of its claim against Government Defendants, contends that the Winston-Salem Police Department bears responsibility for Plaintiff's alleged injuries (see id. at 9 ("As a direct result of the acts of [Chief] Thompson and the City of Winston-Salem and the Winston-Salem Police Department[,] Plaintiff suffered substantial physical injuries, pain and mental anguish in connection with the deprivation of his constitutional rights guaranteed by the Fourteenth Amendment to the Constitution of the United States of America and protected by 42 U.S.C. § 1983.")).    "Under North Carolina law, a police department is merely a component part of a municipality and not a separate entity that can sue or be sued." Anderson v. Winston-Salem Police Dep't, No. 1:20cv596, 2020 WL 6490998, at *2 (M.D.N.C. Oct. 22, 2020), report and recommendation adopted, No. 1:20cv596, 2020 WL 6488089 (M.D.N.C. Nov. 4, 2020). Therefore, any claim that Plaintiff pursues against the Winston-Salem Police Department fails as a matter of law.

29

against Officers Coppola, Faw, Hollifield, Reyes, Vanburen, and Walker (collectively, the "Arresting Officers").

### i. Individual-Capacity Claims Against Arresting Officers

As detailed above, the Amended Complaint asserts that, in the course of Plaintiff's arrest, Officer Faw used excessive force against Plaintiff, breaking and then restraining his leg in a manner that unnecessarily caused Plaintiff increased pain. (See Docket Entry 43-1 at 3-4.) It further asserts that "Officers Reyes, Coppola, Walker, Hollifield, [and] Vanburen[] listened and watched as Officer Faw intentionally applied the extreme and tremendous force that it took to dislocate Plaintiff's knee," disregarding his "pleas that 'Faw was breaking his leg'" and instead "drown[ing] out these pleas with loud shouts of 'stop reaching[,]' 'stop resisting[,'] etc. These officers did nothing to intervene to prevent the injury." (Id. at 4.) Per the Amended Complaint, this conduct violated Plaintiff's constitutional rights and renders Arresting Officers liable for assault and battery and intentional infliction of emotional distress under North Carolina law. (See id. at 6, 10-11.)

As a preliminary matter, Plaintiff asserts that Arresting Officers' actions violated his rights under the Fourth, Eighth, and Fourteenth Amendments. (See id. at 1, 6.) As the United States Supreme Court has explained, however:

> Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen,

30

it is most properly characterized as one invoking the
protections of the Fourth Amendment, which guarantees citizens
the right "to be secure in their persons . . . against
unreasonable . . . seizures" of the person.

Graham v. Connor, 490 U.S. 386, 394 (1989) (ellipses in original).
Thus, "*all* claims that law enforcement officers have used excessive
force — deadly or not — in the course of an arrest, investigatory
stop, or other 'seizure' of a free citizen should be analyzed under
the Fourth Amendment and its 'reasonableness' standard." Id. at
395 (emphasis in original). Accordingly, Plaintiff may only pursue
his Section 1983 excessive force claim under the Fourth Amendment.[7]

"Determining whether the force used to effect a particular
seizure is 'reasonable' under the Fourth Amendment requires a
careful balancing of 'the nature and quality of the intrusion on
the individual's Fourth Amendment interests' against the
countervailing governmental interests at stake." Id. at 396
(certain internal quotation marks omitted). Notably, though, "the
right to make an arrest or investigatory stop necessarily carries
with it the right to use some degree of physical coercion or threat
thereof to effect it." Id.

Although an objective test, see id. at 397, the Fourth
Amendment's reasonableness standard "is not capable of precise

---

7  "Section 1983 authorizes a plaintiff to sue for an alleged
deprivation of a federal constitutional right by an official acting
'under color of' state law." Williamson v. Stirling, 912 F.3d 154,
171 (4th Cir. 2018).

31

definition or mechanical application." Id. at 396 (internal quotation marks omitted). Instead,

> its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Id. The Court conducts this inquiry "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," id., recognizing "that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation," id. at 397. Ultimately, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id.

In addition, "[t]o establish personal liability under § 1983, . . . the plaintiff must affirmatively show that the official charged acted personally in the deprivation of the plaintiff's rights. That is, the official's own individual actions must have violated the Constitution." Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018) (brackets, citation, and internal quotation marks omitted); see also id. (explaining that "mere knowledge of such a deprivation does not suffice"). As a general matter, however, "an officer possesses an affirmative duty to intervene to

32

protect the constitutional rights of citizens from infringement by other law enforcement officers." <u>Randall v. Prince George's Cnty.</u>, 302 F.3d 188, 203 (4th Cir. 2002) (internal quotation marks omitted). "Therefore, an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." <u>Id.</u> at 204 (footnote omitted). "The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." <u>Id.</u> at 204 n.24. Notably, though, "[i]f the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible." <u>Id.</u>

