**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

MICHAEL LEWIS WARDLOW,          )
                                )
                Plaintiff,      )
                                )
        v.                      )          1:22cv416
                                )
OFFICER FAW, et al.,            )
                                )
                Defendants.     )

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the Court on the "Motion for Summary Judgment of Defendants Coppola, Faw, Hollifield, Vanburen, and Walker" (Docket Entry 75) (the "Summary Judgment Motion"). For the reasons that follow, the Court should grant the Summary Judgment Motion.

**I. PROCEDURAL BACKGROUND**

Plaintiff Michael Lewis Wardlow originally filed this action against Winston-Salem Police Chief Catrina Thompson ("Chief Thompson"),[1] "Officer Reyes," "Officer(s) John Doe," and the "City of Winston-Salem" (Docket Entry 2 at 1 ("Complaint"))[2] pursuant to 42 U.S.C. § 1983 ("Section 1983") and North Carolina law (see generally id.). According to the Complaint, Officer John Doe broke

_____

[1] Plaintiff originally spelled this defendant's name "Catherine Thompson" (Docket Entry 2 at 1), but, as the Court noted, "the Winston-Salem Police Chief's actual name is Catrina Thompson" (Docket Entry 4 at 1 n.1), a spelling Plaintiff subsequently adopted (see, e.g., Docket Entry 43-1 at 1).

[2] Docket Entry page citations utilize the CM/ECF footer's pagination.

Plaintiff's knee during his arrest on November 10, 2020, "after a short foot chase by Officer Reyes" (id. at 14), while "approximately 10-20 additional John Doe officers" (id. at 13) and Officer Reyes failed to intervene to stop the first officer's use of excessive force (see id. at 14). However, per the Complaint, "all names [we]re presently being withheld from Plaintiff" (id. at 13), so "Plaintiff would like to amend his [C]omplaint if discovery is allowed to show the other officers['] proper names as [d]efendants" (id. at 23).

"Because Plaintiff [wa]s a prisoner seeking redress from a governmental entity or officer or employee of a governmental entity, this Court ha[d] an obligation to review [his] Complaint" pursuant to 28 U.S.C. § 1915A. (Docket Entry 4 at 1 (brackets and internal quotation marks omitted).) In conducting that review, the undersigned concluded that the fourth-amendment excessive force claims, assault and battery claims, and intentional infliction of emotional distress claims against Officers Reyes and Doe "should go forward as to those Defendants in their individual capacities" (Docket Entry 4 at 3), but that Plaintiff's official-capacity claims against Officers Reyes and Doe and claims against the City of Winston-Salem and Chief Thompson failed to state claims upon which relief could be granted (see id. at 4-5; see also Docket Entry 12 at 1 (adopting foregoing conclusion and ordering that "[P]laintiff's individual capacity claims against Defendants Reyes

2

and Doe are allowed to proceed but that the remainder of the claims be and are DISMISSED pursuant to 28 U.S.C. § 1915A for failing to state a claim upon which relief may be granted," except that "[t]he dismissals [we]re without prejudice to [P]laintiff amending his pleadings if he can state proper claims for relief" (all-cap font in original)).)

The Court (per the undersigned) then established January 19, 2023, as the deadline for moving for leave to amend the pleadings or add parties (see Text Order dated Nov. 16, 2022 (the "Scheduling Order")), and Plaintiff thereafter repeatedly, and unsuccessfully, sought information regarding the identities of the officers involved in the incident on the night of November 10, 2020 (see, e.g., Docket Entry 2 at 8, 26-31; Docket Entry 23 at 2, 4; Docket Entry 28 at 2-5). In June 2023, pro bono counsel made a limited appearance on Plaintiff's behalf to assist in those endeavors, including by obtaining body camera footage and the identification information that Plaintiff had requested. (See Docket Entry 30 at 1; see also Docket Entries 27, 28.) On September 7, 2023, pro bono counsel produced to Plaintiff "incident report #2055751, the names and badge numbers of the officers requested, [and the] use of force policy," and also "reviewed the relevant portions of the body camera footage in person with [Plaintiff]." (Docket Entry 34 at 1-2.) Having completed his task, pro bono counsel withdrew from

3

representation a few days later.  (See id.; see also Text Order dated Sept. 12, 2023 (granting withdrawal request).)

On November 5, 2023 (see Docket Entry 43-1 at 12), Plaintiff moved for leave to amend his Complaint (see Docket Entries 43 to 43-2), naming as defendants "Officer J.M. Reyes," "Officer C.J. Faw," "Officer D.W. Coppola," "Officer W.J. Walker," "Officer J.S. Hollifield," "Officer M.A. Vanburen," "Officer M.C. Merritt,"[3] "Catrina Thompson," the "City of Winston-Salem," and the "Winston-Salem Police Department" (Docket Entry 43-1 at 1).[4]  Officer Reyes opposed Plaintiff's motion to amend the Complaint (Docket Entry 44), primarily on grounds of undue delay (see id. at 1-4), and then moved for summary judgment on "Plaintiff's claims asserted against [Officer Reyes] in this matter" (Docket Entry 37 at 1; see also Docket Entry 38 at 2 ("[Officer] Reyes in his individual capacity now moves for summary judgment as to all claims brought by Plaintiff against [Officer] Reyes.")).  Plaintiff opposed Officer Reyes's motion for summary judgment (Docket Entry 45), chiefly on

_____

[3] Some of the officers named as defendants in this matter have referred to Merritt as "Sergeant" or "Sgt." in their Affidavits (see, e.g., Docket Entry 76-1, ¶ 24; see also Docket Entry 76-3, ¶ 8; Docket Entry 76-4, ¶ 5); however, as Plaintiff's Amended Complaint names him as "Officer [] Merritt" (Docket Entry 43-1 at 1), the undersigned will refer to him as "Officer Merritt."

[4] On October 1, 2023, Plaintiff submitted another application to proceed in forma pauperis and a roughly forty-page pleading regarding this incident, which, inter alia, identified the "John Doe" defendants referenced in the Complaint.  See Wardlow v. Faw, No. 1:23CV850, Docket Entries 1-2 (M.D.N.C. Oct. 4, 2024).  On October 11, 2023, the undersigned recommended dismissal of the new action "without prejudice to Plaintiff moving to file an amended complaint in case 1:22CV416," id., Docket Entry 3 at 2 (M.D.N.C. Oct. 11, 2024), a recommendation that the Court (per Chief United States District Judge Catherine C. Eagles) subsequently adopted, see id., Docket Entry 5 at 1 (M.D.N.C. Nov. 14, 2023).

4

the grounds that the body camera footage established bystander liability, in that Officer Reyes both saw and could have prevented Officer Faw's use of excessive force against Plaintiff (see id. at 1-2).

On May 1, 2024, the Court (per the undersigned) entered an Order finding "that Plaintiff promptly sought to pursue his amended claims" and thus established good cause under Rule 16(b)(4) of the Federal Rules of Civil Procedure to amend his Complaint after the deadline provided in the Scheduling Order. (Docket Entry 52 at 28; see also id. at 48.) The Court, however, found that "certain of Plaintiff's proposed amended claims fail[ed] for futility" under Rule 15(a)(2) of the Federal Rules of Civil Procedure (id.), including Plaintiff's claim of intentional infliction of emotional distress against Officer Merritt (see id. at 39-43), and Plaintiff's official-capacity claims against Officers Reyes, Faw, Coppola, Walker, Hollifield, Vanburen, and Merritt, Chief Thompson, the City of Winston-Salem, and the Winston-Salem Police Department (see id. at 43-48). The Court, therefore, "grant[ed] Plaintiff leave to amend his Complaint to pursue only his individual-capacity fourth-amendment excessive force, assault and battery, and intentional infliction of emotional distress claims against Officers Coppola, Faw, Hollifield, Reyes, Vanburen, and Walker" (id. at 29-30; see also id. at 48), and "deem[ed] Plaintiff's proposed Amended Complaint (Docket Entries 43-1, 43-2) as modified

5

[by the Court's Order], as [Plaintiff's] operative pleading" (id. at 48).[5]

The Court thereafter recommended granting Officer Reyes's motion for summary judgment, finding that 1) "the video footage establishe[d] that Officer Reyes did not have a reasonable opportunity to stop Officer Faw from breaking Plaintiff's leg" (id. at 55), 2) "the record [] provide[d] no grounds for finding that Officer Reyes knew that Officer Faw's positional hold violated Plaintiff's fourth-amendment rights and chose not to act" (id. (numbering omitted)), and 3) "[g]iven th[at] outcome, Plaintiff's state-law claims [of assault and battery and intentional infliction of emotional distress against Officer Reyes] also fail[ed]" (id. at 56; see also Docket Entry 55 (Order of Chief United States District Judge Catherine C. Eagles adopting that recommendation, granting Officer Reyes's motion for summary judgment, and dismissing all of Plaintiff's claims against Officer Reyes).

After Officers Faw, Coppola, Walker, Hollifield, and Vanburen (collectively, the "Arresting Officers") filed Answers to the Amended Complaint (Docket Entries 69, 70), they filed the instant Summary Judgment Motion, supported by 1) a Brief in Support (Docket Entry 76), 2) the Affidavit of Officer Faw (Docket Entry 76-1), 3)

_____

[5] The Court recognized that, although "the filing of an amended complaint normally moots a pending dispositive motion" (Docket Entry 52 at 48), because "the Amended Complaint d[id] not alter the allegations against Officer Reyes, . . . the Court w[ould] consider [Officer Reyes's motion for summary judgment] as being addressed to the Amended Complaint" (id. at 49 (internal quotation marks omitted)).

6

the Affidavit of Officer Coppola (Docket Entry 76-2), 4) the Affidavit of Officer Walker (Docket Entry 76-3), 5) the Affidavit of Officer Hollifield (Docket Entry 76-4), 6) the Affidavit of Officer Vanburen (Docket Entry 76-5), 7) the Affidavit of Donna L. Brown (Docket Entry 76-6), "the Body Worn Camera Administrator" for "the City of Winston-Salem" (id. at 1), and 8) "a thumb drive containing five true and accurate copies of body camera videos of [the Arresting] Officers . . . recorded on November 11, 2020[,] during [their] encounter with [Plaintiff]" (id.; see also Docket Entry 77 (Notice of Manual Filing of thumb drive)). The Clerk thereafter sent Plaintiff a letter in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the Summary Judgment Motion. (Docket Entry 78.) Despite that notice, Plaintiff failed to respond to the Summary Judgment Motion. (See Docket Entries dated Sept. 17, 2025, to present.)

## II. THE PARTIES' FACTUAL ALLEGATIONS

### A. Plaintiff

Through Plaintiff's various verified filings (see, e.g., Docket Entry 49 at 4 (verifying Amended Complaint); Docket Entry 46-1 at 3, 6 (verifying similar assertions)), he avers that:

"On November 10, 2020[,] Plaintiff was arrested . . . after a short foot chase by Officer [] Reyes." (Docket Entry 43-1 at 3.) "During Plaintiff's arrest while laying face down in the front yard

7

of a Winston-Salem residen[ce,] Officer [] Faw grabbed Plaintiff's right leg by the ankle and began striking the outside of Plaintiff's right knee very hard while Officers Reyes, Coppola[,] and Walker restrained Plaintiff." (Id. (citing "exhibit 2").)[6] "Plaintiff at this time was not trying to run and was not kicking, flailing or in any other way utilizing his legs and/or feet in a way that would be considered threatening or assaultive to any officer present." (Id.) "Also at this time Plaintiff's pants and underwear were down to the point where his buttocks and genitals were exposed which shows no weapon in the waist area." (Id.) "After Officer Faw finished punching Plaintiff's knee, he then grabbed Plaintiff's right ankle, brace[d] his leg against the outside of Plaintiff's right knee and pulled until he dislocated Plaintiff's knee." (Id. at 3-4 (internal quotation marks omitted).) Additionally:

> At the time [Officer] Faw is pulling Plaintiff's leg towards him[,] Plaintiff is yelling that he is not resisting and "You gonna break my leg." Plaintiff's hands were behind his back well before the injury yet officers did not cuff him. Prior to this[,] Plaintiff was in fear of being killed by these European officers and repeatedly stated [as] such.
>
> Officers [] Coppola, Walker, Hollifield, [and] Vanburen[] listened and watched as Officer Faw intentionally applied the extreme and tremendous force that it took to

---

[6] The Amended Complaint lacks an "exhibit 2" (see Docket Entries 43-1, 43-2), but from context, Plaintiff appears to reference the body camera footage (see Docket Entry 43-1 at 3-4 (citing "exhibit 2" as support for description of actions and statements during incident); Docket Entry 46-1 at 3 (citing "Exhibit 2 video footage" for similar allegations)). See also Wardlow, No. 1:23CV850, Docket Entry 2 at 31 (identifying "BodyCam" as "Exhibit 2").

dislocate Plaintiff's knee. They heard Plaintiff's pleas
that "[Officer] Faw was breaking his leg" but decided to
drown out these pleas with loud shouts of "stop
reaching[,]" "stop resisting[,]" etc. These officers did
nothing to intervene to prevent the injury.

. . .

Officer Faw continued to bend Plaintiff's knee after he
dislocated it causing more unbearable pain to Plaintiff.
[Officer] Faw could have simply restrained Plaintiff['s]
legs to the ground by the ankles.

(Id. at 4 (certain internal quotation marks omitted); see also
Docket Entry 43-2 at 6 ("Officer Faw sadistically and maliciously
dislocated Plaintiff's knee . . . . [Officers] Coppola, Walker[,]
and Hollifield restrained Plaintiff in [a] prone position while
[Officer] Faw dislocated Plaintiff's knee. [Officer] Vanburen
watched. No officers intervened." (internal quotation marks
omitted)).)

"EMS was called and . . . Plaintiff was taken to Baptist
Hospital where he was treated for the dislocation of his knee."
(Docket Entry 43-1 at 5.) "Plaintiff later received surgery for
other related extensive injuries on his knee besides the
dislocation." (Id.) Plaintiff also "suffers severe emotional
distress in the form of depression and paranoia." (Docket Entry
46-1 at 5.)

Case 1:22-cv-00416-CCE-LPA   Document 79   Filed 03/04/26   Page 9 of 93

**B.    Officer Reyes**[7]

For his part, Officer Reyes avers:

On November 11, 2020, Officer Reyes "was a duly sworn police officer and on duty with the Winston-Salem Police Department." (Docket Entry 38-1, ¶ 1.)  "Around 12:10 a.m., [Officer Reyes] was conducting routine patrol in" Winston-Salem (id., ¶ 3) and observed a suspected drug transaction involving a gold Cadillac (see id., ¶¶ 3-5).  More specifically:

> It was [Officer Reyes's] reasonable suspicion and belief that the operator of this Cadillac was possibly completing a "hand-to-hand" drug transaction when [Officer Reyes] passed by.  [Officer Reyes] then drove to the parking lot across from Rubert Bell Park and turned [his] patrol vehicle lights off and waited for the Cadillac to leave.  A few seconds later, [Officer Reyes] observed the gold Cadillac approaching the intersection of N. Jackson Avenue and Mount Zion Place.  [Officer Reyes] observed the vehicle to have no front head lights on.  Shortly after [Officer Reyes] made this observation, [he] drove [his] vehicle out of the parking lot. (0:28.)[8] The gold Cadillac then made a left onto Mount Zion and [Officer Reyes] attempted to get behind it.  As noted above, the time was just after midnight so it was dark outside.  This meant that the operator of this car was required to operate the car with its headlights on, per the North Carolina General Statute § 20-129 (a)(1) and (2).
>
> Once [Officer Reyes] was on Mount Zion Place, the vehicle made a quick right onto N. Graham Avenue.  [Officer Reyes] observed the vehicle to be picking up speed due to

---

[7] Although the Court dismissed all of Plaintiff's claims against Officer Reyes, the undersigned includes the factual averments of Officer Reyes's Affidavit and summarizes the contents of his body camera footage to provide the complete factual background of the incident in question.

[8] For ease of reading, the undersigned has modified references by Officer Reyes and the Arresting Officers in their Affidavits to specific points in time during their body camera footage as "(x:xx)."

the distance between [his] vehicle and the suspect
vehicle separating. The gold Cadillac then quickly made
a left onto Graham Court, where [Officer Reyes] observed
the vehicle to be parking left of center, on the north
curb line of Graham Court. The Cadillac still had no
headlights operational on the vehicle. Due to radio
traffic, [Officer Reyes] did not call for a license check
but asked communications to show [him] out on a security
check in the 1700 block of Graham Court. (0:50 and 0:56
- 1:02.) [Officer Reyes] then activated [his] blue
lights to conduct a traffic stop for the observed
violation and [he] pulled [his] vehicle behind the
Cadillac. (0:58.)

[Officer Reyes] then observed the driver's side door
open, and after a few seconds, the driver exited the
vehicle. (1:01 - 1:02.) As he exited, [Officer Reyes]
observed [the driver] hastily walk towards the building
(1715 Graham Court). (1:01 - 1:02.) [Officer Reyes]
told the driver "Hey, stay in the car." When he did not
comply, [Officer Reyes] said loudly, "Stay in the car!
Stay out here!" (1:04 - 1:09.) [Officer Reyes] exited
[his] vehicle. As [Officer Reyes] was telling the
suspect multiple times to stay in the car, the suspect
went to the door of the building, and seemed to knock on
the door while saying, "Hey bro. Bro." (1:05 - 1:10.)
[Officer Reyes] believed that the suspect was trying to
get the attention of someone inside the building.