As with the Complaint, the Amended Complaint plausibly alleges that Arresting Officers violated Plaintiff's fourth-amendment rights in connection with Officer Faw's alleged use of excessive force against Plaintiff. (<u>See</u> Docket Entry 4 at 3.) Thus, Plaintiff may proceed on his individual-capacity fourth-amendment excessive force claim against Arresting Officers. For present purposes, as explained below, that conclusion controls the treatment of Plaintiff's assault and battery and intentional

33

infliction of emotional distress claims against Arresting Officers.[8]

Under North Carolina law, an individual may pursue "a civil action for damages for assault and battery . . . against one who, for the accomplishment of a legitimate purpose, such as justifiable arrest, uses force which is excessive under the given circumstances." Myrick v. Cooley, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496 (1988) (citing 6 Am. Jur. 2d Assault and Battery § 122 (1963)). "Under the common law, a law enforcement officer has the right, in making an arrest and securing control of an offender, to use only such force as may be reasonably necessary to overcome any resistance and properly discharge his duties." Id., 371 S.E.2d at 496. Accordingly, "[h]e may not act maliciously in the wanton abuse of his authority or use unnecessary and excessive force." Id., 371 S.E.2d at 496 (internal quotation marks omitted); see also N.C. Gen. Stat. § 15A-401 (specifying circumstances under which "a law-enforcement officer is justified in using force upon another person" and noting that "[n]othing in this subdivision constitutes justification for willful, malicious or criminally negligent conduct by any person which injures or endangers any

_____

8 Because Plaintiff's state-law claims "derive from a common nucleus of operative fact" with his federal claim, such that he "would ordinarily be expected to try them all in one judicial proceeding," this Court may properly exercise supplemental jurisdiction over those claims. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966); see also 28 U.S.C. § 1367(a).

Case 1:22-cv-00416-CCE-LPA   Document 52   Filed 05/01/24   Page 34 of 58

person or property, nor shall it be construed to excuse or justify the use of unreasonable or excessive force"). In addition, "'[c]ivil liability for an assault and battery is not limited to the direct perpetrator of the act charged; it extends to any person who by any means encourages or incites that act or aids and abets it.'" Toone v. Adams, 262 N.C. 403, 409, 137 S.E.2d 132, 136 (1964) (quoting 6 Am. Jur. 2d Assault and Battery § 128).

Importantly, "[t]he threshold for determining whether the limits of privileged force have been exceeded for purposes of liability under Section 1983 is higher than that for a normal tort action." Myrick, 91 N.C. App. at 215, 371 S.E.2d at 496. Thus, "[w]here a plaintiff brings both a § 1983 excessive force claim and a common law claim for assault and battery, the court's determination of the reasonableness of the force used with respect to the § 1983 claim controls its assault and battery analysis," 6 Am. Jur. 2d Assault and Battery § 96 (2024). See Main v. Wingler, No. 5:22cv157, 2024 WL 871384, at *9 (W.D.N.C. Feb. 29, 2024) ("The Fourth Circuit has recognized that[] 'the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence.'"); Morgan v. City of Charlotte, No. 3:22cv3, 2023 WL 4002524, at *15 (W.D.N.C. June 14, 2023) (observing that plaintiff's North Carolina "battery claim[] . . . rises and falls with the excessive force claim"), appeal filed, No. 23-1748 (4th Cir. July 13, 2023); see also Hensley on

35

behalf of N.C. v. Price, 876 F.3d 573, 586-87 (4th Cir. 2017) (explaining that, where Section 1983 fourth-amendment excessive force claim survived summary judgment, "plaintiffs' [North Carolina arrest-related] assault claim could proceed as a matter of law"). Because the Amended Complaint plausibly alleges a fourth-amendment excessive force claim against Arresting Officers, the Court will allow Plaintiff to proceed on his assault and battery claim against them. See Morgan, 2023 WL 4002524, at *16 ("In excessive force cases, a 'parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well' (or does not) if the federal claim survives . . . ." (quoting Rowland v. Perry, 41 F.3d at 167, 174 (4th Cir. 1994))); see also Ellis v. Masscegee, No. 3:21cv271, 2022 WL 20872, at *4 (W.D.N.C. Jan. 3, 2022) (exercising supplemental jurisdiction over assault and battery claim "involv[ing] the same incidents as the excessive force and failure to intervene claims that have passed initial review").[9]

As for Plaintiff's intentional infliction of emotional distress claims, that tort "consists of: (1) extreme and outrageous conduct, (2) which is intended to cause and does cause

---

9 Technically, under North Carolina law, "[a]n assault is an offer to show violence to another without striking him, and a battery is the carrying of the threat into effect by the infliction of a blow." Dickens v. Puryear, 302 N.C. 437, 444, 276 S.E.2d 325, 330 (1981). Thus, Plaintiff's "assault and battery" (Docket Entry 43-1 at 10) claim more properly constitutes a claim for battery than for assault.