As [Officer Reyes] walked away from [his] vehicle and
toward the driver, [Officer Reyes] looked to [his] right
to see if there were any more occupants in the vehicle
and saw none. However, [Officer Reyes] did observe a
white Styrofoam cup containing a substance [Officer
Reyes] believed to be marijuana, placed under the
vehicle, right below the driver's side door where the
driver had just exited. The cup was still intact and
positioned in a manner that it would have been run over
by the car as it parked. Based on [his] observation,
[Officer Reyes] believed that the driver had just placed
the Styrofoam cup there when he exited the car.

[Officer Reyes] was wearing [his] standard patrol
uniform, . . . [and] was clearly identifiable as a police
officer.

[Officer Reyes] then approached the driver and the driver
turned around and faced [Officer Reyes], and said

11

something. (1:11.) [Officer Reyes] said to the suspect, "Walk over here. Turn around. Face away from [Officer Reyes]. Turn around." (1:11 - 1:13.) The suspect then walked away from the door of the building, looked at a window of the building, and shouted in the direction of the window, "Hey bruh. Open the door." (1:13 - 1:15.) [Officer Reyes] continued to slowly walk toward the suspect. [Officer Reyes] said, "Stay over here," intending to convey to him to stay outside the building. The suspect started walking in the direction of the Cadillac. (1:17.) [Officer Reyes] told him, "Put your hands on the car." (1:19.) The suspect did not comply. Instead, he walked away, with his back to [Officer Reyes], then moved back toward the door of the building. (1:20 - 1:22.) [Officer Reyes] then called over [his] radio for "code one back up" due to the driver's resistive behavior and failure to comply with [his] commands. (1:22.) "Code one back up" is a term used by Winston-Salem police officers to request immediate assistance from any officer who might be close by.

The suspect again shouted at the building, "Bro." (1:21 - 1:22.) [Officer Reyes] then said, "Stay over here. Stay over here. Stay over here." (1:23.) At this point, the suspect had his back to [Officer Reyes], walking away. He turned around and said, "For what?" (1:23 - 1:26.) [Officer Reyes] said, "Let me see your hands. Let me see your hands." The suspect continued to walk away, and raised both his hands. (1:28.) [Officer Reyes] then yelled, "Put your hands on the car. You're being detained." (1:31 - 1:32.) The suspect then turned to his right, with his hands still in the air, as if he intended to walk to the Cadillac. (1:32.) [Officer Reyes] said something like, "I'm just putting you in cuffs. You're being detained. You're just being detained." (1:33.) Then [Officer Reyes] said, "Put your hands on the car." (1:34 - 1:35.) The suspect, who at this point was near his car, turned around with his hands up, and said "Don't shoot me, bruh." (1:35.) [Officer Reyes] responded, "You're not. Put your hands on the car. Put your hands on the car." (1:35 - 1:36.) The suspect, still facing [Officer Reyes] with his hands up, started to yell at the building again, "Hey bruh! Hey bruh! Bruh! Hey bruh! Bruh!" (1:37 - 1:45.) [Officer Reyes] believed that the suspect was trying to get the attention of someone in the building.

12

Based on the driver's behavior, failure to follow [Officer Reyes's] commands, and continued attempts to attract the attention of someone inside the apartment, [Officer Reyes] then attempted to grab [the driver's] right arm and the driver pulled back, clinching his fist and stating, "Don't touch me. Don't touch me, bro." (1:45.) From training and experience, [Officer Reyes is] aware that when someone clinches their fists, blades their stance and backs up as the driver was doing, it indicates that the person is getting ready to fight.

The driver was physically taller and more muscular than [Officer Reyes], and [he] believed that engaging [the driver] physically or going "hands on" at that time was not appropriate. Several factors made [Officer Reyes] believe this, such as the driver clinching his fists, blading his stance and backing up, along with him yelling for someone to come out of the apartment. It seemed clear to [Officer Reyes] that [the driver] would fight [Officer Reyes] if [he] tried to engage [the driver] at that point. [Officer Reyes] believed that if [he] were to engage the driver and he did fight, and someone from the building came out, [Officer Reyes] would be outnumbered. The suspect starting [sic] walking away, with his hands still lowered. [Officer Reyes] then stated loudly, "Get on the ground. Get on the ground" (1:45 - 1:48), as the driver was walking away with his hands at his sides (1:47). The suspect continued to yell at the apartment building, "Hey, bruh! Bruh!" (1:48 - 1:50.) The suspect's left hand was out of [Officer Reyes's] sight line, near his left pocket. (1:50.) At this time, the suspect was walking away from [Officer Reyes], by the side of the building. He said something that sounded like, "Hey, fuck that bullshit." (1:50.) [Officer Reyes] said, "Get on the ground. You're not going." (1:51 - 1:52.)

As the driver walked towards the back of the building, he half turned toward [Officer Reyes], and he bladed his stance again to shield the left side of his body from [Officer Reyes's] view as he began to reach his left hand into his front left pocket. (1:52.) [Officer Reyes] know[s] through [his] training and experience that it is common for individuals who are involved in the sale of illegal narcotics to be armed with weapons at their disposal. The driver quickly turned around with his left hand still inside his pants pocket. (1:53.) It was [Officer Reyes's] belief that the driver was potentially

13

in possession of a weapon that could present a threat to [Officer Reyes]. [He] then drew [his] issued service weapon, which is a Smith and Wesson M&P 9mm handgun[,] and pointed it at the driver stating, "Get your hands out of your pocket." Then [Officer Reyes] repeated, again, louder this time, "Get your hands out of your pocket." (1:54 - 1:55.) The suspect said something that sounded like, "Bro. Bro." (1:54 - 1:55.)

From training and experience[, Officer Reyes is] aware that firearms could be concealed in pant pockets and that guns come in all sizes. [He] ha[s] made numerous arrests where suspects had concealed firearms in their pants pockets. This is another reason [Officer Reyes] reasonably believed the driver had a weapon.

The driver then began to jog towards the back of the building, where [Officer Reyes] lost sight of [the driver] for a few seconds due to [Officer Reyes] allowing space after [he] observ[ed] the driver's mannerisms up to this point. (1:57 - 2:00.) After the suspect was out of [Officer Reyes's] field of vision for a few seconds, [he] could hear [the suspect] saying, "I ain't running. I ain't running. I ain't running." (2:00 - 2:02.) [Officer Reyes] then walked towards the back of the building and observed the driver running around the building. [Officer Reyes] then gave chase and began to give the suspect's description and direction of travel over [his] radio. (2:01 - 2:03.)

[Officer Reyes] ran to the back of the building, and [he] saw the suspect ahead of [Officer Reyes]. (2:04 - 2:05.) The suspect ran around the corner, heading to his left. [Officer Reyes] followed. (2:07.) While [he] was still running after the driver, [Officer Reyes] saw [the driver] run towards the vehicle he had been operating. [Officer Reyes] then stated over the radio, "He's going to get in the car." (2:11.) However, the driver then continued to run past the car, heading towards New Walkertown Road. (2:13 - 2:15.) While [Officer Reyes] was still running after [the driver], [Officer Reyes] stated over the radio that officers who would be shortly arriving at the scene should "block in the Cadillac" and that there was "VCSA under the car." (2:16.) "VCSA" is another term Winston-Salem police officers use for illegal narcotics. As [Officer Reyes] continued pursuit, [he] said over the radio, "Black male. Gray shirt. Running toward New Walkertown.["] (2:22 - 2:24.)

14

[Officer Reyes] continued to run after the suspect. The suspect ran across New Walkertown Road, and [Officer Reyes] said over the radio, "Crossing New Walkertown." (2:28.) As [Officer Reyes] was running behind [the suspect], [Officer Reyes] shouted, "Get on the ground, get on the ground!" (2:34 - 2:35.) The driver then ran north on the sidewalk towards Big House Gaines Boulevard. The driver then attempted to cross New Walkertown Road, where he tripped and fell. (2:37 - 2:41.) The driver then attempted to get up and [Officer Reyes] pushed [the driver] by the left shoulder to force him onto the grass area of the south curb line of New Walkertown Road. [Officer Reyes] told [the driver], "Stay down! Stay down! Stay down!" and then, "Get on the fucking ground." (2:39 - 2:44.)

At that point the suspect was lying on his back, facing [Officer Reyes]. [Officer Reyes] saw the suspect motion as if he was going to place his hands back in both of his pants pockets. (2:42 - 2:44.) [Officer Reyes] again took out [his] issued service weapon (Smith and Wesson M&P handgun) and began to yell, "Get your hands out of your pockets!" (2:46.) Officer Coppola then arrived and went "hands on" with the driver, grabbing his arms, and [Officer Reyes] holstered [his] service weapon and [he] also went "hands on" with [the driver]. (2:41 - 2:51.) [Officer Reyes] was aware that other officers had arrived.

The driver continued to resist by failing to follow instructions and was actively trying to pull away as [Officer Reyes] tried to grab [the driver's] right arm. He continued this behavior and would not listen to orders as officers shouted for the suspect to put his hands behind his back. (2:47 - 2:56.) The suspect said, "Are ya'll going to kill me?" and "What ya'll going to do, kill me?" (2:47 - 2:55.) The suspect also said, "Ya'll don't kill me, bro." (2:58 - 3:00.) Officer Coppola then grabbed on to both of the driver's arms, and [Officer Reyes] attempted to turn the driver on his stomach to attempt to get control of his arms and handcuff him. Around this time, [Officer Reyes] observed Officer Faw using hand strikes to the back of the driver's right leg to gain the driver's compliance but the driver still refused to fully roll on his stomach and bring his arms to the back. [Officer Reyes] observed Officer Faw attempting to control the driver's right leg

15

as [Officer Reyes] was trying to finish rolling [the driver] over to his stomach for prone handcuffing.

[Officer Reyes] continued to try and roll the driver on his stomach. About the time that the driver was rolled over onto his stomach, [Officer Reyes] heard the driver yell, "Oh shit my knee, you broke my knee." (3:06 – 3:12.) The driver was then on his stomach and Officers were able to bring his hands to his back. Officers were then able to handcuff the driver. The driver was identified by an Officer on scene who knew the driver from prior interactions. The driver was identified as [Plaintiff].

Right before [Plaintiff] said that his knee was injured, [Officer Reyes] was focused on trying to turn [Plaintiff] over on his stomach in order to bring him under control and handcuff him. [Officer Reyes] was not looking at [Plaintiff]'s leg or knee at the moment of the injury, and [Officer Reyes] did not see the injury occur. [Officer Reyes] do[es] not know how the injury occurred. If, during the encounter with [Plaintiff], [Officer Reyes] had seen or had knowledge of any officer violating [Plaintiff's] constitutional rights, [Officer Reyes] would have attempted to stop the violation. However, [Officer Reyes] did not see, or have knowledge of, any officer violating [Plaintiff's] constitutional rights.

[Officer Reyes] then got up and attempted to broadcast over the radio to make sure someone was out with the gold Cadillac. [Plaintiff] kept yelling that his knee was hurt. [Officer Reyes] then touched [Plaintiff's] knee and felt his bone to be in an unnatural position. EMS was called to respond emergency traffic. Sergeant [] Merritt then cut [Plaintiff's] pants in efforts to see if he had a pulse in his foot. Sergeant [] Merritt has prior medical training. EMS responded and began assisting [Plaintiff].

At some point, Officer [] VanBuren then handed [Officer Reyes] an orange manila envelope with money which [Plaintiff] had on his person when he was placed under arrest.

After EMS arrived, [Officer Reyes] walked back to the suspect vehicle where Officers with the GCRU (Gun Crime

16

Reduction Unit) were standing near the vehicle. (9:31 - 10:36.)

(Id., ¶¶ 5-25 (internal paragraph numbering omitted).) Officer Reyes proceeded to search Plaintiff's car, seizing various items that "relate[d] to the charge of sell and deliver of illegal narcotics" (id., ¶ 33). (See id., ¶¶ 26-33.) "[Officer Reyes] then went to Beaty training center and verified the illegal narcotics and money." (Id., ¶ 34.)

Officer Reyes' body camera footage reflects:

Late at night, Officer Reyes briefly follows Plaintiff's car through a dimly illuminated area, activating his patrol car lights and parking behind Plaintiff's car when it stops at the curb in front of an apparently residential building. Plaintiff, wearing baggy, low-riding jeans, exits his car and approaches the building, disregarding Officer Reyes's instructions to, inter alia, stay in and return to his car. With Officer Reyes's flashlight providing most of the illumination, Plaintiff and Officer Reyes interact outside the building for approximately a minute, with Plaintiff repeatedly calling out for his "Bro" and disregarding Officer Reyes's instructions. After reaching inside the front pocket of his jeans, Plaintiff disappears behind the edge of the building, calling out, "I ain't running." Officer Reyes follows Plaintiff, radioing a report of Plaintiff's description and flight. Officer Reyes chases Plaintiff around the building, through various yards, and across two streets, before catching up to Plaintiff. Although

17

the video does not clearly capture how it happens, it shows that Plaintiff falls, rolls to his feet, and attempts to stand back up as Officer Reyes approaches, yelling at Plaintiff to "stay down." Plaintiff falls back down, rolling onto his back with his pants and underwear falling down his thighs. By the 2:42 mark on the video, Plaintiff lies on his back with his hands at his side while Officer Reyes points a handgun at him and tells him to get on the ground and get his hands out of his pockets.[9]

Within seconds, two other officers rush in from Plaintiff's right, grabbing his arms and legs. As Plaintiff repeatedly asks, "Are y'all going to kill me," one of the officers repeatedly orders, "Hands on your back" as they appear to try rolling Plaintiff onto his stomach, rolling him from right to left towards Officer Reyes, who, from the increased proximity of Plaintiff and the other officers in the video footage, has bent or knelt down closer to Plaintiff. By the 2:49 mark, Officer Reyes appears stationed at Plaintiff's left torso, where the video primarily captures Plaintiff's face and the upper body of the officer on the right side of Plaintiff's torso. At the 2:56 mark, the video briefly shows an officer to the left of Officer Reyes grasping

---

[9] Throughout Officer Reyes's encounter with Plaintiff on the ground, the video, which remains dark with limited visibility, mainly illuminated by nearby patrol car flashing (red and blue) lights, frequently jolts, suggesting movement by Officer Reyes, and quickly switches vantage points from right to left, suggestive of quick glances around by Officer Reyes, with a primary focus on Plaintiff's upper body.

18

Plaintiff's right leg, twisting it towards the officer as they continue rotating Plaintiff to his stomach.

A second later, the video again shows the officer at Plaintiff's torso before, at the 3:03 mark, showing the officer holding Plaintiff's leg again. Plaintiff continues to tell the officers not to kill him, while they continue to tell him to put his hands behind his back; between the 3:02 and 3:04 marks, Plaintiff tells the officers to get off him. At the 3:05 mark, roughly the left third of the video shows a portion of the officer to Officer Reyes's left as he kneels atop Plaintiff's leg, while the rest of the video reveals multiple officers around Plaintiff's upper body. One second later, Plaintiff exclaims, "Oh shit, my knee!" The next second, at 3:07, the video again shows the officer at Plaintiff's legs, this time kneeling back beside Plaintiff rather than on top of him, as Plaintiff cries, "you broke it, you broke it." Plaintiff then continues to exclaim, sounding pained and in distress, that the officer broke his knee.

At the 3:08 mark, the video shows that officer bending Plaintiff's right knee at a 90 degree angle, before, at the 3:10 mark, bracing that officer's left foot against Plaintiff's lower back. One second later, at the 3:11 mark, the video shows the middle and upper portion of Plaintiff's body, with his pants and underwear still below his buttocks, as he lies on his stomach and officers attempt to restrain his arms, bringing them behind his

19

back.  Although difficult to hear properly given overlapping orders from officers for Plaintiff to put his hands behind his back, at around the 3:16 mark, Plaintiff says something that sounds like, "Quit bending my knee."  By the 3:18 mark, officers have begun handcuffing Plaintiff; at the 3:28 mark, one of the officers shines a flashlight at Plaintiff's hands, as one of the other officers finishes handcuffing him.

Meanwhile, continuing to exclaim that officers broke his knee, Plaintiff implores, "Please bro, you broke my knee," and "Just let my knee go."  As Plaintiff continues to request that officers let his knee go, Officer Reyes tells them to stay away from his lower back, to which another officer responds, "That's why I've got him in that leg lock."  Officer Reyes then stands up, asking about Plaintiff's car, to which one officer responds something to the effect of "GRU has it" and another officer says something like, "Go to the Cadillac." Around this time, Plaintiff again implores, "Let my knee go."  Shortly thereafter, around the 3:42 mark, after one of the officers says they are calling EMS, Officer Reyes walks away from Plaintiff, who remains surrounded by other officers, imploring them to "let [his] knee go."  After another officer at the 3:56 mark tells Officer Reyes that "they're already there, they're already at the Cadillac," Officer Reyes walks back toward the area

20

where Plaintiff lies, continuing to exclaim about his knee and asking officers to let it go.[10]

At approximately the 4:03 mark, an officer says to search Plaintiff "real quick for weapons," at which point the video shows Plaintiff, from the thighs upwards, lying on his right side with an officer holding his handcuffed arms behind his back. At the 4:08 mark, Plaintiff says "you see my ass, bro, my ass right here, bro," and the officer pulls up Plaintiff's underwear to cover his buttocks. Plaintiff then returns to commenting about his knee, saying that "it hurts so bad" and asking the officers not to grab his knee while they conduct the search. At about the 4:16 mark, the video briefly shows Plaintiff's entire body, with his right leg angulated behind him. An officer asked if someone called EMS, to which Officer Reyes responds "yeah," after which the first officer asks Plaintiff which knee was injured. After Plaintiff identifies his right knee, the officer holding his arms slightly rotates him towards his stomach, at which point Plaintiff yells in pain. Officer Reyes then briefly touches Plaintiff's knee and says, "It is broken," after which the officer holding Plaintiff's hands says, "Did I break his leg?" Another officer asks something about

---

[10] Because of the lighting and number of officers surrounding Plaintiff, the video does not clearly show Plaintiff's leg between approximately the 3:10 mark and when he lies on his side with his leg outstretched approximately a minute later, as described below. However, at the 3:39 mark, the video shows the sole of Plaintiff's right foot, indicating that his knee remains in a bent position. The video does not clearly reveal when the officer releases Plaintiff's knee from the bent position.