(3) severe emotional distress to another.  The tort may also exist where defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress." Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). "Extreme and outrageous conduct is defined as conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Clark v. Clark, 280 N.C. App. 403, 414, 867 S.E.2d 704, 715 (2021) (internal quotation marks omitted).  Procedurally,

> [t]he initial determination of whether conduct is extreme and outrageous is a question of law for the court:  If the court determines that it may reasonably be so regarded, then it is for the jury to decide whether, under the facts of a particular case, defendants' conduct was in fact extreme and outrageous.

Norton v. Scotland Mem'l Hosp., Inc., 250 N.C. App. 392, 398, 793 S.E.2d 703, 708 (2016) (brackets, ellipsis, and internal quotation marks omitted).

An assault and/or battery "may amount to extreme and outrageous conduct which is intended to cause and which does cause severe emotional distress," thereby also satisfying the elements of an intentional infliction of emotional distress claim. Holloway v. Wachovia Bank & Tr. Co., 339 N.C. 338, 354, 452 S.E.2d 233, 242 (1994).  In turn, "[t]he severe emotional distress required for intentional infliction of emotional distress is 'any emotional or mental disorder, such as for example, neurosis, psychosis, chronic

37

depression, phobia, or any other type of severe or disabling
emotional or mental condition which may be generally recognized and
diagnosed by professionals trained to do so.'" Ellis, 2022 WL
20872, at *4.

Here, Plaintiff asserts that, despite his non-resistence and
pleas, Officer Faw deliberately broke Plaintiff's knee, causing him
permanent injury, and then held it in such a position as to
increase Plaintiff's pain, as well as that the remaining Arresting
Officers "listened and watched" (Docket Entry 43-1 at 4) Officer
Faw's actions without intervening to stop Plaintiff's injury. (See
id. at 3-4.) Plaintiff further alleges that he "suffers severe
emotional distress in the form of depression and paranoia" as a
consequence of these actions. (Docket Entry 46-1 at 5.) At this
stage in the proceedings, these allegations suffice to plausibly
assert an intentional infliction of emotional distress claim. See
Clark, 280 N.C. App. at 414-15, 867 S.E.2d at 715 (finding
plaintiff satisfied severe emotional distress element where she
"'cried hysterically, hyperventilated, and sought out a counselor
at a local clinic'" for anxiety); Russ v. Causey, 732 F. Supp. 2d
589, 606 (E.D.N.C. 2010) (finding "claims of depression, anxiety,
insomnia, and phobia of law enforcement officers" satisfied severe
emotional distress requirement), aff'd in relevant part, 468 F.
App'x 267 (4th Cir. 2012); Pruett v. Town of Spindale, 162 F. Supp.
2d 442, 447 (W.D.N.C. 2001) ("Plaintiff's allegations that

38

excessive force was used in his arrest and that he was beaten in such a manner as to cause permanent physical damage is an allegation that would satisfy the first element [of an intentional infliction of emotional distress claim.]").

### ii. Individual-Capacity Claim Against Officer Merritt

Conversely, the Amended Complaint fails to plausibly allege an intentional infliction of emotional distress claim against Officer Merritt. Citing "exhibit 6," the Amended Complaint asserts that Officer Merritt falsely reported to EMS that Plaintiff incurred his injury when he fell as he "was running from police." (Docket Entry 43-1 at 5.) The Amended Complaint further asserts that "[Officer] Merritt acted individually and in concert with [Arresting Officers] by giving false information to EMS personnel as to how Plaintiff obtained [his] injuries," thereby inflicting severe emotional distress upon Plaintiff. (Id. at 11.)

As a preliminary matter, "exhibit 6" does not support Plaintiff's assertion that Officer Merritt told EMS that Plaintiff injured himself while running from police. (See Docket Entry 43-2 at 24-31.) Exhibit 6 contains Officer Merritt's typewritten "Case Supplemental Report" and certain medical records. (See id.) As relevant here, Officer Merritt's "Case Supplemental Report" states that, upon arriving to find Plaintiff already injured and noticing that Plaintiff's "right leg at the knee appeared to be angulated," Officer Merritt "asked for a pair of scissors in order to cut the

39

pants leg of [Plaintiff] to view any injury and check for a distal pulse in his foot to ensure that circulation was not compromised."

(Id. at 25.)  After another officer provided scissors:

> [Officer Merritt] cut [Plaintiff's] pants along the inseam of the right leg to expose his injury.  Upon doing this [Officer Merritt] noted that [Plaintiff] had a medial dislocation of the right knee.  [Officer Merritt] then checked the dorsalis pedis pulse, which is located on the top of the foot.  This pulse would be the most distal pulse and if present would indicate that there was no circulatory compromised.  [Plaintiff] had a strong dorsalis pedis pulse present, and the foot was warm to touch with normal color.
>
> Once [Officer Merritt] completed this[, Officer Merritt] asked [Plaintiff] not to move his leg as this could compromise his circulation.  EMS arrived on scene and [Officer Merritt] provided them with [his] findings. They assumed care and transported [Plaintiff] to Baptist Medical Center with Officer Pringle accompanying them in the back of the unit.
>
> No other action was taken by [Officer Merritt] in this case.