21

whether Plaintiff tripped or was tackled and Officer Reyes responds, "I don't know. He just ran." Meanwhile, officers tell Plaintiff that EMS was on its way. As other officers deal with Plaintiff, Officer Reyes discusses the preceding events with surrounding officers.

By the 5:44 mark, Officer Merritt has started cutting the right leg of Plaintiff's jeans, telling him "your leg is angulated, I want to make sure that you've got a pulse in your leg." After cutting open Plaintiff's pant leg, removing his shoe, and cutting off his sock, Officer Merritt checks Plaintiff's foot for a pulse. At the 7:26 mark, Officer Merritt tells Plaintiff that he has a pulse in his foot and needs to keep his leg still. At approximately the 7:42 mark, an officer says "the ambulance is pulling up right now." By the 8:15 mark, after the ambulance parks, Officer Reyes walks away from the officers surrounding Plaintiff to answer an inquiry over his radio. When Officer Reyes returns to Plaintiff's vicinity around the 9:01 mark, EMS workers had begun examining Plaintiff, telling him not to move until they could bring over their stretcher. As EMS workers remove their stretcher from the ambulance, Officer Reyes starts walking back to the area where he first encountered Plaintiff. The remainder of the video shows Officer Reyes searching Plaintiff's car and the area where Officer Reyes first encountered Plaintiff, who does not appear again on the video.

22

## C. Officer Faw

For his part, Officer Faw avers:

"[Officer Faw ] ha[s] been a duly sworn police officer for the Winston-Salem Police Department since July 2015." (Docket Entry 76-1, ¶ 1.) "On November 11, 2020, at approximately 12:13 a.m., while on routine patrol, [he] heard Officer [] Reyes call in a 'security check' in the 1700 block of N. Graham Avenue[,]" which "is commonly used to notify communications personnel of an officer's whereabouts when the officer observes possible criminal activity or when the officer begins an investigation of suspicious activity." (Id., ¶ 3.) "[Officer Faw] had been working with Officer Reyes for approximately nine months . . . [and] knew Officer Reyes to frequently conduct 'security checks' and traffic stops which yielded the seizures of illegal narcotics or firearms or both." (Id., ¶ 4.) "[Officer Faw] has become familiar with [Officer Reyes's] varied tones of voice on the radio from hearing him dozens of times a night[ and] could recognize the inflection of his voice, whether the call was calm and 'routine,' or whether something was going awry, and he was in need of assistance." (Id.) "When Officer Reyes called in this 'security check,' [Officer Faw] could hear a tone in [Officer Reyes's] voice that caused [Officer Faw] to believe that more than just a calm, 'routine' incident was occurring." (Id.)

23

"A brief time after hearing Officer Reyes call in the original 'security check,' he quickly requested a 'Code one B.K.[,]'" which "is utilized as radio traffic . . . to disclose that emergency backup is needed as an officer could be in trouble or in need of assistance . . . due to injury or imminent injury due to a limitless possibility of circumstances which encompasses everything from a resistive or combative subject to the presence of weapons." (Id., ¶ 5.) "[Officer Faw] immediately began travelling [sic] towards Officer Reyes'[s] last known location" and "turned on blue lights and audible siren and activated [Officer Faw's] Axon Flex Body Worn Camera." (Id., ¶ 6.)

"From being involved in incidents where an arrest has to be made on a resistive or combative subject[], [Officer Faw] kn[e]w that what usually is just a few seconds or minutes in real time can feel like a much longer time frame in the heat of the moment and that it is a very unsettling feeling for an officer who is waiting for assistance to arrive." (Id.) "[Officer Faw] heard a 'radio check' for Officer Reyes[,]" which "is conducted by communications personnel to ensure the officer's well-being. (0:42.)" (Id., ¶ 7.) "After the radio check, [Officer Faw] only heard silence for what felt to [him] like an unreasonably extended period of time[,]" and "[he] was not sure if Officer Reyes was in good health or if he was injured or possibly struggling to subdue a combative subject." (Id.) "[C]ommunications personnel 'radio checked' Officer Reyes

24

once more (0:57)[,]" and "Officer Reyes called over the radio that
he had 'one running to the back of the building[]'" and "provided
a description of the suspect as "grey shirt, black male, dreads.
(1:07.)'" (<u>Id.</u>, ¶ 8.) "As Officer Reyes'[s] radio traffic
continued, the volume of his voice began increasing, and his tone
became more distressed." (<u>Id.</u>)

"Based on [Officer Faw's] training and experience, [he] kn[e]w
that pursuit of a fleeing suspect on foot involves a tense and
rapidly changing set of circumstances that can prove very dangerous
for involved officers as well as the suspect." (<u>Id.</u>, ¶ 9.)
"Officer Reyes yelled into the radio, 'He's going to get in the
car!' (1:12)" and "then shouted, 'Block in the Cadillac, there is
VCSA underneath the car.' (1:17.)" (<u>Id.</u>) "'VCSA' is used to
refer to illicit drugs and narcotics due to it being a Violation of
the Controlled Substances Act." (<u>Id.</u>) "[Officer Faw] ha[d]
personally been involved in numerous drug and narcotic
investigations" and, "[i]n [his] experience, . . . people who
engage in the use and/or sale of illicit drugs commonly are very
often found to be in possession of weapons and firearms" and thus
"[h]earing Officer Reyes confirm that 'VCSA' was located on scene
heightened [Officer Faw's] suspicion that weapons could be
involved." (<u>Id.</u>)

"Officer Reyes called in the aforementioned description of the
suspect again and stated that 'he is running towards New

25

Walkertown! Crossing New Walkertown!' (1:26.)" (Id.. ¶ 10.) "[Officer Faw] observed Officer [] Coppola's patrol vehicle travelling [sic] on New Walkertown Road in front of [Officer Faw]" and "began following Officer Coppola towards Officer Reyes' location." (Id.) "[Officer Faw] heard another officer on the radio say, 'Units, he's running right at you on New Walkertown!' (1:35.)" (Id.) "[Officer Faw] observed the light from Officer Reyes'[s] flashlight swinging back in [sic] forth in the lane of travel near the south curb line of New Walkertown Road," and "observed the suspect, who was later identified as [Plaintiff], fall down." (Id., ¶ 11.) "Officer Reyes was close behind [Plaintiff] when [Officer Faw] observed [Plaintiff] quickly get back on his feet and begin advancing in Officer Reyes'[s] direction," and "Officer Reyes was able to push [Plaintiff] back to the ground." (Id.) "In [Officer Faw's] training and experience, [he] kn[e]w that the safest and most advantageous position to place a suspect in so that handcuffs can be applied is in the 'prone' position," which "is when the arrestee is lying flat on the ground on his stomach." (Id.) "[Officer Faw] parked [his] vehicle and got out in order to run to assist Officer Reyes. (1:42.)" (Id., ¶ 12.)

More specifically:

As [Officer Faw] was running to the scene, [he] saw that Officer Reyes and Officer Coppola were attempting to gain control of [Plaintiff], who was on his back on the ground. [Officer Faw] observed Officer Reyes with his

26

gun drawn and pointed at [Plaintiff] yelling the command to "get your hand out of your pocket." (1:45.) [Officer Faw] kn[e]w that weapons such as knives and firearms, as well as controlled substances, can be carried in the pockets of pants. Based on the flight of [Plaintiff] and the known presence of drugs, [Officer Faw] believed that [Plaintiff] was probably in possession of either some sort of weapon that could be used to harm officers, and/or in possession of drugs.

Weapons such as knives and firearms can be used against members of a community and police officers to inflict serious bodily injury or death. A knife can be small and easily concealed in a pocket and can be utilized to cut or stab parties involved. Firearms (especially handguns) can be small in size and easily concealed within the waistband of a person's pants or their pockets and can be used to shoot someone, which can cause death or serious injury. A number of controlled substances, including cocaine, methamphetamine, heroin, and fentanyl, can prove very dangerous or fatal if ingested by an arrestee. Fentanyl being a powder can easily be dispersed into the air and ingested either intentionally or unintentionally by arrestees or officers and can be fatal even in small quantities. It is often common that people in possession of illicit narcotics and/or weapons will try to discard them when approached by police.

When [Officer Faw] arrived at the location where Officer Reyes and Officer Coppola were struggling with [Plaintiff], [Officer Faw] saw that [Plaintiff] was wearing a grey shirt, and blue jeans which were positioned well below where a natural waistline would be with part of his buttocks exposed as well as his underwear. Officers Coppola and Reyes were attempting to gain control of [Plaintiff]'s hands. [Plaintiff] was tensing his arms and legs and resisting being placed into handcuffs. [He] was laying [sic] on his back and/or left side, and was moving and struggling with the officers.

[Officer Faw] believed that [he] needed to physically engage [Plaintiff] to help bring him under control. [Officer Faw] considered [his] options on how to best assist with gaining control of [Plaintiff] to complete the arrest. Due to the fact that [Plaintiff] had not yet been searched, and it was known that he was connected to illegal narcotics, [Officer Faw] knew that [Plaintiff] could still be in possession of a weapon

27

also. This unknown factor made the possibility of [Plaintiff] becoming assaultive with either a weapon or his hands a very real possibility. Based on his position on the ground and Officer's [sic] Reyes and Coppola struggling with [Plaintiff's] upper body, [Officer Faw] knew that it would not be reasonable to use [oleoresin capsicum ("OC"), i.e., pepper spray] because the likelihood of contaminating other officers would be too high. The use of the [conducted energy weapon ("CEW"), i.e., TASER] or Asp Baton would have required Officers Reyes and Coppola to partially disengage for [Officer Faw] to have a clear shot without striking one of them. This left [Officer Faw] the option of going hands on with [Plaintiff]'s lower body to gain compliance through other means.

The following describes [Officer Faw's] attempts to help the other officers bring [Plaintiff] under control. Although [Officer Faw's] written description encompasses several paragraphs, the actual events occurred very quickly, over a period of mere seconds, in circumstances that were tense, uncertain and rapidly evolving.

Due to Officers Reyes and Coppola being on either side of [Plaintiff] and attempting to control his upper body, [Officer Faw] made the decision to attempt to control [Plaintiff]'s lower body in order to help the other officers roll [him] into a prone position (face down), and to then utilize the bent knee control/compression technique. [Officer Faw] received departmental training on the bent knee control/compression technique in 2020. [Officer Faw's] understanding is that this technique was taught (after the George Floyd incident highlighted the dangers of positional asphyxia) as an alternative way to bring a suspect under control that would greatly reduce the chances of positional asphyxiation. Sometimes, in the field, officers will shorten the name of the bent knee control/compressions technique, and refer to the technique as a "leg lock." Due to [Plaintiff] being involved in a foot pursuit, which [Officer Faw] kn[e]w leads to shortness of breath, and due to the fact that two officers were struggling with him and placing some weight on his upper torso, [Officer Faw] knew that positional asphyxiation was a consideration that had to be taken into account.

[Officer Faw] then grabbed [Plaintiff]'s right ankle with [Officer Faw's] right hand and attempted to bend

28

[Plaintiff's] leg, in a natural bend, knowing that if [his] knee were naturally bent, it would make it easier to roll him onto the prone position. This was unsuccessful due to [Plaintiff] resisting by tensing his leg and locking it in the straight position. In order to place [Plaintiff] onto his stomach and into the prone handcuffing position, where [Officer Faw] could apply the bent knee control/compressions technique to the best of [his] ability, [Officer Faw] communicated to Officers Coppola and Reyes to "roll [Plaintiff] over," which in [Officer Faw's] mind meant onto his stomach since this was a commonly used position to apply handcuffs in the prone position. (1:54.)

[Plaintiff] was continuously stating words to the effect of, "Y'all gonna kill me?" [Officer Faw] grabbed [Plaintiff] by his right leg and began trying to roll him onto his stomach. [Plaintiff] then began yelling, "Don't kill me bro." [Officer Faw] then transitioned to [his] left hand and wrist on [Plaintiff]'s right ankle and attempted to bend his leg by pushing it towards his buttock. [He] was still resisting by tensing his leg and locking it in the straight position. [He] was also violently tossing, turning and rotating his hips and legs at the same time.

[Officer Faw] attempted to overcome [Plaintiff]'s resistance by delivering hard hand strikes to what [Officer Faw] believed to be the back of [Plaintiff]'s right knee, however; this was ineffective due to [Plaintiff]'s strength. (2:00.) [Officer Faw] kn[e]w that the knee is the bending point of the leg and by applying force or a strike to the back of the knee it makes it harder for a suspect to keep his leg straight instead of bent. That was [Officer Faw's] intention in delivering hard hand strikes to the back of the knee. [Officer Faw's] belief was that it would force [Plaintiff]'s knee to bend forward, and [Officer Faw] would be able roll [Plaintiff] onto his stomach, and then apply the bent knee control/compression technique. However, [Officer Faw's] strikes to the area of the back of [Plaintiff]'s knee were not successful. [He] continued to use his leg strength to keep his leg straight.

[Plaintiff]'s blue jeans were baggy in nature and worn well below his waistline, which obscured [Officer Faw's] view of the angle of [Plaintiff]'s leg. This fact,

29

coupled with [Plaintiff]'s violent tossing and turning, made it difficult for [Officer Faw] to ascertain exactly where [Plaintiff]'s knee was. [Officer Faw] then transitioned both of [his] hands on [Plaintiff]'s right ankle and placed [Officer Faw's] right knee against what [he] believed to be the back of [Plaintiff's] knee in order to create a fulcrum, or bending point, to assist [Officer Faw] in gaining control of [Plaintiff's] leg and putting him in the prone position for handcuffing. [Officer Faw's] objective in placing [his] knee against the back of [Plaintiff]'s right knee was to force [his] knee to bend in a natural bend and complete rolling [him] onto his stomach, and bring him under control. This is a technique that [officers] are trained to use. [Officer Faw] used [his] hands, which were grasping [Plaintiff]'s ankles, and attempted to push [his] right leg towards the buttocks, in an attempt to bend [his] right knee in a natural bend, to facilitate rolling him over onto his stomach. [Officer Faw] felt [Plaintiff]'s knee bend at almost the exact moment that Officer Reyes, Officer Coppola, and [Officer Faw] rolled [Plaintiff] onto his stomach. (2:08.) [Officer Faw] felt or heard a popping noise around the time that [Plaintiff] was rolled onto his stomach; however, [Officer Faw] did not immediately know that [Plaintiff]'s knee had been injured or the extent of any injury. [Officers] had not yet gotten control of [Plaintiff]'s hands/arms, and [Officer Faw's] immediate focus at that point was for officers to gain control of [Plaintiff]'s hands and handcuff him. [Officer Faw] was able to step [his] left leg through the bend of [Plaintiff]'s leg and squat down into the bent knee control/compression technique position. As noted above, this is a technique that officers were trained to perform at the Winston-Salem Police Department. The purpose of this technique is to control a subject on the ground without placing weight on the back of a subject. This technique allows officers to control a subject who is on the ground while mitigating the risk of positional asphyxia.

Immediately after [Plaintiff] was rolled onto his stomach, [he] started yelling that his knee was injured. (2:08.) As stated above, [Officer Faw] did not immediately know the extent of [Plaintiff]'s knee injury, and [his] immediate focus at that time was to bring [Plaintiff] under control by handcuffing him behind his back. [Officers] are trained to set the bent knee

30

compression/control technique and to stay in the bent knee compression/control technique position until the subject is secured. [Officer Faw] commanded [Plaintiff] to "place [his] hand behind [his] back" at which time he began to comply. By this time, Officer [] Van Buren had arrived and gained control of [Plaintiff]'s left arm and wrist and requested to "cuff him." [Officer Faw] heard another officer yell "quit reaching" again, indicating to [Officer Faw] that [Plaintiff] was continuing to resist, and continuing to reach toward []his pocket or pockets. (2:24.)

[Officer Faw] requested that someone call for an EMS unit, emergency traffic due to [Plaintiff] complaining of a knee injury. (2:44.) [Officer Faw] was able to apply handcuffs to both [Plaintiff]'s left and right wrist. [Officer Faw] double locked the handcuffs to prevent any injury to [Plaintiff]'s wrist. (2:50.) After verifying that [Plaintiff] was handcuffed and secure, [Officer Faw] began to exit the bent knee control/compression technique position. As explained above, [Officer Faw] was trained to exit the bent knee control/compression technique position only after a subject is securely handcuffed and secured. To exit the position, an officer has to carefully lean back, weave his or her shin from the back of the subject's upper leg, move the subject's leg out of the way to prevent potential kicking, and stand up. Ensuring an arrestee is secured prior to exiting from the position is important for officer and citizen injury mitigation when using the bent knee control/compression technique. After exiting from the bent knee control/compression technique position, [Officer Faw] relieved all pressure on [Plaintiff]'s leg and rolled him to his right side. (3:00.) Maintaining control of [Plaintiff]'s hands, [Officer Faw] requested that assisting officers search [Plaintiff] for weapons due to believing that he was attempting to grab one during this struggle. (3:04 and 3:20.) [Officer Faw] asked surrounding officers if EMS had been called to ensure that [Plaintiff] had medical assistance coming, to which the[ officers] responded that [EMS] had been called. (3:25.)