(Id. (emphasis in original).)[10]

Next, in the "Injury" category under the "Clinical Impression" section, the EMS records state, "Falls — Fall, Unspecified — 3 ft — Street or Highway — 11/11/2020."  (Id. at 26.)  In the "Narrative" section, the EMS records provide:

> [Arrived to find] 44 [year old male] laying prone in the grass on the side of the road.  Pt was in handcuffs and PD stated that he fell while they were chasing him.  Pt had a deformity to the right knee and kept saying that he need[ed] to roll over.  He denied any other injury or

---

10  The Amended Complaint underscores, in ink pen, the phrase "I provided them with my findings," which contains no typewritten emphasis.  (Id. (emphasis omitted).)

> pain other than in the knee. . . . Pt did have pedal
> pulses in his right foot before we rolled him and
> after. . . . Pt finally told us that he had been running
> and he slipped and fell on the wet grass and hurt his
> leg.

(Id. at 28 (emphasis in original).)[11] Finally, the hospital medical records provide, in relevant part, the following history of present illness: "[Plaintiff] is a 44 [year old] male, who suffered a R[ight] knee dislocation after running from the cop[s]. Brief details of the history include: the patient was running from the cops for unknown reason, fell, and sustained an injury to the right knee." (Id. at 30.)

Put simply, nothing in the cited exhibit suggests that Officer Merritt, rather than another police officer, falsely told EMS that Plaintiff incurred his injury by falling when running from police. Given the context, Officer Merritt's statement that he "provided [EMS] with [his] findings" could easily (and at least as likely) refer to his "findings" about Plaintiff's pulse and medial dislocation. (Id. at 25 (emphasis omitted).) Therefore, to the extent the Amended Complaint relies on Exhibit 6 for its assertion regarding Officer Merritt's statement, it at best raises the mere possibility of misconduct, thereby failing to assert a viable claim, see Francis, 588 F.3d at 193.

_____

11    As with the Case Supplemental Report, the Amended Complaint contains handwritten underlining of the phrase "PD stated that he fell while they were chasing him." (Id. (emphasis omitted).)

More importantly, the Amended Complaint provides no factual basis for its conclusory assertion that Officer Merritt made this alleged false statement "in concert with defendants." (Docket Entry 43-1 at 11.) Moreover, under the circumstances (including that EMS records reflect Plaintiff reported the same (see Docket Entry 43-2 at 28)), erroneously reporting to EMS that Plaintiff incurred his injury by falling when running from police does not constitute "[e]xtreme and outrageous conduct," Norton, 250 N.C. App. at 397, 793 S.E.2d at 708. See id. at 398, 793 S.E.2d at 708 (explaining that North Carolina "courts have set a high threshold for finding that conduct meets the standard" (internal quotation marks omitted)); see also Clark, 280 N.C. App. at 414, 867 S.E.2d at 715 (explaining that extreme and outrageous conduct "go[es] beyond all possible bounds of decency, and [qualifies] as atrocious, and utterly intolerable in a civilized community" (internal quotation marks omitted)). Nor does the Amended Complaint plausibly assert that Officer Merritt made the alleged statements because he "desire[d] to inflict severe emotional distress or kn[ew] that such distress [wa]s certain, or substantially certain, to result from his conduct or [that] he act[ed] recklessly in deliberate disregard of a high degree of probability that the [emotional] distress will follow and the mental distress does in fact result," Norton, 250 N.C. App. at 398, 793 S.E.2d at 708 (emphasis and internal quotation marks omitted).

42

For these reasons, the Amended Complaint fails to plead a viable intentional infliction of emotional distress claim against Officer Merritt, rendering such claim futile under Rule 15(a).  <u>See</u> <u>Katyle</u>, 637 F.3d at 471.

### iii. Official-Capacity Claims

The Amended Complaint also asserts official-capacity claims against Arresting Officers, Officer Merritt, and Government Defendants.  (<u>See</u> Docket Entry 43-1 at 7-9; Docket Entry 43-2 at 2-5.)  Those claims fail as a matter of law.

Under Section 1983, official-capacity liability occurs only if "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  <u>Collins v. City</u> <u>of Harker Heights</u>, 503 U.S. 115, 121 (1992) (internal quotation marks omitted).  Relevant here, "an official's discretionary acts, exercised in carrying out official duties, do not necessarily represent official policy."  <u>Perdue v. Harrison</u>, No. 1:17cv403, 2017 WL 4804363, at *2 (M.D.N.C. Oct. 24, 2017).  "Rather, the official must have 'final authority' over government policy with respect to the action in question to trigger official capacity liability."  <u>Id.</u> (certain internal quotation marks omitted).  Thus, to plead a viable official-capacity claim against a municipality, such as the City of Winston-Salem, "a Section 1983 plaintiff must plead (1) the existence of an official policy or custom; (2) that

43

the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right." Anderson v. Winston-Salem Police Dep't, No. 1:20cv596, 2020 WL 6490998, at *2 (M.D.N.C. Oct. 22, 2020) (internal quotation marks omitted), report and recommendation adopted, No. 1:20cv596, 2020 WL 6488089 (M.D.N.C. Nov. 4, 2020). In addition, "[t]heories of *respondeat superior* or predicated solely on a defendant's identity as a supervisor do not exist under § 1983." Id. at *3 (citing Iqbal, 556 U.S. at 677).