[Officer Faw] then saw Officer Reyes check [Plaintiff]'s right leg, which appeared to be bent at an unnatural angle. [Officer Faw] asked Officer Reyes if the leg appeared to be broken and he replied that it possibly was. Due to [Plaintiff]'s leg being injured, [Officer

31

Faw] did not want to cause further damage to it by
rolling [Plaintiff] over onto his side. [Officer Faw]
did not want [Plaintiff] to have difficulty breathing
either, so allowing him to leave his lower body still,
[Officer Faw] braced [Plaintiff's] torso off the ground
by holding him with [Officer Faw's] right arm to prevent
any positional asphyxiation. Sergeant Merritt began
assisting in medical aid to [Plaintiff]. (5:00 and
thereafter.) [Officer Faw] maintained this position
until Paramedics arrived.

. . .

At all times during [Officer Faw's] encounter with
[Plaintiff], [Officer Faw] used force that was reasonable
in the tense, uncertain, and rapidly evolving
circumstances. [Plaintiff] was struggling and resisting
the officers; therefore, as described above, [Officer
Faw] used [his] knee in an attempt to bend [Plaintiff's]
right knee in a natural bend in order to roll [him] onto
his stomach. The combination of [Plaintiff] resisting,
together with the darkness and baggy jeans making it
difficult to judge the exact location of [his] knee, and
[Plaintiff] resisting as [officers] tried to roll him
onto his stomach, combined in such a way as to
accidentally injure [Plaintiff]'s knee. The injury to
the knee was accidental, and caused by the circumstances
described above, including [Plaintiff]'s decision to
resist.

As noted above, after [Plaintiff] was rolled over to his
stomach, [officers] had not yet gotten control of
[Plaintiff]'s hands/arms, and [Officer Faw's] immediate
focus was to gain control of [Plaintiff]'s hands and get
him properly handcuffed and under control. To facilitate
this, [Officer Faw] stepped [his] left leg through the
bend of [Plaintiff]'s leg and squatted down in the bent
knee control/compression technique position, as [Officer
Faw] had been trained to do. As noted above, [Officer
Faw's] training on this technique taught [him] that this
technique was used to greatly reduce the possibility of
positional asphyxiation. In fact, . . . one of the
officers said something about staying off of
[Plaintiff]'s back (which [Officer Faw] believe[d wa]s a
clear reference to avoiding the possibility of positional
asphyxiation), and [Officer Faw] immediately responded,
"That's why I got him in that leg lock." (2:27.)
[Officer Faw] was conveying to [his] fellow officers that

32

[he] was utilizing the bent knee control/compression technique, sometimes called a "leg lock" technique in the field, as a way of minimizing the possibility of positional asphyxiation. [Officer Faw] stayed in that position for under a minute for the purpose of properly securing the handcuffs on [Plaintiff]. As explained above, officers of the Winston-Salem Police Department are trained to stay in the bent knee control/compression technique position until the suspect is completely secured with handcuffs. After [Officer Faw] felt certain that the handcuffs had been properly secured, [he] exited from the position . . . and got up. (2:41 - 2:59.)

At all times in [Officer Faw's] dealings with [Plaintiff], [Officer Faw] acted in accordance with [his] training, and used only that force which [he] believed was necessary under the circumstances. [Officer Faw] acted without malice toward [Plaintiff], and [Officer Faw] took no actions to intentionally harm or cause pain to [Plaintiff]. Instead, [Officer Faw's] actions were reasonably calculated to bring the resisting [Plaintiff] under control in the tense, uncertain, and rapidly evolving circumstances that [Officer Faw] encountered.

(Id., ¶¶ 12-29 (internal paragraph numbering omitted).)

Officer Faw's body camera footage reflects:

During the nighttime, Officer Faw activates his patrol car lights and siren and begins to drive at an accelerated rate through city streets. (0:24, with audio beginning at 0:30.) A female voice over the radio says "2623 radio check" and then, after radio silence, repeats that statement 15 seconds later. (0:40 - 0:57.) A male voice over the radio then says "I got one running, he's headed to the back of the building, grey shirt, black male, dreads." (1:01 - 1:08.) Officer Faw continues driving through city streets with lights and sirens activated while that same male voice yells, more insistently, "he's getting in the car, hey,

33

units, when you get here, block in the Cadillac, there's VCSA under the car, black male, grey shirt running towards New Walkertown, crossing New Walkertown." (1:12 - 1:29.) Another male voice over the radio then exclaims "units, he's coming right at you on New Walkertown." (1:35 - 1:36.)

Officer Faw's patrol car comes to an abrupt stop, and he exits the car and runs toward Plaintiff and two police officers to the left side of the road in the grass adjacent to the curb. (1:37 - 1:40.) As Officer Faw runs towards Plaintiff and the two officers, one of the officers says "get on the fucking ground and get your hand out of your pocket." (1:41 - 1:46.) The video shows Plaintiff lying on his back with his baggy jeans and underwear halfway down his thighs with one officer kneeling at Plaintiff's right side and the other officer standing over Plaintiff on his left side. Officer Faw kneels or bends down at Plaintiff's right side and puts his left arm on what appears to be Plaintiff's left hip to assist the two officers in trying to gain control of Plaintiff.[11] Plaintiff rolls from his back to his right side resisting the officers' repeated commands to put his hands on his back and says words to the effect of "are y'all going to kill me" and "don't kill me, bro." (1:47 - 1:50.) One of the officers says "roll him over," and the officers appear to try rolling Plaintiff

_____

[11] Due to the close proximity of Officer Faw's body camera to Plaintiff, the darkness, and the rapid body motions involved, the video does not clearly depict Officer Faw's movements once he physically engaged with Plaintiff.

34

onto his stomach, rolling him from right to left. (1:50 - 2:03.) Plaintiff then tells the officers to "get off of me." (2:04.)

A few seconds later, Plaintiff exclaims, "Oh, oh my knee! You broke my knee," as the officers roll Plaintiff onto his stomach and command him to put his hands behind his back. (2:08 - 2:17.) The video then shows Officer Faw in the vicinity of Plaintiff's legs, with two officers on either side of Plaintiff's torso actively cuffing Plaintiff's hands. (2:18 - 2:20.) An officer says "someone call for EMS," while another commands Plaintiff to "stop reaching" twice. (2:20 - 2:24.) At this point, an officer says "stay back off his back," to which Officer Faw responds "that's why I've got him in that leg lock." (2:25 - 2:29.) The video then shows the upper portion of Plaintiff's body illuminated by a flashlight, as he lies on his stomach and officers attempt to handcuff his hands behind his back. Plaintiff says "let my knee go," and Officer Faw responds "relax, hold on." (2:30 - 2:37.) At around the 2:38 mark, an officer is heard calling for a "code five" and by 3:00, the officers finish handcuffing him.

Officer Faw then appears behind Plaintiff to his left, rolls him onto his left side, and requests the officers to search Plaintiff for weapons. (3:01 - 3:05.) Plaintiff says "I don't have no weapons, bro," to which Officer Faw responds "well we gotta make sure," and Plaintiff says "you see my ass, bro, my ass right here, bro." (3:05 - 3:11.) Officer Faw again requests that

35

officers "do a search of him real quick," while Plaintiff says "please don't grab my knee, bro." (3:11 - 3:23.) Officer Faw asks if someone has called EMS, and another officer answers affirmatively, while Officer Reyes searches Plaintiff's pants and asks "which knee," to which Plaintiff responds "my right knee." (3:24 - 3:32.) Officer Faw then asks if Plaintiff is "good search wise," and then starts to say "okay we're gonna let you sit - ," but does not finish that statement due to Plaintiff crying out. Officer Faw then asks "did I break his leg," and Plaintiff says "my knee's broke, please." (3:33 - 3:44.) Officer Faw then says "I know, just relax, we got EMS coming for you." Plaintiff says that he wants an ambulance and "don't put no pressure" on his knee, and Officer Faw responds "we're not, I'm just trying to keep you off your chest and leave you where you're at." (3:45 - 4:25.)

Plaintiff subsequently asks if he can roll over, and Officer Faw responds "let's not roll right now because of your leg." (4:26 - 4:30.) Officer Faw then informs Plaintiff that another officer is cutting Plaintiff's jeans so he can assess Plaintiff's right leg. The video shows Officer Merritt at Plaintiff's feet cutting Plaintiff's right pants leg with scissors. (4:31 - 4:52.) Officer Merritt then says "listen to me, you need to lay still, your leg is angulated, I want to make sure you've got a pulse in your leg." (4:53 - 4:58.) After cutting open Plaintiff's pant leg, removing his shoe, and cutting off his sock, Officer Merritt checks

36

Plaintiff's right foot for a pulse and then tells Plaintiff that he
has a pulse in his foot and needs to keep his leg still. (4:59 -
6:33.) At approximately the 6:42 mark, an officer says "the
ambulance is pulling up right now, man." Plaintiff later asks if
someone can roll him over, and Officer Faw says "just hold on, the
ambulance is here, and we're gonna get you everything we can get
for you." (6:43 - 7:09.) Plaintiff states that "it hurts so bad,"
and Officer Faw responds "I know but you don't need to move your
leg." (7:10 - 7:19.) Plaintiff states that he "can't breathe,"
and Officer Faw says "I know, hold on, here, just get your weight
off your chest and just keep breathing, I don't want to move his
leg at all," and the video shows Officer Faw's left hand on
Plaintiff's left shoulder rolling Plaintiff back off his chest
slightly. (7:20 - 7:28.)

At the 8:02 mark, a paramedic enters the field of view to the
left and examines Plaintiff's knee, telling him not to move until
EMS workers could bring over their stretcher, and Officer Faw tells
Plaintiff to "hold on." (8:02 - 8:25.) As EMS workers bring their
stretcher over to Plaintiff, Officer Faw tells Plaintiff "hold on,
we're getting you on the stretcher, just give us one second, we're
working through it." (8:26 - 9:12.) As EMS workers engage with
Plaintiff, Officer Faw says "EMS is going to let you roll," and
that officers will "adjust the handcuffs" to assist. (9:13 -
9:32.) Officer Faw then utilizes a waist belt to assist other

37

officers in transferring the handcuffs to the front of Plaintiff's body, telling Plaintiff "I know, just relax, man, we're trying to get you some help."  (9:33 - 9:58.)  EMS workers successfully place Plaintiff onto the stretcher (11:16), and Officer Faw continues to assist other officers with securing Plaintiff's handcuffs in the front of his body (11:16 - 12:00).  EMS workers complete loading Plaintiff's stretcher into the ambulance (12:54), and Officer Faw remained standing at Plaintiff's right side during much of that process (12:01 - 12:53).  The remainder of the video shows Officer Faw standing at the back of the ambulance as EMS workers administer to Plaintiff.  (12:54 - 16:13.)

## D.  **Officer Coppola**

Officer Coppola avers as follows:

"[Officer Coppola is] employed by the City of Winston-Salem as a police officer, and was so employed on November 11, 2020." (Docket Entry 76-2, ¶ 1.)  "On November 11, 2020, shortly after midnight, [Officer Coppola] responded code one (lights and siren) to the area of Graham Court in reference to an officer asking for 'code one' (emergency traffic) backup."  (Id., ¶ 3.)  "While enroute (traveling [w]est on New Walkertown Road), [Officer Coppola] could hear the officer saying, on the radio, that the individual running away from him was a black male with dreads and was running ([s]outh) towards the area of New Walkertown Road." (Id.)  As [Officer Coppola] was approaching the area of New

38

Walkertown Road, . . . [he] could see the individual described as he was running across New Walkertown Road, being pursued by Officer Reyes[,]" and, "[o]nce the individual made it to the south curb line of new Walkertown Road, he then started running east (toward [Officer Coppola] on the [s]outh sidewalk of New Walkertown Road) still being pursued by Officer Reyes." (Id., ¶ 4.) "Due to [Officer Coppola's] training and experience, [he] kn[e]w that most law-abiding citizens usually do not run away from police" and "that[,] if a subject[] running away from police isn't detained in a timely manner, it can result in serious injury to officers and possible injury to the public (due to the suspect possibly being armed and not properly searched prior to running away, the suspect running into traffic, the suspect possibly breaking into a house or stealing a car to getaway, etc.)." (Id., ¶ 5.)

"While [Officer Coppola's] emergency equipment was still activated (lights and siren), . . . [he] went onto the opposite lanes of travel on New Walkertown Road . . . [to not] unnecessarily prolong [his] response time to Officer Reyes." (Id., ¶ 6.) [Officer Coppola] then saw the subject, later identified as [Plaintiff], fall down near the curb of New Walkertown Road and attempt to get up[,]" and "Officer Reyes push[ Plaintiff] to the ground on a grassy area alongside New Walkertown Road, next to the sidewalk. (0:49.)" (Id., ¶ 7.) "[Officer Coppola] stopped [his] patrol car, exited it, and commanded [Plaintiff] to get on the

39

ground as [Officer Coppola] ran towards [Plaintiff] and Officer Reyes." (<u>Id.</u>) [Plaintiff] was laying [sic] on his back, with [] both his hands near his pant pockets. (0:52.)" (<u>Id.</u>)

In particular:

Officer Reyes commanded [Plaintiff] to get his hands out of his pockets as [Officer Coppola] grabbed both [Plaintiff's] wrists with [Officer Coppola's] hands ([his] right hand grabbing [Plaintiff's] right wrist, [Officer Coppola's] left hand grabbing [Plaintiff]'s left wrist). [Officer Coppola] then commanded [Plaintiff] to put his hands on his back as [Officer Coppola] attempted to roll [Plaintiff] over to his stomach for prone handcuffing. [Plaintiff] resisted by bending his left hand and placing his left hand near the left side of his head. He then straightened out his right arm keeping it near the area of his right pant pocket. [He] then continued to make statements like: "Are you guys gonna kill me?" as he refused to listen to police commands. (1:00 – 1:12.)

Other officers arrived. [Officers] have been taught to roll such suspects as [Plaintiff] onto their stomach (a prone position) so that they can be brought under control and handcuffed. Therefore, the other officers and [Officer Coppola] attempted to turn or roll [Plaintiff] onto his stomach so that [officers] could safely handcuff him behind his back. [Plaintiff] continued to resist by not following officer's [sic] instructions. [Officers] rolled [Plaintiff] onto his back.[12] Almost immediately, [he] said something like, "Oh shit. My knee. You broke my knee." (1:18.)

_____

[12] Although Officer Coppola states that "[officers] rolled [Plaintiff] onto his <u>back</u>" (Docket Entry 76-2, ¶ 9 (emphasis added)), given both Officer Coppola's reference earlier in that same paragraph to the officers' "attempt[] to turn or roll [Plaintiff] onto his <u>stomach</u> so that officers could safely handcuff him behind his back" (<u>id.</u> (emphasis added)), and the other officers' similar averments about rolling Plaintiff onto his <u>stomach</u> and/or Plaintiff lying on his <u>stomach</u> as officers attempted to handcuff his hands behind his back (<u>see, e.g.</u>, Docket Entry 76-1, ¶¶ 18-22; <u>see also</u> Docket Entry 76-3, ¶ 6; Docket Entry 76-5, ¶¶ 6-7), the undersigned interprets Officer Coppola's statement that "[officers] rolled [Plaintiff] onto his <u>back</u>" (Docket Entry 76-2, ¶ 9 (emphasis added)) as a scrivener's error that should read "[officers] rolled [Plaintiff] onto his <u>stomach</u>."

Right before [Plaintiff] said that his knee was injured, [Officer Coppola] was focused on trying to turn [Plaintiff] over onto his stomach in order to bring him under control and handcuff him. [Officer Coppola] was not looking at [Plaintiff]'s leg or knee at the moment of injury, and [Officer Coppola] did not see the injury occur. [Officer Coppola] do[es] not know how the injury occurred. If, during the encounter with [Plaintiff], [Officer Coppola] had seen or had knowledge of any officer violating [Plaintiff]'s constitutional rights, [Officer Coppola] would have attempted to stop the violation. However, [Officer Coppola] did not see, or have knowledge of, any officer violating [Plaintiff]'s constitutional rights.

After [Plaintiff] was rolled onto his stomach, he still continued to resist by not obeying [officers'] commands to place his hands behind his back. However, within a few seconds, [Plaintiff] complied, placed his hands behind his back and officers were able to place handcuffs on him. (1:36.)

Once [Plaintiff] was handcuffed, [Officer Coppola] got up and stepped away from him. (1:49.) Officer Faw continued to kneel on [Plaintiff] for several seconds while securing the handcuffs. (1:49 – 2:05.) . . . [Officer Coppola] say[s] to Officer Faw, "You got him under control?" to which Officer Faw answered, "Yeah." [Officer Coppola] then said, "Let's roll him over." (2:06.) Officer Faw immediately got up.

[Officers Coppola and Faw] then attempted to roll [Plaintiff] to his side so he could breathe freely and so [officers] could search his person. [Plaintiff] continued to complain about his right knee. (2:12.)

. . .

Someone called for an ambulance, and you can hear an officer telling [Plaintiff] that EMS was coming . . . . (2:59.) [Officer Coppola] can be heard telling [Plaintiff] that an ambulance was on the way . . . . (3:16.)

Forsyth EMS ambulance 31 can be seen arriving at the scene . . . . (6:02.)

41

> Due to [Plaintiff]'s condition, and needing to be placed on a stretcher, a decision was made to handcuff [Plaintiff] in the front with the aid of a restraint belt. [Officer Coppola] assisted in taking off the handcuffs so [Plaintiff] could have his hands in front. [Officer Coppola] then assisted in lifting [Plaintiff] onto the stretcher. (9:04 - 10:40.)