The Amended Complaint makes a number of bare assertions, without any factual development, regarding Chief Thompson and/or the City of Winston-Salem's alleged policies and failures, including regarding training, supervision, officer discipline, and handling excessive force matters, both in connection with Arresting Officers and otherwise. (See, e.g., Docket Entry 43-1 at 7-9.) These undeveloped, conclusory allegations do not support a viable claim. See, e.g., Iqbal, 556 U.S. at 678; SD3, 801 F.3d at 422. The Amended Complaint further asserts that the hold that Officer Faw "intentional[ly]" and "malicious[ly]" used on Plaintiff "is not used or practiced by [Winston-Salem Police Department (the "WSPD")] officers." (Docket Entry 43-1 at 8.) Officer Faw's alleged use of an unsanctioned hold cannot, by itself, support an official-capacity claim. See Collins, 503 U.S. at 121; Perdue, 2017 WL 4804363, at *2.

44

The Amended Complaint also (baldly) asserts that Arresting Officers and Officer Merritt "were acting pursuant to the official policy, practice[,] or custom of the City of Winston-Salem and the [WSPD] as said Policy relates to the use of force." (Docket Entry 43-1 at 7 (citing "exhibit 3").) It then asserts that Chief Thompson approved and/or ratified the WSPD's policies regarding use of force, which allegedly caused Plaintiff injury "[b]ecause the policy lacked the duty for officers to intervene when excessive force was being used against citizens." (Id. at 9.) Construed liberally, the Amended Complaint additionally asserts that Government Defendants failed to properly train Arresting Officers and Officer Merritt on their duty to refrain from assaulting or otherwise using excessive force against citizens, "their duty to intervene when excessive force is being inflicted[,] and their duty to properly and honestly report incidents of excessive force." (Id. at 8.) According to the Amended Complaint, "[t]he reporting of the incident was also non-existent, except through 'Faw[,]' out of six official statements by the defendants 'None' 'See' the injury take place." (Id. at 9.)

Contrary to Plaintiff's assertions, the policy excerpts at Exhibit 3 to the Amended Complaint reflect that the WSPD does prohibit the use of excessive force by its officers and does require other officers to intervene, where possible, in excessive force situations. (See Docket Entry 43-2 at 16-19

45

(containing excerpts from General Order 1.27, governing "Use of Force").)  The provided "Use of Force" excerpts state that "[t]he purpose of th[e] policy is to establish guidelines for officers of the [WSPD] as to the use of force, including deadly force, as allowed by applicable law.  Applicable law includes, but is not limited to, N.C.[ Gen. Stat.] §15A-401(d), 'Use of Force in Arrest' . . . ."  (Docket Entry 43-2 at 16, 18.)  The referenced North Carolina statute explicitly specifies that "[n]othing in th[e relevant "Use of Force in Arrest" subsection] constitutes justification for willful, malicious or criminally negligent conduct by any person which injures or endangers any person or property, nor shall it be construed to excuse or justify the use of unreasonable or excessive force."  N.C. Gen. Stat. § 15A-401(d).

The provided WSPD policy excerpts also contain a subsection entitled "Duty to Intervene and Report Use of Force Incidents," which provides:

> **According to N.C.[ Gen. Stat.] §15A-401(d1):**
>
> A law enforcement officer, while in the line of duty, who observes another law enforcement officer use force against another person that they [sic] reasonably believes exceeds the amount of force authorized by subsection (d) of this section [(i.e., the "Use of Force in Arrest" subsection)] and who possesses a reasonable opportunity to intervene, shall, if it is safe to do so, attempt to intervene to prevent the use of excessive force.
>
> A. Employees shall make notification as soon as it is safe to do so after the incident, but no later than the end of their tour of duty, to their supervisor or on duty field commander of an allegation of use of force that

46

exceeds what is authorized by **N.C.[ Gen. Stat.] §15A-401(d) or General Order 1.27.**

B. Supervisors should refer to the Professional Standards of Conduct, Section IX, Duty to Intervene Notification, regarding responsibilities for reporting an allegation of this nature.

(Docket Entry 43-2 at 19 (emphasis in original).) The excerpts also include provisions detailing supervisors' responsibilities in use of force situations (see id. at 17, 19), which include "ensur[ing that] the involved officer(s) completes an Incident Report" and interviewing witnesses and the person subjected to the use of force (id. at 17).