(Id., ¶¶ 8-16 (paragraph numbering omitted).)

In turn, Officer Coppola's body camera footage shows the following:

The video begins with Officer Coppola driving his patrol car at night, activating his lights and siren, and accelerating through city streets. (0:00 - 0:11.) Audio begins at 0:12 with a male voice over the radio saying "I got one running to the back of the building, black male, grey shirt, dreads." (0:12 - 0:19.) That male voice then states, more insistently, "he's going to get in the car, hey, units when you get here, block in the Cadillac, there's VCSA under the car." (0:20 - 0:27.) The voice continues "black male, grey shirt running towards New Walkertown, crossing New Walkertown," and another voice over the radio says "units, he's running right at you on New Walkertown." (0:28 - 0:45.)

At this point, Officer Coppola's patrol car pulls to a stop at the left-hand curb of a street, and his headlights illuminate Officer Reyes pushing Plaintiff to the grass next to the curb. (0:46-0:48.) Officer Coppola exits his vehicle and runs towards Plaintiff and Officer Reyes, who shouts "get on the ground" multiple times. The video shows Plaintiff lying on his back with

42

his jeans and underwear down below his hips and both hands near the front pockets of his jeans, as well as Officer Reyes standing to Plaintiff's left pointing a gun at Plaintiff. (0:49 - 0:53.) As Office Coppola engages with Plaintiff, Plaintiff raises his left arm and appears to clutch a wadded-up, white-colored item in his left hand. (0:53- 0:54.) Officer Coppola orders Plaintiff "get your hands on your back" multiple times, while Plaintiff repeatedly says words to the effect of "are y'all going to kill me." (0:55 - 1:03.) A siren wails in the background as more officers arrive and engage with Plaintiff. (1:04 - 1:15.) At the 1:16 mark, Officer Coppola's left arm holds Plaintiff's left wrist, as Plaintiff continues to resist the officers, and the officers roll Plaintiff over onto his stomach. Plaintiff then says "oh shit, my knee, you broke it," officers order him to put his hands behind his back, and Plaintiff repeats words to the effect of "oh my knee." (1:17 - 1:26.) An officer tells Plaintiff to "stop reaching," another officer says "stay back off his back," and Officer Faw says "that's why I got him in that leg lock." (1:27 - 1:38.)

The next portion of the video shows that Officer Coppola has stood back up, while Officer Faw remains on top of Plaintiff's legs trying to handcuff Plaintiff's hands behind his back. (1:39 - 1:53.) Plaintiff repeats several times "please let my knee go." (1:54 - 2:00.) Officer Coppola asks Officer Faw "hey, do you have him under control" and, when Officer Faw responds "yeah," Officer

43

Coppola says "let's roll him over." (2:01 - 2:07.) Officer Faw rolls Plaintiff over onto his right side and requests other officers to "search him real quick for weapons." (2:08 - 2:13.) Plaintiff says "I don't have no weapons, bro, you see my ass, bro, my ass right here, bro," and Officer Faw pulls up Plaintiff's underwear over his buttocks. (2:14 - 2:21.) Officer Faw again requests "can someone do a search of him real quick," and Officer Reyes searches the pockets of Plaintiff's jeans. (2:22 - 2:26.) Plaintiff says "please don't grab my knee," Officer Reyes asks "which knee," and Plaintiff responds "my right knee." (2:27 - 2:40.) Officer Faw asks "is [Plaintiff] good search wise," and then says "okay, we're going to let you sit - ," but does not finish that statement due to Plaintiff crying out. Officer Faw then asks "did I break his leg," and another officer says "we've got EMS coming for you." (2:41 - 2:59.)

The video then shows Officer Faw remaining on the ground to Plaintiff's left side with his right hand on Plaintiff's cuffed hands, with other officers standing nearby, including Officer Coppola, who says "we got an ambulance coming." (3:00 - 3:15.) Plaintiff asks if he can roll over, and Officer Faw says "let's not roll right now because of your leg." (3:16 - 3:39.) Officer Merritt then appears at Plaintiff's feet and begins to cut Plaintiff's right pants leg, and Officer Coppola returns to his vehicle and moves it to a new location further down the street.

44

(3:40 - 4:47.)  Officer Coppola returns to Plaintiff's location in the grassy area by the curb, and then directs traffic to make room for the arriving ambulance.  (4:48 - 7:00.)  Officer Coppola then returns to Plaintiff's location where EMS workers have arrived and have started tending to Plaintiff.  (7:01 - 7:16.)

Beginning at about the 9:00 mark, Officer Coppola assists other officers in applying a waist belt to Plaintiff so they can transfer his handcuffs to the front of his body and then assists EMS and other officers as they lift Plaintiff onto the stretcher.  (9:00 - 10:25.)  Officer Coppola asks "[Plaintiff] didn't drop anything, did he," as Officer Coppola shines his flashlight on the ground in the grassy area near the curb.  (11:49 - 12:05.)  With the exception of a brief trip over to his patrol vehicle to retrieve his phone, the remainder of the video shows Officer Coppola standing at the back of the ambulance while EMS workers assist Plaintiff inside on the stretcher.  (12:06 - 15:27.)

### E.  Officer Walker

Officer Walker offers the following averments:

"On November 11, 2020, [Officer Walker] was duly sworn and on duty with the Winston-Salem Police Department."  (Docket Entry 76-3, ¶ 1.)  "In the early morning hours of November 11, 2020, [he] was sitting in [his] patrol car on 550 N. Martin Luther King Jr. Drive when [he] heard Officer Reyes call for Code 1 (Emergency assistance) to Graham Court."  (Id., ¶ 4.)  [Officer Walker]

45

activated the lights and siren on [his] patrol vehicle and proceed [sic] to the area" and, "[w]hile enroute, [he] heard Officer Reyes state that a subject was running toward New Walkertown Road, and [Officer Reyes] was directing units to the area the offender was running." (Id.)

"Upon arriving at the scene, [Officer Walker] observed three officers in an active struggle with the suspect. (1:12.)" (Id., ¶ 5.) "It was dark, but [Officer Walker] could see the struggle. (Id.) "[He] parked [his] patrol vehicle in the inside lane of New Walkertown Road . . . [and] immediately got out of [his] patrol vehicle and ran to assist the officers who were in an active struggle with the suspect attempting to gain control of him. (1:18.)" (Id.) [Officer Walker] observed the suspect to be laying [sic] face down in a grassy area just beyond the curb of New Walkertown Road." (Id.) "[I]n [Officer Walker's] body camera video, you can hear the suspect yelling something to the effect that his knee had been broken, but [Officer Walker] d[id] not remember hearing that at the time. (1:18 - 1:20.)" (Id.)

More specifically:

As [Officer Walker] arrived at the scene, the suspect was on the ground, face down. [Officer Walker] observed the suspect's right hand attempt to go under his stomach in the belt line region of his body. At this time, [Officer Walker] commanded [the suspect] to "stop reaching" on at least two different occasions. (1:26.) [Officer Walker] then grabbed the suspect's wrist, in a bent wrist technique to prevent him from reaching toward his abdomen area. It should be noted, that at this time, [Officer Walker] did not know if the suspect had a weapon on him

46

so it was imperative to not let the suspect reach for any part of his body during [the officers'] struggle with him. The bent wrist technique was taught to [Officer Walker] during [Basic Law Enforcement Training ("BLET") ] which [he] completed in 2018.

[A]n officer said something to the effect that officers should stay off of the suspect's back. From [Officer Walker's] training, [he] knew that staying off a suspect's back in this situation was something [officers] were trained to do, in order to avoid positional asphyxiation. You can hear Officer Faw respond, "That's why I got him in that leg lock."

[Officer Walker] was able to get the suspect's right hand behind his back, and an assisting officer handcuffed the suspect. (1:35.) At this point[,] [Officer Walker] heard the suspect stating words to the effect that his knee had been broken. As [Officer Walker] stood up, [he] called for EMS "10-18" (Emergency Traffic) to [the officers'] location. (1:50.) Other officers may have also called for EMS. [Officer Walker] then alerted communications that [officers] had the suspect in custody. As [officers] were waiting for EMS to arrive on scene, Sgt. Merritt performed first aid. [Officer Walker] then was able to observe the suspect and [he] knew [the suspect] to be [Plaintiff]. [Officer Walker] knew [Plaintiff] due to having multiple contacts with him prior to [November 11, 2020].

EMS arrived on scene, and [Officer Walker] provided [Plaintiff]'s information to [EMS workers] prior to them leaving for the hospital.

The injury to [Plaintiff]'s knee occurred before [Officer Walker] arrived at the scene. [Officer Walker] do[es] not know how the injury occurred. If, during the encounter with [Plaintiff], [Officer Walker] had seen or had knowledge of any officer violating [Plaintiff]'s constitutional right, [Officer Walker] would have attempted to stop the violation. However, [Officer Walker] did not see, or have knowledge of, any officer violating [Plaintiff]'s constitutional rights.

(Id., ¶¶ 6-10 (internal paragraph numbering omitted).)

47

Officer Walker's body camera footage reveals the following:

The video opens with Officer Walker operating his patrol car at nighttime at an accelerated rate. (0:00 - 0:11, with audio beginning at 0:12.) As Officer Walker drives through city streets with his lights and siren activated, a male voice over the radio proclaims "he's going to get in the car, hey units, when you get here, block in the Cadillac, there's VCSA under the car." (0:12 - 0:23.) That same male voice then says, more insistently, "black male, grey shirt, running towards New Walkertown, crossing New Walkertown." (0:24 - 0:30.) Officer Walker's patrol car then passes a gold Cadillac parked on the left side of the road where other patrol cars with lights activated and at least one officer on foot appear in view. (0:31 - 0:36.) Officer Walker continues driving through city streets, with various individuals speaking somewhat inaudibly over the radio. (0:37 - 1:13.)

Officer Walker thereafter pulls to a stop and, to the right of the field of view, three officers kneel on the ground struggling with an individual in a grassy area adjacent to the curb. (1:14 - 1:18.) As Officer Walker reaches the officers, the individual, later identified as Plaintiff, says "oh shit, my knee, you broke it." (0:19 - 0:20.) An officer says "somebody call for EMS" (0:24), and Officer Walker commands Plaintiff to "stop reaching" twice (1:26). Officer Reyes then says "stay back off his back," to which Officer Faw responds "that's why I got him in that leg lock."

48

(1:27 - 1:32.)  A flashlight illuminates Plaintiff lying on his stomach while multiple officers attempt to handcuff his hands behind his back.  (1:33 - 1:35.)

An officer calls a "code 5 to the Cadillac" multiple times, and another officer calls "EMS 10-18," while Plaintiff says words to the effect of "ah man, you broke my knee, please man, let me go."  (1:36 - 1:49.)  Officer Walker says "they're already there at the Cadillac, we're good," and officers appear to have successfully handcuffed Plaintiff's hands behind his back.  (1:50 - 2:03.)  Officer Faw asks if someone can "search him real quick for weapons," and Plaintiff says "you see my ass, bro, my ass right here, bro."  (2:04 - 2:14.)  As Plaintiff continues to express that his knee hurts, an officer confirms that "EMS is coming."  (2:15 - 2:29.)  Officer Reyes approaches Plaintiff and asks "which knee," to which Plaintiff responds "my right knee."  (2:30 - 2:35.)  Officer Faw then asks "did I break his leg," and tells Plaintiff "we got EMS coming for you."  (2:36 - 2:53.)

Officer Walker says "hey, Reyes, if you need to do something with the car, you can do that" and, after Officer Reyes responds inaudibly, Officer Walker says "well, he's gonna be going in an ambulance, bro."  (2:54 - 3:25.)  Plaintiff requests to roll over, and Officer Faw says "well, let's not roll over with your leg."  (3:26 - 3:44.)  Officer Merritt appears at Plaintiff's feet and begins to cut Plaintiff's right pants leg with scissors.  (3:45 -

49

3:47.)  Officer Merritt says "listen, your leg is angulated, and I
want to make sure you got a pulse in your leg."  (3:48 - 4:01.)
Officer Merritt then removes Plaintiff's shoe and cuts off his sock
while Plaintiff continues to express his pain.  (4:02 - 4:58.)
Officer Merritt gets up and kneels down at Plaintiff's shoulder and
says "listen to me a minute, you've got a pulse in your foot, don't
move your leg any at all."  (4:59 - 5:33.)  The ambulance pulls
into view (6:12), and EMS workers start tending to Plaintiff (7:05
- 7:19).

Officer Walker then approaches another officer and says "hey,
I know who he is," and the other officer asks "you know his name,"
and Officer Walker says "Michael Wardlow."  (7:20 - 7:25.)  Officer
Walker then says "alright Mr. Wardlow, we'll get it, hold on,
they're getting the stretcher right now."  (7:26 - 7:44.)  The
remainder of the body camera footage depicts EMS workers loading
Plaintiff onto the stretcher and then into the ambulance, as well
as Officer Walker going to his patrol vehicle to look up
Plaintiff's date of birth and providing Plaintiff's information to
EMS workers.  (7:45 - 15:16.)

**F.   Officer Hollifield**

Officer Hollifield avers as follows in his Affidavit:

"[Officer Hollifield] is employed by the City of Winston-Salem
as a Police Officer, and was so employed on November 11, 2020."
(Docket Entry 76-4, ¶ 1.)  "On November 11, 2020, shortly after

50

midnight, [he] heard a call over [his] radio that Officer Reyes was calling for assistance." (Id., ¶ 3.) "[Officer Hollifield's] memory is that Officer Reyes was involved in a traffic stop, and that the driver of the vehicle, later identified as [Plaintiff], ran from [Officer] Reyes, and that [Officer] Reyes was in pursuit of [Plaintiff]" and "was calling for assistance." (Id.) "[Officer Hollifield] drove [his] patrol vehicle to the area (New Walkertown Road near North Cameron Avenue) from [his] location in the 500 Block of Martin Luther King Jr. Drive." (Id.) "When [Officer Hollifield] arrived at the scene, several other officers were with Officer Reyes and [Plaintiff], and the officers were in the process of taking him into custody. (1:39.)" (Id., ¶ 4.) "Due to having no room to assist, [Officer Hollifield] stood by and watched" and "did not physically engage with, or touch, [Plaintiff]." (Id.) "While standing by, [Officer Hollifield] heard [Plaintiff] yelling that his leg was injured." (Id.) "Using [Officer Hollifield's] radio, [he] called EMS to the scene." (Id.)

"When Sergeant [] Merritt arrived on scene, he asked if anyone had a pair of scissors in their patrol car. (3:18.)" (Id., ¶ 5.) "[Officer Hollifield] retrieved a pair of scissors from [his] patrol car and provided them to Sgt. Merritt. (3:49.)" (Id.) "When EMS arrived on scene, one of the medical professionals requested that [Plaintiff]'s hands be placed in front of him handcuffed as opposed to behind his back." (Id.) "[Officer

51

Hollifield] retrieved a handcuff restraint belt to place on [Plaintiff] so this could be done.  (8:18 - 9:03.)"  (Id.)

"The injury to [Plaintiff]'s knee occurred before [Officer Hollifield] arrived at the scene[,]" and "[Officer Hollifield] do[es] not know how the injury occurred."  (Id., ¶ 7.)  "If, during the encounter with [Plaintiff], [Officer Hollifield] had seen or had knowledge of any officer violating [Plaintiff]'s constitutional rights, [Officer Hollifield] would have attempted to stop the violation."  (Id.)  "However, [he] did not see, or have knowledge of, any officer violating [Plaintiff]'s constitutional rights."  (Id.)

Officer Hollifield's body camera footage shows the following:

The video begins with Officer Hollifield driving his patrol car during nighttime hours through city streets at an accelerated rate behind another police car with its lights activated.  (0:00 - 0:20, with audio beginning at 0:18.)  A male voice over the radio says "he's getting in the car, hey, units, when you get here, block in the Cadillac, there's VCSA under the car."  (0:21 - 0:29.)  That same male voice then says "black male, grey shirt, heading towards New Walkertown, crossing New Walkertown," while Officer Hollifield's patrol car and the police car in front of him pick up speed.  (0:30 - 0:40.)  A different male voice says over the radio "units, he's running right at you on New Walkertown."  (0:41 - 0:46.)  Officer Hollifield parks his patrol car at the left-hand

52

curb of a city street and exits his car (0:47 - 1:00), but then re-enters his patrol car, while saying over his radio "down the hill Walker" (1:01 - 1:16). Officer Hollifield drives a little farther down the road, and stops his vehicle in the middle of the road, with several police cars parked with lights activated at the right-hand curb ahead. (1:17 - 1:28.)

Officer Hollifield exits his vehicle and runs towards those police cars ahead, and comes upon five officers struggling with an individual on the ground in a grassy area next to the curb. (1:29 - 1:39.) Officer Hollifield's flashlight illuminates the individual, later identified as Plaintiff, lying on his stomach, as the five officers attempt to gain control of his arms and hands to handcuff his hands behind his back. (1:40 - 1:41.) Plaintiff then says "oh you broke my knee, please, bro, please, my knee man." (1:42 - 1:44.) Officer Reyes asks Officer Hollifield if he could "go to the Cadillac," and Officer Hollifield says "Hey Ruiz, go to the Cadillac." (1:45 - 1:48.) Plaintiff repeats words to the effect of "please let my knee go," and Officer Hollifield says "EMS 10-18 to New Walkertown" over his radio. (1:49 - 2:10.) Officer Hollifield's camera turns back to Plaintiff, revealing his hands now handcuffed behind his back, while he rests on his right side with Officer Faw crouched behind him holding Plaintiff's handcuffed hands. (2:11- 2:12.) Officer Faw asks if someone can "search him real quick for weapons" (2:13 - 2:15), and Plaintiff says "I don't

<sub>53</sub>

have no weapons, you see my ass, bro, my ass right here, bro,"
while Officer Faw pulls Plaintiff's underwear up over his buttocks
(2:16 - 2:22).