Because the provided policy excerpts fatally undermine Plaintiff's allegations, his policy-related official-capacity claims against Government Defendants fail for futility. See Veney, 293 F.3d at 730 (explaining that courts need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit"). In addition, the Amended Complaint's assertion that "[t]he reporting of the incident was also non-existent" (Docket Entry 43-1 at 9), does not support an official-capacity claim, for, by itself, the failure to comply with an official policy does not create official-capacity liability for any of the defendants. Moreover, any post-incident failure to properly document the incident would not cause Plaintiff's injury, a failure that independently undermines any official-capacity claim on this point. See, e.g., Wong v. Guilford Cnty. Sheriff Dep't, No.

47

1:23cv223, 2024 WL 85548, at *8 (M.D.N.C. Jan. 8, 2024) ("[B]ecause the commanders' post-incident determinations regarding the propriety of the deputies' actions in arresting Wong did not <u>cause</u> the allegedly unlawful arrest, Plaintiffs lack a viable Section 1983 claim against those officials." (emphasis in original)), <u>recommendation adopted</u>, slip op. (M.D.N.C. Jan. 30, 2024).  The Amended Complaint therefore fails to viably assert any official-capacity claims.

In sum, Plaintiff established good cause for amending his Complaint, but the Amended Complaint only asserts viable individual-capacity claims against Arresting Defendants for excessive force (in violation of the Fourth Amendment), assault and battery, and intentional infliction of emotional distress.  The Court will therefore grant Plaintiff's amendment request only as to those claims and will deem Plaintiff's proposed Amended Complaint (Docket Entries 43-1, 43-2), as modified herein, as his operative pleading for purposes of resolving the Summary Judgment Motion.

## II. Summary Judgment Motion

"As a general rule, an amended pleading ordinarily supersedes the original and renders it of no legal effect." <u>Young v. City of Mount Ranier</u>, 238 F.3d 567, 572 (4th Cir. 2001) (internal quotation marks omitted), <u>abrogated in nonrelevant part by</u> <u>Kingsley v. Hendrickson</u>, 576 U.S. 389 (2015).  Thus, the filing of an amended complaint normally moots a pending dispositive motion.  <u>See, e.g.,</u>

48

1:23cv223, 2024 WL 85548, at *8 (M.D.N.C. Jan. 8, 2024) ("[B]ecause the commanders' post-incident determinations regarding the propriety of the deputies' actions in arresting Wong did not <u>cause</u> the allegedly unlawful arrest, Plaintiffs lack a viable Section 1983 claim against those officials." (emphasis in original)), <u>recommendation adopted</u>, slip op. (M.D.N.C. Jan. 30, 2024).  The Amended Complaint therefore fails to viably assert any official-capacity claims.

In sum, Plaintiff established good cause for amending his Complaint, but the Amended Complaint only asserts viable individual-capacity claims against Arresting Defendants for excessive force (in violation of the Fourth Amendment), assault and battery, and intentional infliction of emotional distress.  The Court will therefore grant Plaintiff's amendment request only as to those claims and will deem Plaintiff's proposed Amended Complaint (Docket Entries 43-1, 43-2), as modified herein, as his operative pleading for purposes of resolving the Summary Judgment Motion.

## II. Summary Judgment Motion

"As a general rule, an amended pleading ordinarily supersedes the original and renders it of no legal effect." <u>Young v. City of Mount Ranier</u>, 238 F.3d 567, 572 (4th Cir. 2001) (internal quotation marks omitted), <u>abrogated in nonrelevant part by</u> <u>Kingsley v. Hendrickson</u>, 576 U.S. 389 (2015).  Thus, the filing of an amended complaint normally moots a pending dispositive motion.  <u>See, e.g.,</u>

48

Case 1:22-cv-00416-CCE-LPA   Document 52   Filed 05/01/24   Page 48 of 58

Anderson v. Witherspoon, No. 7:15cv236, 2015 WL 7721842, at *1 (W.D. Va. Nov. 30, 2015) (granting in part motion to amend complaint and explaining that, "[b]ecause [the defendant's] motion for summary judgment relates to the original complaint, the motion for summary judgment is dismissed without prejudice as moot"); Mooney v. Cato Corp., No. 1:07cv76, 2007 WL 2406961, at *1 (W.D.N.C. Aug. 20, 2007) (concluding that filing of amended complaint mooted dismissal motion) (collecting cases).

Here, however, the Amended Complaint does not alter the allegations against Officer Reyes, and the Summary Judgment Motion's arguments apply equally to both complaints.[12] "Under the circumstances, the Court will consider the [Summary Judgment M]otion as being addressed to the Amended Complaint." Flanagan v. Syngenta Crop Prot., LLC, No. 1:17cv202, 2017 WL 3328168, at *2

---

12 Although the Screening Order did not specifically detail each of Plaintiff's claims against Officer Reyes (see Docket Entry 4 at 1, 3, 6), as the above discussion makes clear, the Amended Complaint and Complaint pursue individual-capacity claims against Officer Reyes for excessive force, assault and battery, and intentional infliction of emotional distress premised on a bystander-liability theory rather than any direct use of physical force by Officer Reyes against Plaintiff. Accordingly, the memorandum in support of the Summery Judgment Motion errs in asserting that "only two claims remain against [Officer] Reyes in his individual capacity: a claim under 42 U.S.C. § 1983 for excessive force; and a claim under 42 U.S.C. § 1983 for 'bystander liability.'" (Docket Entry 38 at 2.) As discussed below, however, given the current record and the intertwined nature of Plaintiff's federal and state claims, resolution of Plaintiff's bystander-liability excessive force claim against Officer Reyes also resolves Plaintiff's related assault and battery and intentional infliction of emotional distress claims against Officer Reyes.