Plaintiff then repeats words to the effect of "oh my knee,
just please don't grab my knee," Officer Reyes asks Plaintiff
"which knee," and Plaintiff responds "my right knee." (2:23 -
2:41.) Officer Faw asks "is he good search wise," and then says
"okay, we're gonna let you sit - ," but does not finish his
sentence due to Plaintiff crying out. (2:42 - 2:49.) At this
point, Officer Hollifield calls over his radio "Ruiz, are you with
the car," and a male voice responds "I'm getting ready to pull up
right now." (2:50 - 2:54.) Officer Hollifield then says "Paul,
where's your car at" (2:55 - 3:02), and then says to an officer
"hey, you said your car is right here" while pointing to a patrol
vehicle in front of him (3:03 - 3:15).

Officer Merritt then asks if anybody has "any scissors," and
Officer Hollifield responds "I got some in my car." (3:16 - 3:20.)
Officer Hollifield subsequently heads to his patrol car, retrieves
the scissors, and hands them to an officer, who then hands them to
Officer Merritt. (3:16 - 3:49.) Officer Hollifield then says
"hey, get some of these cars cleared out so we can get EMS down in
here, just out of that lane." (3:50 - 3:56.) At this point,
Officer Hollifield shines his flashlight on Plaintiff's right leg
to assist Officer Merritt in cutting Plaintiff's right pants leg,

54

and Officer Merritt says "listen to me, your leg is angulated, I want to be sure you have a pulse in your leg." (3:57 - 4:09.) Officer Hollifield continues to illuminate Plaintiff's right leg while Officer Merritt removes Plaintiff's right shoe, cuts off his right sock, and takes his pulse in his right foot. (4:10 - 5:30.) Officer Merritt approaches Plaintiff's shoulders and head and says "listen to me a minute, you've got a pulse in your foot, don't move your leg any at all." (5:31 - 5:41.)

The ambulance pulls into view at the 6:20 mark, and EMS workers start tending to Plaintiff by the 7:12 mark, with Officer Hollifield standing by illuminating Plaintiff's legs. Officer Hollifield later says "I can get a belt out of my car, do you want a belt, I'm going to go get a handcuff belt." (8:15 - 8:22.) Officer Hollifield proceeds to his patrol car, retrieves the belt, and returns to the area as EMS workers load Plaintiff onto the stretcher. (8:23 - 9:06.) Officer Hollifield illuminates Plaintiff with his flashlight to assist the officers in transferring his handcuffs to the front of his body. (9:07 - 11:22.) The remainder of the video shows Officer Hollifield standing by while EMS workers load Plaintiff into the ambulance, and Officer Hollifield discussing the logistics of which officer(s) would ride in the ambulance with Plaintiff to the hospital. (11:23 - 15:29.)

55

**G.  Officer Vanburen**

In his Affidavit, Officer Vanburen avers as follows:

"Officer [] Vanburen [] was a duly sworn Police Officer for the Winston-Salem Police Department on November 11, 2020." (Docket Entry 76-5, ¶ 1.)  "Around 12:12 a.m. or so on November 11, 2020, [he] was conducting surveillance on an area near the intersection of Walkertown Road and Graham Avenue in Winston-Salem."  (Id., ¶ 2.)  "Because [he] was conducting surveillance and wanted to avoid being seen, [he] had turned off and/or powered down some of [his] police equipment, including [his] body camera[, which] emits a red light, even when it is not recording[.]" (Id.)  "As [he] was in the midst of the above-referenced surveillance, [he] saw Officer Reyes pursuing a suspect on foot near the intersection of New Walkertown Road and Graham Avenue."  (Id., ¶ 3.)  "[Officer Vanburen] left [his] position, and started running in the direction of Officer Reyes and the suspect he was chasing[ and, a]s [Officer Vanburen] moved, [he] attempted to turn on [his] body camera; however, [his] body camera had to power on, and it did [not] begin recording right away."  (Id.)[13]  "As [he] was running in Officer Reyes' direction, [Officer Vanburen] saw Officer Reyes chasing the

_____

[13] Although Officer Vanburen states that his body camera "did begin recording right away" (Docket Entry 76-5, ¶ 3 (emphasis added)), his earlier statement that "[his] body camera had to power on" (id.), as well as his later statement that "it was about this time when [his] body camera video began recording" (id., ¶ 6), makes clear that Officer Vanburen meant to say that his body camera "did [not] begin recording right away" (id., ¶ 3 (emphasis added)).

suspect across New Walkertown Road" and "saw the suspect fall to
the ground near New Walkertown Road and Cameron Avenue." (Id.,
¶ 5.) "As [Officer Vanburen] continued to run toward the area,
[he] saw other officers arriving on the scene," and "other officers
went 'hands on' with the suspect, struggling to bring the suspect
under control." (Id.)

"When [Officer Vanburen] arrived at the spot where Officer
Reyes and the other officers had been struggling with the suspect,
the suspect was on his stomach, in a prone position[,]" and "it was
about this time when [Officer Vanburen's] body camera video began
recording." (Id., ¶ 6.) "By the time [Officer Vanburen] reached
the suspect, he was already on his stomach, and officers were
trying to handcuff him." (Id., ¶ 7.) "[Officer Vanburen] was not
looking at the suspect's leg when the injury to his leg or knee
occurred" and "did not know at the time how the injury occurred."
(Id.) "If [Officer Vanburen] had seen or had knowledge of any
officer violating the suspect's constitutional rights, [Officer
Vanburen] would have attempted to stop the violation." (Id.)
"However, [he] did not see, or have knowledge of, any officer
violating the suspect's constitutional rights." (Id.)

"After [Officer Vanburen] arrived at the scene, [he] watched
and assisted as officers handcuffed the suspect behind his back.
(0:06.)" (Id., ¶ 8.) "[Officer Vanburen] remember[s] hearing the
suspect yell as [Officer Vanburen] was approaching the scene and

upon arrival at the scene." (Id., ¶ 9.) "[He is] used to suspects yelling when they are taken into custody." (Id.) "[Y]ou can hear the suspect yelling that his knee was injured. (0:11.)" (Id.)

"After the suspect was handcuffed, [Officer Vanburen] observed that [the suspect] was clenching several bills of U.S. currency in his hand[,]" and "[Officer Vanburen] took the currency from the suspect, looked through the currency, then placed the currency in an evidence envelope, and handed the envelope to Sgt. Caffey. (1:20 - 2:58.)" (Id., ¶ 11.) "After that, [Officer Vanburen] walked away from the area where the suspect was laying [sic], and assisted in directing traffic." (Id., ¶ 12.) "Thereafter, [Officer Vanburen] drove [his] vehicle to Officer Reyes'[s] location, near the suspect's vehicle, to assist Officer Reyes with packaging of evidence that he located in the suspect's vehicle." (Id.)

Officer Vanburen's body camera footage depicts the following events:

The video opens with Officer Vanburen on the ground next to Plaintiff and shows multiple officers struggling to gain control of Plaintiff.[14] The officers have rolled Plaintiff onto his stomach, and his jeans and underwear have sagged below his buttocks. It appears that Officer Vanburen's left arm rests on Plaintiff's back.

---

[14] The proximity of Officer Vanburen's body camera, the darkness, and the rapid movements of the individuals in view make it difficult to discern Officer Vanburen's movements.

(0:00 - 0:02.)  Multiple officers command Plaintiff to put his hands behind his back.  (0:03 - 0:06.)  Plaintiff then says "please my knee, you broke it, bro," and an officer says "stop reaching" twice.  (0:07 - 0:15.)  Officer Reyes says "stay back off his back," and Officer Faw says "that's why I got him in that leg lock."  (0:16 - 0:20.)  A flashlight illuminates Plaintiff lying on his stomach with officers attempting to handcuff his hands behind his back, and Plaintiff says "oh you broke my knee, please bro, my knee, let me go, let my knee go."  (0:21 - 0:30.)  After the officers handcuff Plaintiff's hands behind his back, several of them, including Officer Vanburen, stand back up, while Officer Faw remains on the ground at Plaintiff's left side.  (0:31 - 0:52.)

Officer Faw requests other officers to "search him real quick for weapons," Plaintiff responds "I don't have no weapons," and Officer Faw says "well we gotta make sure."  (0:53 - 0:58.) Plaintiff then says "you see my ass, bro, my ass right here, bro." (0:59 - 1:04.)  Officer Faw asks again "can someone do a search of him real quick," and Officer Reyes searches Plaintiff's pants. (1:05 - 1:17.)

Officer Vanburen then walks away from Plaintiff and asks another officer "you got an evidence bag," and that officer inaudibly responds.  (1:18 - 1:19.)  Officer Vanburen then asks for some light as he begins to unfurl some currency on the hood of a patrol car.  (1:20 - 1:22.)  Officer Vanburen says "he was

59

clenching this pretty hard," as Officer Vanburen unfurls a one dollar bill and a five dollar bill, and another officer's hand appears from the right holding a manila envelope. (1:23 - 1:30.) Officer Vanburen then says "I don't see anything so far, if there was any cocaine in that one, it's gone," and the other officer asks "do you want gloves." (1:31 - 1:41.) Officer Vanburen responds "well, at this point, no, I got it, there isn't any in it, I just wanted to check, you can feel." (1:42 - 1:53.) Officer Vanburen then says "we're gonna put it in this anyways, thank you" and places the money in the manila envelope. (1:54 - 1:58.)

Officer Vanburen then returns to the grassy area where Officer Faw holds Plaintiff on the ground, and Officer Merritt begins cutting Plaintiff's right pants leg with scissors. (1:59 - 2:31.) Officer Vanburen walks over to another officer and hands him the manila envelope, while saying "this is the money that was in his hand, I'm gonna go move my car." (2:32 - 2:57.) The remainder of the video shows Officer Vanburen directing traffic to make room for the approaching ambulance and then driving his patrol car to the location of Plaintiff's Cadillac and conversing with the officers who searched the Cadillac. (2:58 - 6:45.)

### III. DISCUSSION

A.   **Relevant Standards**

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, in applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at

248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08CV2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (unpublished) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Further, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08CV721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011) (unpublished), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011) (unpublished) (Eagles, J.).

Ordinarily, "where affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie." Raynor v. Pugh, 817 F.3d 123, 130 (4th Cir. 2016) (internal quotation marks omitted). Yet, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v.

Harris, 550 U.S. 372, 380 (2007); see also, e.g., Love v. Beasley, 788 F. App'x 935, 937 (4th Cir. 2020) (concluding, on review of summary judgment decision, "that the district court did not err in finding that [a defendant] did not punch [the plaintiff] as alleged, because video of the incident confirms [the defendant's] denial").  In Scott,

> the [United States] Supreme Court was faced with a videotape of the incident in question that "utterly discredited" the plaintiff's account, rendering it a "visible fiction."  550 U.S. at 380-81.  As between a videotape of undisputed authenticity, *id.* at 378, and the plaintiff's story, the [Supreme] Court held, the videotape should prevail.  Where the nonmoving plaintiff's account is "blatantly contradicted by the record" so that "no reasonable jury could believe it," it should not be adopted by a court ruling on a motion for summary judgment.  *Id.* at 380.
>
> As [the Fourth Circuit] ha[s] clarified, *Scott* is the exception, not the rule.  It does not "abrogate the proper summary judgment analysis, which in qualified immunity cases 'usually means adopting . . . the plaintiff's version of the facts.'"  *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott*, 550 U.S. at 378).  That standard continues to apply in the face of "documentary evidence" that lends support to a government official's account of events, *id.*, or even makes it "unlikely" that the plaintiff's account is true, *United States v. Hughes*, 606 F.3d 311, 319–20 (6th Cir. 2010) (holding that *Scott* does not apply to photographs rendering plaintiff's account "unlikely").  Summary judgment is proper under *Scott* only when there is evidence — like the videotape in *Scott* itself — of undisputed authenticity that shows some material element of the plaintiff's account to be "blatantly and demonstrably false." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007) (refusing to extend *Scott* to evidence in form of police photographs that fail to depict "all of the defendant's conduct and all of the necessary context"); *see also Witt*, 633 F.3d

63

at 277 (holding *Scott* inapplicable to soundless video that does not capture key disputed facts).

Harris v. Pittman, 927 F.3d 266, 275-76 (4th Cir. 2019) (ellipsis in original) (parallel citations omitted).

As discussed above, Plaintiff failed to respond to the Summary Judgment Motion (see Docket Entries dated Sept. 17, 2025, to present), despite notice to do so (see Docket Entry 78). However, Plaintiff's "verified [Amended C]omplaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (emphasis omitted).[15] The undersigned will therefore consider the verified allegations in the Amended Complaint in resolving the Summary Judgment Motion.

**B.   Analysis**

1.   Section 1983 Excessive Force Claims

"Section 1983 authorizes a plaintiff to sue for an alleged deprivation of a federal constitutional right by an official acting 'under color of' state law." Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018). "[A]ll claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen

---

[15] Even for unopposed summary judgment motions, the moving party must establish "that it is entitled to a judgment as a matter of law." Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) (internal quotation marks omitted).

64

should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989) (emphasis omitted).[16] "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (certain internal quotation marks omitted). Notably, though, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id.

Although an objective test, see id. at 397, the Fourth Amendment's reasonableness standard "is not capable of precise definition or mechanical application," id. at 396 (internal quotation marks omitted). Instead,

> its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Id. The Court conducts this inquiry "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," id., recognizing "that police officers are often

---

[16] The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV.

forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation," id. at 397. Ultimately, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id.

In addition, "[t]o establish personal liability under [Section] 1983, . . . the plaintiff must affirmatively show that the official charged acted personally in the deprivation of the plaintiff's rights[,]" i.e., that "the official's own individual actions must have violated the Constitution." Williamson, 912 F.3d at 171 (brackets, citation, and internal quotation marks omitted); see also id. (explaining that "mere knowledge of such a deprivation does not suffice"). As a general matter, however, "an officer possesses an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers." Randall v. Prince George's Cnty., 302 F.3d 188, 203 (4th Cir. 2002) (internal quotation marks omitted). "Therefore, an officer may be liable under [Section] 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Id. at 204 (footnote omitted). "The rationale underlying

66

the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." Id. at 204 n.24. Notably, though, "[i]f the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible." Id. In other words, "[o]fficers will not face bystander liability where they do not observe the use of force, or when they arrive after other officers have arrested an individual with allegedly excessive force." Thomas v. Holly, 533 F. App'x 208, 221 (4th Cir. 2013).

a. Officer Faw

As detailed above, the Amended Complaint asserts that, in the course of Plaintiff's arrest, Officer Faw used excessive force against Plaintiff, breaking and then restraining his leg in a manner that unnecessarily caused Plaintiff increased pain. (See Docket Entry 43-1 at 3-4.) In particular, Plaintiff avers that, "[a]t the time [Officer] Faw is pulling [] Plaintiff's leg towards him [ P]laintiff is yelling that he is not resisting and 'You gonna break my leg[,]'" and that "[his] hands were behind his back well before the injury yet officers did not cuff him." (Docket Entry 43-1 at 4 (stray quotation mark omitted).)