49

(M.D.N.C. Aug. 3, 2017) (brackets and internal quotation marks omitted); see also Brumfield v. McCann, No. 2:12-cv-1481, 2013 WL 943807, at *2-3 (S.D. W. Va. Mar. 11, 2013) (granting motion to amend complaint, but concluding that court could still consider pending dismissal motions) (collecting cases).

### A. Relevant Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Anderson"). The movant bears the burden of establishing the absence of such dispute. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith,

50

597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08cv2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Further, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No.

51

1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).[13]

Ordinarily, "where affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie." Raynor v. Pugh, 817 F.3d 123, 130 (4th Cir. 2016) (internal quotation marks omitted). Yet, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); see also, e.g., Love v. Beasley, 788 F. App'x 935, 937 (4th Cir. 2020) (concluding, on review of summary judgment decision, "that the district court did not err in finding that [a defendant] did not punch [the plaintiff] as alleged, because video of the incident confirms [the defendant's] denial"). In Scott,

> the [United States] Supreme Court was faced with a
> videotape of the incident in question that "utterly
> discredited" the plaintiff's account, rendering it a

---

13  Once verified, such filings retain their status as functional equivalents of affidavits for summary judgment purposes regardless of the subsequent submission of any unverified amended filings. See Goodman v. Diggs, 986 F.3d 493, 498-99 (4th Cir. 2021) (examining cases, "hold[ing] that an amended complaint does not divest an earlier verified complaint of its evidentiary value as an affidavit at the summary judgment stage," and "conclud[ing] that the district court erred in disregarding the evidentiary value of [the plaintiff's] original and first amended complaints, which were verified and based on [his] personal knowledge, and were therefore the equivalent of opposing affidavits").

52

"visible fiction." 550 U.S. at 380-81. As between a videotape of undisputed authenticity, *id.* at 378, and the plaintiff's story, the Court held, the videotape should prevail. Where the nonmoving plaintiff's account is "blatantly contradicted by the record" so that "no reasonable jury could believe it," it should not be adopted by a court ruling on a motion for summary judgment. *Id.* at 380.

As [the Fourth Circuit] ha[s] clarified, *Scott* is the exception, not the rule. It does not "abrogate the proper summary judgment analysis, which in qualified immunity cases 'usually means adopting . . . the plaintiff's version of the facts.'" *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott*, 550 U.S. at 378). That standard continues to apply in the face of "documentary evidence" that lends support to a government official's account of events, *id.*, or even makes it "unlikely" that the plaintiff's account is true, *United States v. Hughes*, 606 F.3d 311, 319-20 (6th Cir. 2010) (holding that *Scott* does not apply to photographs rendering plaintiff's account "unlikely"). Summary judgment is proper under *Scott* only when there is evidence — like the videotape in *Scott* itself — of undisputed authenticity that shows some material element of the plaintiff's account to be "blatantly and demonstrably false." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007) (refusing to extend *Scott* to evidence in form of police photographs that fail to depict "all of the defendant's conduct and all of the necessary context"); *see also Witt*, 633 F.3d at 277 (holding *Scott* inapplicable to soundless video that does not capture key disputed facts).

Harris v. Pittman, 927 F.3d 266, 275-76 (4th Cir. 2019) (ellipsis in original) (parallel citations omitted).

### B. Analysis

Plaintiff maintains that Officer Reyes failed to intervene to stop Officer Faw's use of excessive force against Plaintiff, both in breaking Plaintiff's knee and in holding Plaintiff's knee in a position designed to increase his pain. (See, e.g., Docket Entry

53

43-1 at 4; Docket Entry 45 at 2 (arguing that, because body camera footage shows that Officer "Reyes clearly faces [Officer] Faw while he uses excessive force against Plaintiff not once but twice and failed to intervene[, it] clearly shows that he had knowledge of what was going on and . . . could have prevented Plaintiff's injuries not once but twice").)[14]  For his part, Officer Reyes maintains that he neither saw nor knew that any other officer used excessive force against Plaintiff, as well as that, at the relevant time, he remained focused on attempting to restrain and handcuff Plaintiff and did not see the injury occur. (Docket Entry 38-1, ¶ 22.)  Officer Reyes further avers that, "[i]f, during the encounter with [Plaintiff], [Officer Reyes] had seen or had knowledge of any officer violating [Plaintiff's] constitutional rights, [Officer Reyes] would have attempted to stop the violation. However, [Officer Reyes] did not see, or have knowledge of, any officer violating [Plaintiff's] constitutional rights." (Id.)