For his part, Officer Faw disputes those averments, and maintains that, "[a]t all times during [his] encounter with [Plaintiff], [Officer Faw] used force that was reasonable in the

67

tense, uncertain, and rapidly evolving circumstances." (Docket Entry 76-1. ¶ 27.) As discussed in more detail above, Officer Faw supported that position with the following averments:

1) when Officer Faw arrived at the scene, "[he] saw that Officer Reyes and Officer Coppola were attempting to gain control of [Plaintiff], who was on his back on the ground[,]" and "[Officer Faw] observed Officer Reyes with his gun drawn and pointed at [Plaintiff] yelling the command to 'get your hand out of your pocket'" (id., ¶ 12);

2) "[a] knife can be small and easily concealed in a pocket and . . . [f]irearms (especially handguns) can be small in size and easily concealed within the waistband of a person's pants or their pockets" (id., ¶ 13);

3) "[Plaintiff] was tensing his arms and legs and resisting being placed into handcuffs . . . and was moving and struggling with the officers" (id., ¶ 14);

4) "[d]ue to Officers Reyes and Coppola being on either side of [Plaintiff] and attempting to control his upper body, [Officer Faw] made the decision to attempt to control [Plaintiff]'s lower body in order to help the other officers roll [him] into a prone position (face down), and to then utilize the bent knee control/compression technique" (id., ¶ 17);

5) "[Officer Faw] received departmental training on the bent knee control/compression technique" and "underst[oo]d[ ] that this technique was taught (after the George Floyd incident highlighted the dangers of positional asphyxia) as an alternative way to bring a suspect under control that would greatly reduce the chances of positional asphyxiation" (id.);

6) "[Officer Faw] then grabbed [Plaintiff]'s right ankle with [Officer Faw's] right hand and attempted to bend his leg, in a natural bend, knowing that if [Plaintiff]'s knee were naturally bent, it would make it easier to roll him onto the prone position[,]" but that "[t]his was unsuccessful due to [Plaintiff] resisting by tensing his leg and locking it in the straight position" (id., ¶ 18);

68

7) "[Officer Faw] attempted to overcome [Plaintiff]'s resistance by delivering hard hand strikes to what [Officer Faw] believed to be the back of [Plaintiff]'s right knee," but "this was ineffective due to [Plaintiff]'s strength" (id., ¶ 20);

8) "[Plaintiff]'s blue jeans were baggy in nature and worn well below his waistline, which obscured [Officer Faw's] view of the angle of [Plaintiff's] leg[,]" and "[t]his fact, coupled with [Plaintiff]'s violent tossing and turning, made it difficult for [Officer Faw] to ascertain exactly where [Plaintiff]'s knee was" (id., ¶ 21);

9) "[Officer Faw] then transitioned both of [his] hands on [Plaintiff]'s right ankle and placed [Officer Faw's] right knee against what [he] believed to be the back of [Plaintiff's] knee in order to create a fulcrum, or bending point, to assist [Officer Faw] in gaining control of [Plaintiff's] leg and . . . to force [his] knee to bend in a natural bend and complete rolling [him] onto his stomach" (id.);

10) "[Officer Faw] felt [Plaintiff]'s knee bend at almost the exact moment that Officer Reyes, Officer Coppola, and [Officer Faw] rolled [Plaintiff] onto his stomach[,]" and "[Officer Faw] felt or heard a popping noise around the time that [Plaintiff] was rolled onto his stomach[,]" but "did not immediately know that [Plaintiff]'s knee had been injured or the extent of any injury" (id.);

11) "[Officer Faw] was able to step [his] left leg through the bend of [Plaintiff]'s leg and squat down into the bent knee control/compression technique position" (id.);

12) "[i]mmediately after [Plaintiff] was rolled onto his stomach, [he] started yelling that his knee was injured[,]" but "[Officer Faw] did not immediately know the extent of [Plaintiff]'s knee injury, and [Officer Faw's] immediate focus at that time was to bring [Plaintiff] under control by handcuffing him behind his back" (id., ¶ 22);

13) "[Officer Faw] heard another officer yell 'quit reaching' again, indicating to [Officer Faw] that [Plaintiff] was continuing to resist, and continuing to reach toward []his pocket or pockets" (id.);

69

14) "[officers] are trained to . . . stay in the bent knee compression/control technique position until the subject is secured" (id.) and, "[a]fter verifying that [Plaintiff] was handcuffed and secure, [Officer Faw] began to exit the bent knee control/compression technique position" (id., ¶ 23); and

15) "[t]he combination of [Plaintiff] resisting, together with the darkness and baggy jeans making it difficult to judge the exact location of [his] knee, and [Plaintiff] resisting as [officers] tried to roll him onto his stomach, combined in such a way as to accidentally injure [Plaintiff]'s knee" (id., ¶ 27).

Those averments show that Officer Faw faced "tense, uncertain, and rapidly evolving circumstances," Graham, 490 U.S. at 396, and that he used each application of force (grabbing Plaintiff's right ankle, striking the back of Plaintiff's right knee, bracing Officer Faw's knee against Plaintiff's right knee) to accomplish the goal of rolling Plaintiff over onto his stomach so that officers could handcuff his hands behind his back. Moreover, Officer Faw only used greater applications of force, i.e., hand strikes to Plaintiff's knee and bracing against Plaintiff's knee, when previous applications did not prove successful. Furthermore, Officer Faw utilized the bent knee control/compression technique position to accomplish the goal of securing Plaintiff's position so that officers could handcuff Plaintiff's hands behind his back without exposing him to the risk of positional asphyxiation and released that position as soon as officers handcuffed Plaintiff.

In turn, the officers' body camera footage "blatantly contradicts," Scott, 550 U.S. at 380, Plaintiff's averments that

70

"[he] was yelling that he [wa]s not resisting[,]" and that "[his] hands were behind his back well before the injury yet officers did not cuff him" (Docket Entry 43-1 at 4). That footage, as described more fully above, does not reflect any statements by Plaintiff while he remained on the ground that he "[wa]s not resisting" (id.) and, in fact, demonstrates that Plaintiff continually refused to place his hands behind his back for handcuffing and disobeyed the officers' orders to keep his hands out of his pockets and to stop reaching. It also shows that Officer Faw physically engaged with Plaintiff while he actively resisted the officers for approximately one minute and thirteen seconds (1:47 - 3:00), and disengaged from Plaintiff as soon as officers successfully handcuffed Plaintiff's hands behind his back (3:00).

Thus, "[s]ignificantly, there is [] no evidence that, once Plaintiff was handcuffed and under control, any further physical force was used against him." Smalls v. Dorchester Cnty. Sheriff's Dep't, No. CIV.A. 9:10-421, 2011 WL 1042764, at *7 (D.S.C. Feb. 16, 2011) (unpublished), recommendation adopted, 2011 WL 979030 (D.S.C. Mar. 18, 2011) (unpublished); see also Dunn v. Vanmeter, No. 5:09CV85, 2010 WL 3154972, at *5 (W.D. Va. Aug. 9, 2010) (unpublished) ("[T]he fact that [the officer] stopped using force immediately after [the plaintiff] was restrained suggests that the force used by [the officer] was only that which was necessary to effect [the plaintiff]'s arrest."). That competent evidence "of

undisputed authenticity," Harris, 927 F.3d at 276, overcomes Plaintiff's "self-serving allegations unsupported by any corroborating evidence," Pronin, 628 F. App'x at 161, and establishes that a "material element of [P]laintiff's account," i.e., that he did not resist officers while on the ground and had his hands behind his back well before his knee injury, qualifies as "blatantly and demonstrably false," Harris, 927 F.3d at 276 (internal quotation marks omitted). Moreover, consideration of the Graham factors further demonstrates that Officer Faw's use of force qualified as objectively reasonable under the circumstances at issue, thus entitling him to summary judgment.

With regard to the first Graham factor, the severity of the crimes at issue, Officer Reyes averred that, while on "routine patrol," he "observed a gold in color Cadillac backed into a driveway" with "a male in the driver's seat and a male standing outside of the car at the driver's side door." (Docket Entry 38-1, ¶ 3.) As Officer Reyes drove past, "the male who was standing at the driver's side door looked at [Officer Reyes] and began to walk away from the [Cadillac]" (id.) and, thus, Officer Reyes developed "reasonable suspicion and belief that the operator of this Cadillac [later identified as Plaintiff] was possibly completing a 'hand-to-hand' drug transaction]" (id., ¶ 5). After Officer Reyes effected a traffic stop of Plaintiff's Cadillac, Officer Reyes "observe[d] a white Styrofoam cup containing a

72

substance [he] believed to be marijuana, placed under the vehicle, right below the driver's side door where [Plaintiff] had just exited." (Id., ¶ 8.) Moreover, as the officers' body camera footage makes clear, Officer Reyes's radio communications advised those officers to "[b]lock in the Cadillac" because "there [wa]s VCSA underneath the car" (see, e.g., Docket Entry 76-1, ¶ 9 (containing Officer Faw's averments that "Officer Reyes [] shouted, 'Block in the Cadillac, there is VCSA underneath the car'" and that "'VCSA' is used to refer to illicit drugs and narcotics due to it being a Violation of the Controlled Substance Act")), thus alerting the officers of evidence confirming his reasonable suspicion of Plaintiff's involvement in drug dealing.[17]

---

[17] Notably, after officers had handcuffed Plaintiff, Officer Reyes returned to the Cadillac where other officers had conducted a search of that car. (Id., ¶ 25.) Those officers had located the Styrofoam cup, which contained "a clear sandwich bag with a green flaky substance consistent with marijuana" (id.), "a smaller plastic baggie containing a green flaky substance consistent with marijuana" (id., ¶ 26), and "two other plastic baggies[,]" one of which "contained a white powdery substance which [Officer Reyes] suspected to be cocaine" and another of which "contained white rock substances which [he] suspected to be crack cocaine" (id.). Officer Reyes then "conducted a more thorough search of the [Cadillac] and located two smaller plastic baggies with a white powdery substance in the center cup holder and . . . in between the center console and the passenger seat (id., ¶ 27), "[a] green digital scale . . . in the center console" (id., ¶ 28), "a brown small book bag" on "the passenger seat" containing "multiple plastic baggies" (id., ¶ 30) and "[a] large sum of cash[,]" with "[m]ost of the money . . . crumbled up into a ball or folded up flat . . . consistent with the sale of illegal narcotics" (id., ¶ 28), "multiple[] 'tear offs' . . . under the seats and between the center console and seats" (id., ¶ 30), and "[a] second digital scale" (id., ¶ 32). Officer Reyes "went to Beaty training center" and "weighed and packaged everything seized[,]" which included "23.77 [grams] of marijuana," "7.12 [grams] of crack cocaine," and "2.22 [grams] of powder cocaine." (Id., ¶ 34.) Officer Reyes further averred that, following Plaintiff's arrest, he pled guilty to felony possession of cocaine with intent to sell or deliver in violation of N.C. Gen. Stat. § 90-95(a)(1), felony possession of marijuana with intent to sell or deliver in violation of N.C. Gen. Stat. § 90-95(a)(1), misdemeanor resisting a public officer in violation of N.C. Gen. Stat. § 14-223, and misdemeanor maintaining a vehicle for the purpose of keeping or selling controlled substances in violation
(continued...)

73

The undisputed facts thus show that "a reasonable officer on
the scene," Graham, 490 U.S. at 396, would have possessed probable
cause to believe Plaintiff had engaged in serious criminal activity
under the first Graham factor, see, e.g., Walker v. City of
Houston, No. 22-20537, 2023 WL 6457926, at *3 (5th Cir. Oct. 4,
2023) (unpublished) ("[The plaintiff] does not dispute that the
officers had probable cause to arrest him for the delivery of a
controlled substance, which is a serious offense.  Accordingly, we
agree with the district court that this factor weighs in favor of
the officers." (internal citation omitted)); Darden v. City of Fort
Worth, Tex., 880 F.3d 722, 729 (5th Cir. 2018) ("The magistrate
judge who issued the warrant determined that there was probable
cause to believe that suspects at the residence were dealing drugs.
These types of drug crimes are certainly serious
offenses . . . .  Thus, the severity of the crime at issue weighs
in favor of the officers."); Jackson v. City of Leland, No.
4:18CV181, 2020 WL 4318762, at *9 (N.D. Miss. July 27, 2020)
(unpublished) (holding that, given "[the o]fficer['s ] concern that
[the plaintiff] had recently been engaged in selling crack
cocaine, . . . the severity of the crimes at issue weigh[s] in
favor of [the o]fficer['s ] position"); Darnell v. Jolly, No.

    [17](...continued)
of N.C. Gen. Stat. § 90-108(a)(7), and received a sentence of 16 to 29 months in
prison.  (See id., ¶¶ 36-37.)  Significantly, Plaintiff's Amended Complaint does
not offer any facts to refute those averments by Officer Reyes.  (See Docket
Entries 43-1, 43-2.)

74

2:18CV142, 2019 WL 5677551, at *6 (N.D. Tex. Sept. 27, 2019) (unpublished) ("[The o]fficer [] suspected [the plaintiff] of possessing a controlled substance — a state felony — of which [the plaintiff] was ultimately convicted. . . . The severity of the suspected crimes at issue weigh in favor of [the officer]." (internal citations omitted)), recommendation adopted, 2019 WL 5653430 (N.D. Tex. Oct. 30, 2019) (unpublished). Accordingly, the Court should find that the first Graham factor weighs strongly in favor of Officer Faw.

Next, the Court must consider "whether [Plaintiff] posed an immediate threat to the safety of the officers or others." Graham, 490 U.S. at 396. Plaintiff's Amended Complaint avers that, "[d]uring [his] arrest while laying [sic] face down[,] . . . [he] at th[at] time was not . . . kicking, flailing or in any other way utilizing his legs and/or feet in a way that would be considered threatening or assaultive to any officer present[,]" and "[his] pants and underwear were down to the point where his buttocks and [g]enitals were exposed which show[ed] no weapon in [his] waist area." (Docket Entry 43-1 at 3.)

Contrary to those averments, the officers' body camera footage demonstrates that Plaintiff posed an immediate threat to officers throughout their entire interaction with him. As summarized in detail above, that footage shows that 1) Officer Reyes observed Plaintiff in the middle of a hand-to-hand drug transaction at

75

approximately midnight in a residential area, 2) when Officer Reyes attempted a traffic stop of Plaintiff, he ran from Officer Reyes and repeatedly ignored Officer Reyes's commands to stay in the car, put Plaintiff's hands on the car, get on the ground, and get his hands out of his pockets, 3) Plaintiff repeatedly tried to attract the attention of someone inside a residence instead of complying with Officer Reyes's commands, 4) when Officer Reyes tried to grab Plaintiff, he pulled back from Officer Reyes, bladed his stance, and clenched his fist, and 5) during Plaintiff's scuffle with officers while on the ground, Plaintiff repeatedly ignored the officers' requests that he put his hands behind his back, stop reaching, and get his hands out of his pocket, all while actively resisting the officers' efforts to turn him onto his stomach. Moreover, the location of Plaintiff's jeans and underwear below his hips did not rule out the possibility that he had a weapon in the pockets of his baggy jeans, as bourne out by Officer Faw's request that officers search Plaintiff for weapons after officers handcuffed him.

The competent evidence thus "blatantly contradicts" Plaintiff's self-serving averments in the Amended Complaint such that "no reasonable jury could believe it." Scott, 550 U.S. at 380. Accordingly, the Court should find that Plaintiff posed an immediate threat to the officers under the second Graham factor. See Cadena v. Ray, 728 F. App'x 293, 296 (5th Cir. 2018)

76

(unpublished) (observing that suspect who backed away from officers after being ordered to place his hands behind his back posed "an immediate threat" to those officers under Graham); Poole v. City of Shreveport, 691 F.3d 624, 629 (5th Cir. 2012) (finding that, in "tense, uncertain, and rapidly evolving" situation, "[the suspect], upon refusing to turn around and be handcuffed, posed an immediate threat to the safety of the officers," noting that the suspect "could [] reach for any concealed weapons in his pockets" (internal quotation marks omitted)); Givens v. Demaioribus, No. 3:09CV158, 2012 WL 706122, at *7 (W.D.N.C. Mar. 5, 2012) (unpublished) ("It is reasonable for officers to believe that a person engaged in selling crack cocaine on a city street at night poses a danger to their safety, as there is a strong connection between the sale of drugs and the use of guns to protect those engaged in such criminal conduct. . . . An officer effectuating an on-the-street arrest, at night, of a person engaged in the sale of crack cocaine could reasonably believe that the person presented an immediate threat to the safety of the officer." (citing United States v. Grogins, 163 F.3d 795, 799 (4th Cir. 1988))).

The third Graham factor tasks the Court with determining "whether [Plaintiff wa]s actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Plaintiff avers that, "[d]uring [his] arrest while laying [sic] face down[,] . . . [he] at this time was not trying to run." (Docket

Entry 43-1 at 3.) That averment entirely fails to establish that Plaintiff did not "actively resist[] arrest or attempt[] to evade arrest by flight," Graham, 490 U.S. at 396. Although Plaintiff may not have (and likely could not have) run during the time that officers had him in the prone position while attempting to handcuff his hands behind his back, the Arresting Officers' body camera footage shows that Plaintiff 1) ran from Officer Reyes and repeatedly ignored Officer Reyes's commands to stay in the car, put Plaintiff's hands on the car, get on the ground, and get his hands out of his pockets, 2) pulled back from Officer Reyes, bladed his stance, and clenched his fist when Officer Reyes tried to grab Plaintiff, and 3) repeatedly ignored the Arresting Officers' requests that Plaintiff put his hands behind his back, stop reaching, and get his hands out of his pocket, all while actively resisting their efforts to turn him over onto his stomach.

Such evidence thus establishes that Plaintiff "actively resist[ed] arrest" and "attempt[ed] to evade arrest by flight," Graham, 490 U.S. at 396, and thus, the third Graham factor strongly weighs in Officer Faw's favor. See Walker, 2023 WL 6457926, at *4 ("[The plaintiff] maintains that the district court erroneously determined that th[e third Graham] factor weighed in favor of the officers because he complied with all commands of [an officer] and at no point during this period did [the plaintiff] resist arrest. [H]is argument is wholly belied by the videotape evidence in the

record. . . . [The plaintiff] quite clearly resisted arrest from the moment [the officer] ordered him to exit the vehicle. First, he refused to allow [the officer] to cuff both of his hands by pulling away when the officer placed the handcuff on one hand and then attempted to cuff his other hand. . . . Additionally, [the plaintiff] continued to argue, scream, and curse at officers during the entire incident telling them to let him go and declaring that he 'ain't did nothing.' The videotape footage shows him physically fighting and resisting officers at every turn to the point where the officers actually told him to 'quit fighting' and just 'relax' and 'breathe[.]'" (some internal quotation marks and brackets omitted)); Braley v. Thompson, No. 2:22CV534, 2024 WL 4481043, at *3 (S.D.W. Va. Oct. 11, 2024) (unpublished) ("[The p]laintiff refused to move away from his vehicle and, once he was on the ground, resisted attempts to place him in handcuffs. A reasonable officer would perceive these actions as those of an individual resisting arrest."), appeal dismissed, No. 24-7088, 2025 WL 1380503 (4th Cir. Jan. 15, 2025); Dunn, 2010 WL 3154972, at *5 (concluding that arresting officer could "reasonably [] construe[]" the plaintiff's actions in "walk[ing] several yards away from [the officer] and attempt[ing] to enter [the suspect's] house" and "struggling while [the officer] was attempting to handcuff [the plaintiff] on the ground . . . as conduct resisting or evading arrest" under Graham).