To establish a bystander liability claim against Officer Reyes, Plaintiff must show that Officer Reyes (1) knew that Officer

---

14  It remains at best questionable whether Plaintiff's bystander excessive force claim encompasses the latter aspect of Officer Faw's actions, as the bystander-liability allegations arguably apply only to the breaking of Plaintiff's knee. (See, e.g., Docket Entry 43-1 at 4 (discussing positional hold issue separately and after discussion of bystander liability for breaking knee); Docket Entry 43-2 at 8 (same); see also Docket Entry 43-1 at 6 (discussing only dislocating knee in detailing excessive force claim); Docket Entry 43-2 at 6 (detailing dislocating knee as basis for Section 1983 liability).)

Faw was violating Plaintiff's fourth-amendment rights, (2) had a reasonable opportunity to prevent this harm, and (3) chose not to act. See Randall, 302 F.3d at 204. Given the body camera footage, Plaintiff cannot make that showing. To begin, the video footage establishes that Officer Reyes did not have a reasonable opportunity to stop Officer Faw from breaking Plaintiff's leg: that conduct occurred in seconds, without any advanced warning from Plaintiff's comments or any visible indication from Officer Reyes's vantage point — late at night, in poor lighting, positioned at Plaintiff's torso, while engaged in attempting to restrain and handcuff the resistant Plaintiff — that Officer Faw acted in a manner that endangered Plaintiff.

Although a closer question given Plaintiff's comments and audible indicia of ongoing pain, the record also provides no grounds for finding that Officer Reyes (1) knew that Officer Faw's positional hold violated Plaintiff's fourth-amendment rights and (2) chose not to act. The brief glimpse the video provides of Plaintiff's leg during the relevant interval did not reveal any injury; instead, it showed Plaintiff's leg bent in a natural position with the baggy nature of his jeans obscuring any otherwise-apparent physical signs of injury. On the record before the Court, where Officer Reyes avers that he did not see Officer Faw break Plaintiff's knee (see Docket Entry 38-1, ¶ 22), the video provides no visible sign of the broken leg until after its release,

55

and Officer Reyes remained engaged in restraining Plaintiff and/or addressing other issues with the arrest during the period when Officer Faw bends Plaintiff's knee, a reasonable factfinder would have no basis for discrediting Officer Reyes's sworn statement that he did not see or know about any officer violating Plaintiff's rights during this encounter (see id.). Accordingly, the Court should enter summary judgment for Officer Reyes on Plaintiff's excessive force claim.

Given this outcome, Plaintiff's state-law claims against Officer Reyes also fail. Because Officer Reyes bears no responsibility for any use of excessive force against Plaintiff, he also bears no liability for assault and battery against Plaintiff. See, e.g., Morgan, 2023 WL 4002524, at *15 (observing that plaintiff's North Carolina "battery claim[] . . . rises and falls with the excessive force claim"). Nor does the record before the Court reflect that Officer Reyes engaged in "extreme and outrageous" conduct either deliberately to cause Plaintiff severe emotional harm or with reckless indifference to the likelihood of such harm. See, e.g., Clark, 280 N.C. App. at 414, 867 S.E.2d at 715 ("Extreme and outrageous conduct is defined as conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (internal quotation marks omitted)). The Court should thus also

56

enter summary judgment for Officer Reyes on Plaintiff's remaining state-law claims.

**CONCLUSION**

Plaintiff established good cause to amend his Complaint, but his official-capacity claims and any claims against Officer Merritt and the WSPD qualify as futile. In addition, on the record before the Court, Plaintiff's excessive force, assault and battery, and intentional infliction of emotional distress claims against Officer Reyes fail as a matter of law.

**IT IS THEREFORE ORDERED** that the Amendment Motion (Docket Entry 43) is **GRANTED IN PART** and **DENIED IN PART** as follows: Plaintiff may pursue his amended individual-capacity fourth-amendment excessive force, assault and battery, and intentional infliction of emotional distress claims against Arresting Officers. In the interests of efficiency, the Court **DEEMS** Plaintiff's proposed Amended Complaint (Docket Entries 43-1, 43-2), as modified herein, Plaintiff's operative pleading and **DIRECTS** the Clerk to docket those filings as Plaintiff's Amended Complaint. The Court further **DIRECTS** the Clerk to send Plaintiff five summons forms. Plaintiff **SHALL** promptly submit to the Clerk the properly completed summons forms for WSPD Officers C.J. Faw, D.W. Coppola, W.J. Walker, J.S. Hollifield, and M.A. Vanburen.

**IT IS FURTHER RECOMMENDED** that the Summary Judgment Motion (Docket Entry 37) be granted and summary judgment be entered in

favor of Officer Reyes on Plaintiff's individual-capacity excessive force, assault and battery, and intentional infliction of emotional distress claims against him.

This 1st day of May, 2024.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**