79

In sum, all three <u>Graham</u> factors strongly weigh against Plaintiff and the record before the Court establishes as a matter of law that Officer Faw did not use unreasonable, excessive force against Plaintiff. <u>See, e.g.</u>, <u>Lamson v. Koon</u>, No. CV 9:18-812, 2019 WL 9341411, at *8 (D.S.C. July 16, 2019) (unpublished) ("[The p]laintiff has failed to submit evidence sufficient to create a genuine issue of fact as to whether [the officers] used constitutionally excessive force on [the plaintiff] in effecting his arrest. [The p]laintiff does not dispute anywhere in his filings that the events at issue occurred at night when it was dark, that he fled from the Sheriff's deputies by way of a high speed chase, and was only apprehended after he had wrecked his vehicle and had then continued to flee on foot in an attempt to escape capture. Under the <u>Graham</u> 'objective reasonableness' standard, all of these factors no doubt placed the officers on a high alert status. Having fled from the officers, and then only having been caught along a tree line by a fence in the dark after attempting to evade capture, [the p]laintiff was then taken to the ground and handcuffed. Under such circumstances, there was no way for the officers to know if [the p]laintiff was in possession of a weapon or what his next move might be. . . . It was manifestly reasonable for the officers to use some degree of force to secure the [p]laintiff under these facts, both to ensure their own safety as well as the [p]laintiff's." (internal citation omitted)),

80

recommendation adopted as modified, 2020 WL 2393928 (D.S.C. Apr. 29, 2020) (unpublished).

In light of the foregoing analysis, the Court should grant the Summary Judgment Motion as to Plaintiff's excessive force claim against Officer Faw.

b.   Officer Coppola

Plaintiff's Amended Complaint avers that "Officer[ ] Coppola . . . listened and watched as Officer Faw intentionally applied the extreme and tremendous force that it took to dislocate Plaintiff's knee," disregarding his "pleas that '[Officer] Faw was breaking his leg'" and instead "drown[ing] out these pleas with loud shouts of 'stop reaching[,]' 'stop resisting[,'] etc." and thus "did nothing to intervene to prevent the injury."  (Docket Entry 43-1 at 4; see also Docket Entry 43-2 at 6 ("[Officer] Coppola . . . restrained Plaintiff in prone position while [Officer] Faw dislocated Plaintiff's knee. . . .   No officers intervened.").)

Officer Coppola avers that he neither saw nor knew that any other officer used excessive force against Plaintiff, as well as that, at the relevant time, he remained focused on attempting to restrain and handcuff Plaintiff and did not see the injury occur. (Docket Entry 76-2, ¶ 10.)  Officer Coppola further avers that, "[i]f, during the encounter with [Plaintiff], [Officer Coppola] had seen or had knowledge of any officer violating [Plaintiff's]

81

constitutional rights, [Officer Coppola] would have attempted to stop the violation[; h]owever, [he] did not see, or have knowledge of, any officer violating [Plaintiff's] constitutional rights." (Id.)

As discussed above, to establish a bystander liability claim against Officer Coppola, Plaintiff must show that Officer Coppola (1) knew that Officer Faw was violating Plaintiff's fourth-amendment rights, (2) had a reasonable opportunity to prevent this harm, and (3) chose not to act. See Randall, 302 F.3d at 204. Given Officer Coppola's averments and his body camera footage, Plaintiff cannot make that showing. To begin, the body camera footage, as detailed above, establishes that Officer Coppola did not have a reasonable opportunity to stop Officer Faw from dislocating Plaintiff's knee. The dislocation occurred in mere seconds, without any advance warning from Plaintiff's comments or any visible indication from Officer Coppola's vantage point — late at night, in poor lighting, positioned at Plaintiff's torso, while attempting to restrain and handcuff the resistant Plaintiff — that Officer Faw acted in a manner that endangered Plaintiff. The brief glimpse Officer Coppola's video (and thus his vantage point) provides of Plaintiff's right leg during the relevant moments did not reveal any injury; instead, it showed Plaintiff's leg bent in a natural position with the baggy nature of his jeans obscuring any otherwise-apparent physical signs of injury. On the record before

the Court, where Officer Coppola avers that he did not see Officer Faw injure Plaintiff's knee (see Docket Entry 76-2, ¶ 10), the video provides no visible sign of the dislocated knee until well after the injury occurred, and Officer Coppola remained engaged in restraining Plaintiff during the period when Officer Faw bent Plaintiff's knee, a reasonable factfinder would have no basis for discrediting Officer Coppola's sworn statement that he did not see or know about any officer violating Plaintiff's rights during this encounter (see id.).

Accordingly, the Court should enter summary judgment for Officer Coppola on Plaintiff's excessive force claim against Officer Coppola.[18]

c.   Officers Walker, Hollifield, and Vanburen

Plaintiff's Amended Complaint avers that "Officers . . . Walker, Hollifield, [and] Vanburen[] listened and watched as Officer Faw intentionally applied the extreme and tremendous force that it took to dislocate Plaintiff's knee," disregarding his "pleas that '[Officer] Faw was breaking his leg'" and instead "drown[ing] out these pleas with loud shouts of 'stop reaching[,]' 'stop resisting[,'] etc." and thus "did nothing to intervene to prevent the injury."  (Docket Entry 43-1 at 4; see also Docket Entry 43-2 at 6 ("[Officers] Walker and Hollifield

_____

[18] Alternatively, because the record does not support a claim that Officer Faw used excessive force, Officer Coppola could not face liability for failing to intervene to stop Officer Faw's use of force.  See Randall, 302 F.3d at 203.

83

restrained Plaintiff in prone position while [Officer] Faw dislocated Plaintiff's knee.  [Officer] Vanburen watched.  No officers intervened.").)

As summarized in more detail above, Officer Walker averred that, when he arrived at the scene, "[he] observed three officers in an active struggle with [Plaintiff,]" and "observed [Plaintiff] to be laying [sic] face down in a grassy area jury beyond the curb of New Walkertown Road."  (Docket Entry 76-3, ¶ 5 (emphasis added).)  Additionally, Officer Walker averred that, at the time of his arrival at the scene, his body camera footage reflects that "[Plaintiff] yell[ed] something to the effect that his knee had been broken, but [Officer Walker] d[id] not remember hearing that at the time."  (Id. (emphasis added).)  Officer Walker confirmed that "[t]he injury to [Plaintiff]'s knee occurred before [Officer Walker] arrived at the scene."  (Id., ¶ 10 (emphasis added).)  For his part, Officer Hollifield averred that, "[w]hen [he] arrived at the scene, . . . the officers were in the process of taking [Plaintiff] into custody" and that, "[d]ue to having no room to assist, [he] stood by and watched."  (Docket Entry 76-4, ¶ 4.)  Officer Hollifield further averred that "[he] did not physically engage with, or touch, [Plaintiff]" (id.), as well as that "[t]he injury to [Plaintiff]'s knee occurred before [Officer Hollifield] arrived at the scene" (id., ¶ 7 (emphasis added).)  In turn, Officer Vanburen averred that, "[b]y the time [he] reached

84

[Plaintiff], he was <u>already on his stomach</u>, and officers were trying to handcuff him." (Docket Entry 76-5, ¶ 7 (emphasis added).) All three officers averred that "[they] did not know how the injury occurred[,]" and that, "[i]f [they] had seen or had knowledge of any officer violating [Plaintiff]'s constitutional rights, [they] would have attempted to stop the violation[,]" but that "[they] did not see, or have knowledge of, any officer violating [Plaintiff]'s constitutional rights." (Docket Entry 76-3, ¶ 10; <u>see also</u> Docket Entry 76-4, ¶ 10; Docket Entry 76-5, ¶ 7.) Moreover, as summarized in more detail above, those officers' body camera footage confirms that Officers Reyes, Coppola, and Faw had already rolled Plaintiff into the prone position and thus that the injury to his knee had already occurred by the time Officers Walker, Hollifield, and Vanburen arrived at the scene.

In light of that evidence, no reasonable juror could discredit the averments of Officers Walker, Hollifield, and Vanburen that they did not see or know about any violation of Plaintiff's constitutional rights by Officer Faw, and no reasonable juror could thus find that those officers had a reasonable opportunity to prevent Officer Faw from injuring Plaintiff's knee and chose not to act. See <u>Randall</u>, 302 F.3d at 204.[19]

---

[19] Alternatively, because the record does not support a claim that Officer Faw used excessive force, Officers Walker, Hollifield, and Vanburen could not face liability for failing to intervene to stop his use of force. <u>See</u> <u>Randall</u>, 302 F.3d at 203.

In short, the Court should grant the Summary Judgment Motion as to Plaintiff's bystander excessive force claims against Officers Walker, Hollifield, and Vanburen.

d.  Qualified Immunity

The Arresting Officers argue that "each [Arresting] Officer, in his individual capacity, is entitled to qualified immunity because each officer's specific actions under the circumstances of this case did not violate the Constitution, or alternatively[,] because a reasonable officer in the same circumstances as each officer could have believed his actions were lawful." (Docket Entry 76 at 7 (block formatting omitted).)

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Brown v. Gilmore, 278 F.3d 362, 366-67 (4th Cir. 2002) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). "The Supreme Court has directed that 'qualified immunity questions should be resolved at the earliest possible stage of a litigation.'" Smith v. Reddy, 101 F.3d 351, 357 (4th Cir. 1996) (quoting Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987)). In

86

analyzing qualified immunity, the Court must consider (1) "whether a constitutional violation occurred," and (2) "whether the right violated was 'clearly established' at the time of the official's conduct." Williams v. Ozmint, 716 F.3d 801, 805 (4th Cir. 2013). The Court possesses discretion to address either prong first. See Henry, 652 F.3d at 531.

Here, as the foregoing analysis demonstrates, the record, viewed in the light most favorable to Plaintiff, fails to support a finding that the Arresting Officers violated Plaintiff's constitutional rights. Therefore, as an additional basis on which the Court may grant the Summary Judgment Motion, qualified immunity bars Plaintiff's excessive force claims against the Arresting Officers.

2.    Assault and Battery Claims[20]

Under North Carolina law, an individual may pursue "a civil action for damages for assault and battery . . . against one who, for the accomplishment of a legitimate purpose, such as justifiable arrest, uses force which is excessive under the given circumstances." Myrick v. Cooley, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496 (1988) (citing 6 Am. Jur. 2d Assault and Battery § 122 (1963)). "Under the common law, a law enforcement officer

---

[20] Because Plaintiff's state-law claims "derive from a common nucleus of operative fact" with his federal claim, such that he "would ordinarily be expected to try them all in one judicial proceeding," this Court may properly exercise supplemental jurisdiction over those claims. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966); see also 28 U.S.C. § 1367(a).

87

has the right, in making an arrest and securing control of an offender, to use only such force as may be reasonably necessary to overcome any resistance and properly discharge his duties." Id., 371 S.E.2d at 496. Accordingly, "[h]e may not act maliciously in the wanton abuse of his authority or use unnecessary and excessive force." Id., 371 S.E.2d at 496 (internal quotation marks omitted); see also N.C. Gen. Stat. § 15A-401 (specifying circumstances under which "a law-enforcement officer is justified in using force upon another person" and noting that "[n]othing in this subdivision constitutes justification for willful, malicious or criminally negligent conduct by any person which injures or endangers any person or property, nor shall it be construed to excuse or justify the use of unreasonable or excessive force"). In addition, "'[c]ivil liability for an assault and battery is not limited to the direct perpetrator of the act charged; it extends to any person who by any means encourages or incites that act or aids and abets it.'" Toone v. Adams, 262 N.C. 403, 409, 137 S.E.2d 132, 136 (1964) (quoting 6 Am. Jur. 2d Assault and Battery § 128).

Importantly, "[t]he threshold for determining whether the limits of privileged force have been exceeded for purposes of liability under Section 1983 is higher than that for a normal tort action." Myrick, 91 N.C. App. at 215, 371 S.E.2d at 496. Thus, "[w]here a plaintiff brings both a [Section] 1983 excessive force claim and a common law claim for assault and battery, the court's

determination of the reasonableness of the force used with respect to the [Section] 1983 claim controls its assault and battery analysis," 6 Am. Jur. 2d <u>Assault and Battery</u> § 96 (2024).  <u>See</u> <u>Main v. Wingler</u>, No. 5:22CV157, 2024 WL 871384, at *9 (W.D.N.C. Feb. 29, 2024) (unpublished) ("The Fourth Circuit has recognized that[] 'the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence.' Therefore, state law tort claims that are premised on an officer's reasonable, non-excessive use of force are not actionable under North Carolina law." (quoting <u>Njang v. Montgomery Cnty., Maryland</u>, 279 F. App'x 209, 216 (4th Cir. 2008))); <u>Morgan v. City of Charlotte</u>, No. 3:22CV3, 2023 WL 4002524, at *15 (W.D.N.C. June 14, 2023) (unpublished) (observing that the plaintiff's North Carolina "battery claim[] . . . rises and falls with the excessive force claim"), <u>appeal filed</u>, No. 23-1748 (4th Cir. July 13, 2023).

Given the recommendation that the Court grant summary judgment in favor of the Arresting Officers on Plaintiff's fourth-amendment excessive force claims, Plaintiff's state-law assault and battery claims against the Arresting Officers should also fail.

3.  <u>Intentional Infliction of Emotional Distress Claims</u>

The tort of intentional infliction of emotional distress "consists of:  (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another[,]" and "may also exist where defendant's actions indicate

89

a reckless indifference to the likelihood that they will cause severe emotional distress." <u>Dickens v. Puryear</u>, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). "Extreme and outrageous conduct is defined as conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Clark v. Clark</u>, 280 N.C. App. 403, 414, 867 S.E.2d 704, 715 (2021) (internal quotation marks omitted). Procedurally,

> [t]he initial determination of whether conduct is extreme and outrageous is a question of law for the court: [i]f the court determines that it may reasonably be so regarded, then it is for the jury to decide whether, under the facts of a particular case, defendants' conduct was in fact extreme and outrageous.

<u>Norton v. Scotland Mem'l Hosp., Inc.</u>, 250 N.C. App. 392, 398, 793 S.E.2d 703, 708 (2016) (brackets, ellipsis, and internal quotation marks omitted).

An assault and/or battery "may amount to extreme and outrageous conduct which is intended to cause and which does cause severe emotional distress," thereby also satisfying the elements of an intentional infliction of emotional distress claim. <u>Holloway v. Wachovia Bank & Tr. Co.</u>, 339 N.C. 338, 354, 452 S.E.2d 233, 242 (1994). In turn, "[t]he severe emotional distress required for intentional infliction of emotional distress is 'any emotional or mental disorder, such as for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe or disabling

90

emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.'" <u>Ellis v. FNU Masscegee</u>, No. 3:21CV271, 2022 WL 20872, at *4 (E.D.N.C. Jan. 3, 2022) (unpublished).

Here, as shown by the foregoing analysis of Plaintiff's excessive force claims, the record before the Court does not reflect that the Arresting Officers engaged in "extreme and outrageous" conduct, either deliberately to cause Plaintiff severe emotional harm or with reckless indifference to the likelihood of such harm.  Beyond that, as discussed above, "state law tort claims that are premised on an officer's reasonable, non-excessive use of force are not actionable under North Carolina law." <u>Main</u>, 2024 WL 871384, at *9; <u>see also</u> <u>Wilcoxson v. Painter</u>, 2016 WL 866327, *10 (E.D.N.C. March 3, 2016) (unpublished) ("Where a law enforcement officer's use of force was reasonable for the purposes of . . . a [Section] 1983 excessive force claim, it is fatal to the [p]laintiff's state law tort claims.").

In light of that analysis, the Court should also enter summary judgment for the Arresting Officers on Plaintiff's intentional infliction of emotional distress claims against them.

4.    <u>Public Officer Immunity</u>

Lastly, the Arresting Officers argue that "each individual [officer] is entitled to public officer's immunity" with regard to Plaintiff's state-law claims against them.  (Docket Entry 76 at 21

91

(block formatting omitted).) "In North Carolina, official immunity protects public officials performing discretionary acts under color of authority from suit in their individual capacity." Evans v. Chalmers, 703 F.3d 636, 656-57 (4th Cir. 2012) (citing Moore v. Evans, 124 N.C. App. 35, 41, 476 S.E.2d 415, 421 (1996)). Moreover, "[p]olice officers engaged in performing their duties are public officials for the purposes of public official immunity." Lopp v. Anderson, 251 N.C. App. 161, 168, 795 S.E.2d 770, 776 (2016). "As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." Smith v. State, 289 N.C. 303, 331, 222 S.E.2d 412, 430 (1976). Conduct qualifies as "malic[ious] when [a public official] wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984).

Significantly, "the analysis of public officers' immunity is functionally identical to [the undersigned's] discussion of the [Arresting] Officers' entitlement to qualified immunity with respect to the [Section] 1983 claims." Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013). "An officer acts with malice when he 'does that which a man of reasonable intelligence would know to be

92

contrary to his duty,' i.e., when he violates a clearly established right." Id. (quoting Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003)). Because the Arresting Officers did not violate Plaintiff's constitutional rights, those officers could not have violated a clearly established right and, thus, Plaintiff has not shown that the Arresting Officers acted with malice.

Put simply, public officers' immunity bars Plaintiff's state law claims against the Arresting Officers, entitling them to summary judgment on those claims on that basis as well.

## IV. CONCLUSION

On the record before the Court, Plaintiff's excessive force, assault and battery, and intentional infliction of emotional distress claims against the Arresting Officers all fail as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 75) be granted and summary judgment be entered in favor of the Arresting Officers on Plaintiff's individual-capacity excessive force, assault and battery, and intentional infliction of emotional distress claims against them.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

March 4, 2026

93